IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| TRUDY KARR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-2134 |
| vs. | ) | |
| | ) | |
| CITY OF DECATUR, ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

Defendant's Motion for Summary Judgment
EXHIBIT A

AFFIDAVIT OF PENNY ROGERS
AND ATTACHED EXHIBITS
(under seal)

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| TRUDY KARR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-2134 |
| vs. | ) | |
| | ) | |
| CITY OF DECATUR, ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

Defendant's Motion for Summary Judgment
EXHIBIT B

DEPOSITION TRANSCRIPT - TRUDY KARR
EXHIBITS 1-12 ONLY (under seal)

1

1

2

3        IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
4

5

6   TRUDY KARR,                    )
                                   )
7                    Plaintiff     )
                                   )
8      -vs-                        )NO. 2019-CV-2134
                                   )
9   THE CITY OF DECATUR, ILLINOIS, )
                                   )
10                   Defendant     )

11

12

13        Deposition of TRUDY KARR OWNBY taken at the

14   instance of the Defendant, on June 22, 2020, at

15   the hour of 9:00 A.M., at One Gary K. Anderson

16   Plaza, Decatur, Illinois, before Sandra K.

17   Haines, CSR and Notary Public, pursuant to

18   notice.

19

20                              Sandra K. Haines
                                CSR No. 084-002423
21

22              ANCHOR REPORTING
                 P.O. Box 25471
23           Decatur, Illinois 62525-5471
                 (217)428-0946
24

2

```
 1                    APPEARANCES

 2

 3      BAKER, BAKER & KRAJEWSKI, LLC
        Attorneys at Law
 4      415 South Seventh Street
        Springfield, Illinois 62701
 5      (217)522-3445

 6           BY:  MR. JOHN A. BAKER
                  Appearing on behalf of the Plaintiff
 7

 8
        CITY OF DECATUR
 9      One Gary K. Anderson Plaza
        Decatur, Illinois  62523-1196
10      (217)424-2871

11           BY:  MR. JOHN T. ROBINSON
                  Assistant Corporation Counsel
12                Appearing on behalf of the Defendant

13

14                         PRESENT

15

16      Ms. Penny Rogers

17

18

19

20

21

22

23

24
```

1                              INDEX

2

3      Direct Examination by Mr. Robinson....  4 - 46

4      Cross Examination by Mr. Baker....... 47 - 54

5      Redirect-Examination by Mr. Robinson.. 54 - 61

6      Recross-Examination by Mr. Baker......    61

7

8                            EXHIBITS

9

10     Deposition Exhibit Number  1 .........     16

11     Deposition Exhibit Number  2 .........     18

12     Deposition Exhibit Number  3 .........     22

13     Deposition Exhibit Number  4 .........     24

14     Deposition Exhibit Number  5 .........     27

15     Deposition Exhibit Number  6 .........     30

16     Deposition Exhibit Number  7 .........     34

17     Deposition Exhibit Number  8 .........     37

18     Deposition Exhibit Number  9 .........     39

19     Deposition Exhibit Number 10 .........     40

20     Deposition Exhibit Number 11 .........     41

21     Deposition Exhibit Number 12 .........     43

22

23

24

TRUDY KARR OWNBY

1                       TRUDY KARR OWNBY

2   called as a witness herein, at the instance

3   of the Defendant, having been first duly

4   sworn/affirmed on her oath, was examined and

5   testified as follows, to-wit:

6                DIRECT EXAMINATION

7                BY MR. ROBINSON:

8     Q.   Please let the record reflect that this

9   is the deposition of Plaintiff, Trudy Karr,

10   taken pursuant to the Federal Rules of Civil

11   Procedure and notice.

12     Present is Trudy Karr, her lawyer

13   Mr. Baker, the court reporter, myself John

14   Robinson, Assistant Corporation Counsel, and

15   Penny Rogers who is the City's designated Rule

16   30(b)(6) witness.

17     Miss Karr, would you please state your name

18   and spell your last name.

19     A.   Trudy Karr Ownby.  I have married.  My

20   last name is Ownby now, O-W-N as in Nora, B as

21   in boy-Y.

22     Q.   Okay, but you were known as Trudy Karr

23   when you were employed with the City of Decatur,

24   is that correct?

1          A.    Yes, sir.

2          Q.    How long have you been married?

3          A.    Almost a year.

4          Q.    Okay.  Now, before we get started have

5    you ever given a deposition before?

6          A.    Yes, sir.

7          Q.    Okay.  So, you are probably familiar

8    with the basics.  It is my opportunity to ask

9    you questions about what you know about the

10   case.  I will ask you to wait until I finish

11   each question before you answer.  I will also

12   ask that you answer yes or no as the case may be

13   rather than uh-huh or huh-uh because the court

14   reporter is taking down the words, and we want

15   to make a clear record.  Also if you need to

16   take a break at any time, just say so.  I would

17   prefer that we, that you not take a break while

18   a question is pending, but other than that if

19   you need a break, no problem.

20         Now, getting down to it what is your date

21   of birth?

22         A.    October 23rd, 1971.

23         Q.    Your current age?

24         A.    Forty-eight.

1    Q.    Where do you currently live?

2    A.    Walled Lake, Michigan.

3    Q.    I am sorry, say it again.

4    A.    Walled Lake, Michigan.

5    Q.    How long have you been there?

6    A.    A year.

7    Q.    Okay.  Who do you live there with?

8    A.    My husband.

9    Q.    Anyone else?

10   A.    No.

11   Q.    Where did you live before you lived in

12   Walled Lake, Michigan?

13   A.    I was in Richardson, Texas.

14   Q.    How long were you there?

15   A.    Nine months.

16   Q.    With whom did you live in Richardson,

17   Texas?

18   A.    I was by myself.

19   Q.    Before you lived in Richardson, Texas

20   where did you live?

21   A.    Clinton, Illinois.

22   Q.    How long did you live in Clinton?

23   A.    Oh, goodness, I moved there in '91.

24   Q.    Well, if you prefer it, tell me the

1  years approximately, from '91 to approximately?

2      A.    I moved there in '91, and I moved out

3  in 2008.

4      Q.    Okay.  So, you lived in Clinton until

5  shortly after you became a Decatur police

6  officer?

7      A.    Yes, sir.

8      Q.    Okay.  Where did you live after you

9  left Clinton?

10     A.    I lived in -- I moved to Texas from

11  Clinton.

12     Q.    So, you became a Decatur police officer

13  in 2007, correct?

14     A.    Yes, sir.

15     Q.    Were you living in Clinton when you

16  became a Decatur police officer?

17     A.    Yes, sir.

18     Q.    Were you living in Clinton for the

19  entire time that you were serving as a Decatur

20  police officer?

21     A.    Yes.

22     Q.    So, it probably was beyond 2008?

23     A.    Hold on just a second.  Let me --

24     Q.    Maybe 2018?

1    A.    Let me see.  My son was born in -- he

2    is 20.  So, I don't know why I am having

3    difficulty with this.

4        Let's see, I graduated high school in '89.

5    I moved to Illinois in '91.  I lived in

6    Bloomington, and then I guess -- I am a little

7    bit confused.  Let's go back to what we are

8    trying to figure out here.

9    Q.    Okay.  Well, I believe you told me that

10   you lived in Clinton from approximately 1991 to

11   2008?

12   A.    Yes.

13   Q.    You became a Decatur police officer in

14   2007?

15   A.    Yes.

16   Q.    You were still a Decatur police officer

17   in 2008.  Where did you live then?

18   A.    In Clinton, Illinois.

19   Q.    Okay.  So, I am trying to piece this

20   together.  You think perhaps you lived in

21   Clinton longer than, until 2008?

22   A.    Okay.  I moved to Illinois in '91.  I

23   moved to Clinton in -- I don't know why I am

24   having such difficulty.

1     Q.    How about this way.  Did you live in

2  Clinton the entire time that you served as a

3  Decatur police officer?

4     A.    Yes, sir.

5     Q.    Okay.  So, from 2007 when you became a

6  Decatur police officer until you were no longer

7  a Decatur police officer you lived in Clinton?

8     A.    Yes, sir.

9     Q.    Okay.  What is your current employment?

10     A.    I work for Ascension Providence

11  Hospital in Novi, Michigan.

12     Q.    How long have you worked at Ascension

13  Providence Hospital in -- what is the town?

14     A.    Novi.

15     Q.    How do you spell that?

16     A.    N-O-V-I.

17     Q.    Okay.  How long have you worked there?

18     A.    I started there in -- oh, goodness, let

19  me think about this -- nine months, I think.  I

20  moved to -- I started there -- I don't know why

21  I am having such difficulty remembering this,

22  sorry.  Give me a moment.  Okay.  Let me think

23  about this.  I started -- I am sorry.  I am

24  drawing blanks.  I am not sure why.

1     Q.    Okay, do you want to take a break?

2           MR. BAKER:  Yes, let's take a break

3     real quick.  Thank you.

4         (Whereupon the deposition was in

5          recess.)

6           MR. ROBINSON:  I am sorry, I forgot

7     where we were at.  Could I ask the court

8     reporter to read back the last question.

9         (Whereupon the reporter then read the

10         requested testimony.)

11    A.    I started there in October.

12    Q.    Of this year?  No, of last year?

13    A.    Yes, sir.

14    Q.    Where did you work before you worked at

15    Ascension Providence Hospital?

16    A.    I worked for a Michigan Neurosurgery

17    Brain & Spine for a short time.

18    Q.    Okay.  How long?

19    A.    Just about a month and a half until I

20    got the job at the hospital.

21    Q.    The hospital?

22    A.    At Ascension Providence.

23    Q.    At the hospital, okay.

24    A.    Yes.

1      Q.    Did you go directly from there to the
2  hospital, from the neurosurgeon's office to the
3  hospital?
4      A.    Yes, sir.
5      Q.    What was the neurosurgeon's name?
6      A.    It is Michigan Neurosurgeons.  There is
7  a whole group.
8      Q.    Okay.  Before the Michigan
9  Neurosurgeons group where did you work?
10     A.    I worked for a short time for a State
11  Farm agent.
12     Q.    Directly for an agent or for State Farm
13  Insurance?
14     A.    I worked for the agent, and prior to
15  that I worked for State Farm Insurance.
16     Q.    Who was the agent?
17     A.    Veronica Murff.
18     Q.    Where?
19     A.    In Novi, Michigan.
20     Q.    Okay.  Before you worked for Veronica,
21  State Farm Agent Veronica in Novi, where did you
22  work?
23     A.    I worked for State Farm.
24     Q.    How long did you work for State Farm?

1      A.    I started there in March of 2017, and I

2    worked there until June of 2019, I think.

3      Q.    '18 or '19?

4      A.    '19.

5      Q.    Okay.  Now, what are your -- do you

6    have a title or job description at Ascension

7    Providence Hospital?

8      A.    I am a surgical technologist.

9      Q.    What training is required for being a

10   surgical technologist?

11     A.    I received a certificate in '91.  It

12   was a two year program.

13     Q.    Did you work as a surgical technologist

14   or technician before you became a Decatur police

15   officer?

16     A.    Yes, sir.

17     Q.    What are some of your duties as a

18   surgical technician?

19     A.    I assist the surgeon during surgery,

20   prepare the case, get all of the instrumentation

21   ready, and then make sure the field is sterile,

22   and then assist the surgeon passing the

23   instruments, sewing wounds, that sort of thing.

24     Q.    How many years have you performed as a

1    surgical technician total?

2         A.    Nine.

3         Q.    Does that include just prior to

4    becoming a Decatur police officer and Ascension

5    Providence, or are there others?

6         A.    Prior to becoming a Decatur police

7    officer I worked as a surgical technologist for

8    eight years.

9         Q.    Okay.

10        A.    Then after becoming a police officer I

11   just now recently gone back to being a tech,

12   surgical technologist.

13        Q.    What is your rate of pay as a surgical

14   technician in Novi, Michigan?

15        A.    I make $26.00 an hour.

16        Q.    Okay.  Have you enjoyed any advancement

17   in your career since you joined Ascension

18   Providence Hospital?

19        A.    No.  I am -- actually I just got off of

20   my orientation.

21        Q.    Okay.  How long is the orientation

22   period?

23        A.    It has been about -- it is generally

24   six to nine months.

1        Q.    Has it been extended in your case at

2  all?

3        A.    It was extended only because, due to

4  the COVID outbreak.  I was removed from surgery,

5  and had to work on the COVID floor for five

6  weeks.  So, that kind of put us a little bit

7  behind.

8        Q.    Sure.

9        A.    So, I was extended for a couple of

10  weeks.

11        Q.    But any other reason?

12        A.    No.

13        Q.    Now, how long were you employed with

14  the City of Decatur as a police officer?

15        A.    I started there in September of 2007

16  until March of 2017, yes, March of 2017.

17        Q.    Why did you apply to become a police

18  officer at the Decatur Police Department?

19        A.    I was at a point in my life where I

20  decided I wanted to do something challenging,

21  and that would challenge me mentally and

22  physically.  My husband at the time was a

23  dispatcher, and so he said why don't you come

24  and ride with some of the guys I work with, and

1    see what you think of this.  I fell in love with

2    it.  So, I started the application process, and

3    became a police officer for Decatur.

4        Q.    Do you know whether your then husband

5    is still a dispatcher with the City of Decatur?

6        A.    He is not.

7        Q.    Do you know about when he left?

8        A.    He never worked for the City of

9    Decatur.  He actually worked for Champaign and

10   for DeWitt County, Illinois.

11       Q.    All right.  I think you already

12   answered it, but have you given me the reasons

13   that you wanted to be a police officer?

14       A.    I wanted something challenging and

15   something that I felt like I could make a

16   difference, but mostly I wanted something that

17   would challenge me mentally and physically.  I

18   was kind of bored in the career path that I had

19   chosen, and I spent a couple days with some

20   officers, and it just really appealed to me.

21       Q.    Miss Karr, I am going to show you, or

22   I am showing you what has been marked Karr

23   Exhibit, Karr Deposition Exhibit 1.  I will ask

24   you to examine it.  Do you recognize that

1      document?

2          (Whereupon said document was duly

3          marked, for purposes of identification,

4          as Karr Deposition Exhibit Number 1, as

5          of this date.)

6      A.    I don't remember filling it out, but I

7  recognize my handwriting and everything.

8      Q.    Okay.  Is it dated June 20th of 2014?

9      A.    It says June 23rd.  Oh, I see, yes.

10     Q.    Up there at the top, and then what is

11  this sick and injury report?  What is this

12  document?

13     A.    I honestly don't remember.  Just

14  looking at it it is a report that I was required

15  to fill out apparently.

16     Q.    On that report you were required to

17  certify that you were unable to perform your

18  work on May 14th, 2014?

19     A.    Yes.

20     Q.    What is the reason that you listed for

21  being unable to perform your work?

22     A.    It says minor stroke caused by atypical

23  migraine event.

24     Q.    Who was your attending physician for

1      that occurrence?

2           A.    Dr. Kattah.

3           Q.    That's your signature on it, correct?

4           A.    Yes, sir.

5           Q.    Can you describe the occurrence that

6      caused you to be unable to perform your work on

7      this sick slip?

8           A.    I had come to work, and I was on my way

9      to work, and I had an event where there was a

10     van in front of me, and then there was three

11     vans.  I had triple vision.  I lost my memory.

12     I don't remember getting to work.  When I got to

13     work, I went in and Sergeant Seal said I didn't

14     look right.  I don't have a whole lot of memory

15     of it.  I have mostly memory of what people told

16     me happened.  The people around me said it

17     appeared as though I was having a stroke because

18     I was -- they said it looked like lights on,

19     nobody home is the way they described it to me.

20     I was taken to the hospital, and then they ran

21     several tests, and this was one of the possible

22     diagnosis that they provided me with.

23          Q.    Would it be fair to say that the memory

24     loss that you suffered back in May of 2014 was

18

1      more severe than the momentary memory loss that

2      you suffered this morning beginning your

3      deposition?

4           A.    Oh, yes, sir.

5           Q.    Now, if you could pass that exhibit to

6      the court reporter, please.   That's fine.

7            Ms. Ownby, showing you what has been marked

8      Karr Deposition Exhibit 2, do you recognize this

9      document?

10           (Whereupon said document was duly

11            marked, for purposes of identification,

12            as Karr Deposition Exhibit Number 2, as

13            of this date.)

14           A.    Yes, sir.

15           Q.    Actually backing up for the record Karr

16     Deposition Exhibit 1 is bates stamped 318 of

17     833, and Karr Deposition Exhibit 2 is bates

18     stamped 317 of 833.   Did you complete this form?

19           A.    Yes.

20           Q.    And did you complete it on or about

21     July 3rd of 2015?

22           A.    Yes.

23           Q.    And by this form did you certify to

24     your employer that you were unable to perform

1    your work on May 19th, 2014?

2        A.    Yes.

3        Q.    And what was the reason that you were

4    unable to perform your duties during that period

5    of time?

6        A.    I had another incident similar to the

7    first incident.  This time the doctor suggested

8    that it was a possible seizure.

9        Q.    Okay.  Do you recall how long you were

10   off work for this?

11       A.    I don't -- I don't recall exactly.

12       Q.    Can you describe the incident that

13   caused you to, that caused this medical

14   condition to begin?

15       A.    I was on -- what I remember is I was --

16   as I said I was on my way to work, which was in

17   May.  I was on my way to work, and I hadn't felt

18   right.  I saw the van in front of me turn into

19   three vans.  I don't recall getting to work.

20   When I got there, they immediately noticed

21   something was not right.  I was told -- I don't

22   remember much about it.  I was told that I was

23   not making sense.  They were asking me

24   questions.  I would respond to them, but I

1    wasn't making sense.  So, they -- that was the

2    first incident in May.

3        They took me to the hospital, and did some

4    tests, and then my follow-up was with Dr.

5    Kattah.  I believe he was in Peoria.  So, that

6    was the second diagnosis.

7        Q.    On the May 14th incident were you taken

8    to the hospital?

9        A.    Yes.

10       Q.    And on the May 19th incident were you

11   taken to the hospital?

12       A.    The first incident would have been on

13   the 19th.  I don't think -- I guess I am a

14   little bit confused.

15       Q.    Please turn back to Karr Deposition

16   Exhibit 1, the one we just looked at.

17       A.    Yes, I see it.  Can you repeat -- what

18   is the question?

19       Q.    Going back to the condition that was

20   diagnosed as minor stroke were you taken to the

21   hospital on that day?

22       A.    The initial -- I believe the initial

23   incident occurred on the 14th, and I was taken

24   to the hospital on that day.

1       Q.    Were you taken to the hospital on May

2    19th, five days later when you also were unable

3    to perform your duties this time for seizure?

4       A.    I do not remember, I am sorry.

5       Q.    Now, Deposition Exhibit 2 was completed

6    by you, was it not?

7       A.    Yes, sir.

8       Q.    You wrote on there that the seizure

9    resulted in hospitalization, is that correct?

10      A.    Yes.

11      Q.    Can you describe the hospitalization.

12      A.    I was taken to the hospital right after

13   the initial incident, which would have been, I

14   believe, on the 14th, and I was there for a

15   couple of days, I believe.  I am sorry, it has

16   been such a long time ago.  I don't really

17   recall the exact -- I remember going to the

18   emergency room at St. Mary's, and I believe they

19   kept me there for a couple of days.  And then I

20   went to St. Joseph's in Bloomington, but I can't

21   remember exactly if that was the first incident

22   or the second.

23      Q.    Okay.  You submitted this deposition

24   Exhibit 2 on July the 3rd, is that correct?

1        A.    I believe so, yes.

2        Q.    It says that you were unable to perform

3   your work for ten days.  Does that sound

4   correct?

5        A.    Yes.

6        Q.    Backing up to the Exhibit 1, you

7   submitted that on June the 20th, is that

8   correct?  Please feel free to put it in front of

9   you and look at it.

10       A.    Yes, sir.  That's what it says here,

11   yes.

12       Q.    You stated that you were off for 200

13   hours, is that correct?

14       A.    That's what it says here.  I don't have

15   a recollection of why that would have been

16   worded that way.

17       Q.    Okay.  Miss Karr, I am showing you what

18   has been marked deposition, Karr Deposition

19   Exhibit 3.  I will ask you to take a moment to

20   examine it.  Do you recognize this?

21       (Whereupon said document was duly

22       marked, for purposes of identification,

23       as Karr Deposition Exhibit Number 3, as

24       of this date.)

1      A.    Yes.

2      Q.    What is it?

3      A.    It is a sick and injury report.

4      Q.    Completed by you?

5      A.    Yes, sir.

6      Q.    Dated July 3rd, 2015?

7      A.    Yes, sir.

8      Q.    This sick and injury report did you

9   certify to your employer that you were unable to

10  perform your work on January 11th, 2015?

11     A.    Yes.

12     Q.    For what reason?

13     A.    I had a second incident similar to the

14  first incident of the seizure or what appeared

15  to be a seizure.

16     Q.    Did you treat with the same physician

17  both on the May 14th and May 19th occurrences?

18     A.    Yes.

19     Q.    Looks like you were off for five days

20  for that one.  Does that sound correct?

21     A.    Yes.

22     Q.    I am showing you what is marked as Karr

23  Deposition Exhibit 4.  I will ask you to examine

24  that.

1          (Whereupon said document was duly

2          marked, for purposes of identification,

3          as Karr Deposition Exhibit Number 4, as

4          of this date.)

5     A.    Okay.

6     Q.    Have you seen this before?

7     A.    Yes.

8     Q.    Okay.  This is a physical result form,

9  is it not?

10    A.    Yes, sir.

11    Q.    You did not complete this form, is that

12 correct?

13    A.    Correct.

14    Q.    In fact, Sarah Peters or Sarah Sheers

15 completed this form at Decatur Memorial

16 Hospital?

17    A.    Yes.

18    Q.    Do you recall when the first time was

19 that you saw this form?

20    A.    I do not.

21    Q.    Do you recall seeing Sarah Sheers?

22    A.    Vaguely.  It has been sometime ago.

23    Q.    Can you tell us what you recall about

24 seeing Sarah Sheers?

1      A.    I believe that is the department

2  required me to go to a fit for duty exam at the

3  DMH Corporate Health, and this is the person

4  that I spoke to.

5      Q.    Sarah Sheers is the provider of this

6  report form?

7      A.    Yes.

8      Q.    Now, with your medical background do

9  you -- can you describe for us what the initials

10  after her name PA-C mean?

11      A.    PA stands for physician's assistant.  I

12  am not sure what the C stands for.

13      Q.    Is a physician's assistant a medical

14  doctor?

15      A.    No.

16      Q.    Did Sarah Sheers on this form state

17  that she conducted a fit for duty examination?

18      A.    Yes.

19      Q.    Did she check the physical exam results

20  box marked not suitable for position?

21      A.    Yes.

22      Q.    Do you know whether Sarah Sheers

23  prepared a detailed report of her examination of

24  you?

1          A.    I do not know.

2          Q.    Do you have any reason to believe

3    that -- do you have any reason not to believe

4    that she provided this report to your employer?

5          A.    I do not know.

6          Q.    Now, for the January 11th incident, the

7    sick and injury report that you were unable to

8    perform your duties, how long were you off work?

9          A.    January 11th, I honestly don't

10   remember.  I am seeing here it says five days,

11   but I have no recollection of the exact amount

12   of time.

13         Q.    Okay.  Well, the reason I am asking is

14   because Sarah Sheers on January 20th offered the

15   opinion that you were not suitable for the

16   police officer position, yet you returned to

17   work sometime after that or before that, do you

18   recall?

19         A.    I do not.

20         Q.    Did you see somebody, one of your

21   treating physicians after you saw Sarah Sheers?

22         A.    I am not 100 percent confident on the

23   timeline, but I believe I did see, I saw

24   Dr. Kattah.  He was with the Illinois

1    Neurological Institute in Peoria, and I saw I

2    think my own primary care physician just to get

3    referrals.  That's where the emergency room told

4    me to follow-up to the primary care physician.

5        Q.    Did you submit reports of any of those

6    to your employer to return to work?

7        A.    I don't recall exactly.

8        Q.    Directing your attention to Karr

9    Deposition Exhibit 5 please take a moment to

10    review that document.  This is actually two

11    documents, is it not?

12       (Whereupon said document was duly

13        marked, for purposes of identification,

14        as Karr Deposition Exhibit Number 5, as

15        of this date.)

16        A.    Yes, sir.

17        Q.    Both completed, appear to have been

18    completed by Dr. Braco at Decatur Memorial

19    Hospital?

20        A.    Yes, sir.

21        Q.    The date of service on each is November

22    29, 2016?

23        A.    Yes, sir.

24        Q.    In each of these Dr. Braco checks a box

1      under physical exam results suggesting that you

2      may work with restrictions.  Do you see that?

3          A.    Yes, sir.

4          Q.    Do you remember this at all?

5          A.    Yes.

6          Q.    Okay, and Dr. Braco it appears said

7      that you would not be fit for unrestricted duty,

8      and then he goes on to describe that.  That's on

9      the first page.

10         On the second page he states until further

11     medical information is available no lethal

12     weapon use, no Hazmat, or ERT team duty.  What

13     is your understanding of what Dr. Braco is

14     telling us there?

15         A.    Let me try and understand what you are

16     asking.

17         Q.    What is your understanding of

18     Dr. Braco's opinion?  What does it mean that he

19     completed these forms?

20         A.    Well, I mean just reading what it says

21     it is claiming that I would not be fit for

22     unrestricted duty, and the restrictions that he

23     provided would not allow me to do a job as a

24     police officer.  I don't remember exactly why

1    there is two of them here.  One saying until

2    further information is available the

3    recommendation is no weapon use.  I don't

4    remember why there was two forms on the exact

5    same date.

6        Q.    Okay.  Do you recall see Dr. Braco?

7        A.    I do.

8        Q.    Probably would have been on or about

9    November 29th, 2016, right?

10       A.    Yes, sir.

11       Q.    Did you see him on more than one day?

12       A.    I don't believe so.

13       Q.    What kind of an examination did

14   Dr. Braco perform?

15       A.    He asked me some questions about -- he

16   asked about the medication that I was taking.

17   At the time I was taking Topamax, which is an

18   anti-seizure medication, and he asked why I was

19   taking it.  I told him it was to treat a

20   possible seizure disorder.

21          He had me do -- he requested medical

22   records from me, and he had me do some physical

23   things, picking up some weights, walking around

24   the room, just things like that.

1          Q.    Your physical capabilities to perform

2     the job of a police officer never really have

3     been an issue, have they?

4          A.    No, sir.

5          Q.    Dr. Braco is a medical doctor, is that

6     correct?

7          A.    Yes, sir.

8          Q.    I am showing you what has been marked

9     as Karr Deposition Exhibit 6.  I will ask you to

10    take a few moments to examine that.  It is a

11    several page document.  Are you ready?

12          (Whereupon said document was duly

13           marked, for purposes of identification,

14           as Karr Deposition Exhibit Number 6, as

15           of this date.)

16          A.    Yes, sir.

17          Q.    Is Exhibit 6 a fit for duty-employer

18    summary?

19          A.    Yes, sir.

20          Q.    Was this completed by Dr. Jon Petersen,

21    M.D.?

22          A.    Yes, sir.

23          Q.    Do you recall seeing Dr. Petersen on

24    February 23rd, 2017?

1     A.    I do.

2     Q.    Can you tell me about the exam that

3    Dr. Petersen conducted that day.

4     A.    I don't remember the specifics.  I

5    remember discussing the incidents, describing

6    them to him.  We did the typical balance tests

7    and nystagmus tests, that sort of thing.  It has

8    been a long time ago, but that's the basic gist

9    of it.  It was a basic exam with questions and

10   just some physical tests, balance tests, and

11   that sort of thing.

12     Q.    Okay.  Did you describe for him the May

13   14th incident where your co-employees called an

14   ambulance for you?

15     A.    Yes.

16     Q.    Did you describe the May 19th incident,

17   similar incident where co-employees called an

18   ambulance for you?

19     A.    The incidents were May 14th and then in

20   January.  There was two.

21     Q.    January, okay.

22     A.    Uh-huh.

23     Q.    How did you get to the hospital on May

24   19th?  Where did you go?

1          MR. BAKER:  Do you want me to explain

2     this because I understand what's going on with

3     these documents, Exhibits 1 and 2?  I think the

4     questions are misleading, but I am not saying

5     intentionally.

6          MR. ROBINSON:  I will let you deal with

7     that on cross.

8          MR. BAKER:  That's fine.  I am going to

9     object to the question because I believe it is

10    misleading.  It assumes evidence not in the

11    record, but she can answer.

12    A.    I apologize.  Can you repeat the

13    question, please.

14         MR. ROBINSON:  I will ask the court

15    reporter to read the question back, please.

16      (Whereupon the reporter then read the

17       requested testimony.)

18         MR. BAKER:  Same objection.  You can

19    answer.

20    Q.    Let me strike the question, Miss Karr.

21      Do you recall whether you went to the

22    hospital on May 19th?

23    A.    I don't recall the exact date.

24    Q.    It is possible that you didn't go to

1    the hospital on May 19th.  You just saw a doctor

2    for whatever ailed you?

3        A.    It is possible.  I honestly don't

4    recall the exact dates.

5        Q.    But then in January, January 11th you

6    went to the hospital?

7        A.    It was in January of 2015.  I don't

8    recall the exact, the exact date.

9        Q.    It was a situation where you arrived at

10   work and your co-employees were concerned?

11       A.    Yes, sir.

12       Q.    Did you describe these events, these

13   occurrences to Dr. Petersen?

14       A.    Yes.

15       Q.    Your description to Dr. Petersen

16   includes that you didn't, or a red van in front

17   of you suddenly appeared to be three red vans?

18       A.    Yes, sir.

19       Q.    How many times has that occurred where

20   you have suffered double or triple vision?

21       A.    Just that once.

22       Q.    Dr. Petersen describes another one that

23   you described to him of a tan van appeared to be

24   two vans in front of you?

1      A.     I believe that was the second incident

2  in May.  I don't recall exactly.

3      Q.     How many times has that occurred since

4  2015, 2014?

5      A.     None, zero.

6      Q.     Okay.  Dr. Petersen is not your

7  physician, is that correct?

8      A.     Correct.

9      Q.     Did you take Dr. Petersen's fit for

10  duty-employer summary to your physician?

11      A.     I don't recall.

12      Q.     Now, Miss Karr, I will show you

13  Deposition Exhibit 7.  It is labeled the report

14  of proceedings of the administrative hearing

15  Tuesday, March 6th, 2018, and it is in re Trudy

16  Karr application for disability pension benefits

17  before the Decatur Police Pension Board.

18        (Whereupon said document was duly

19         marked, for purposes of identification,

20         as Karr Deposition Exhibit Number 7, as

21         of this date.)

22      A.     Uh-huh.

23      Q.     I will represent to you this is a

24  transcript of the hearing, actually the

1    examination by the lawyers of you.  Do you have

2    any reason to doubt the accuracy of this report

3    of proceedings?

4         A.    No, sir.

5              MR. BAKER:  We will stipulate that it

6    is accurate.

7         Q.    You recall testifying before the

8    Pension Board?

9         A.    Yes.

10        Q.    Why were you testifying before the

11   Police Pension Board?

12        A.    Because I had applied for disability

13   pension benefits after the City determined that

14   I was unfit for duty.

15        Q.    Okay.  You say after the City

16   determined you were unfit.  What do you mean by

17   that?

18        A.    I was found to be unfit, and was

19   advised by the City of Decatur that I was not

20   fit to perform my duties as a police officer,

21   and advised to apply for disability because of

22   that.

23        Q.    Okay.  Did you believe that you were

24   not capable of performing the essential job

1   duties of a police officer?

2        A.    I had been doing my job as a police

3   officer for two years following the initial

4   incident.  So, I believed that I was fine.  I

5   was told by the City that I was unfit.

6        Q.    Are you saying you made a false

7   application for a disability pension?

8        A.    No.

9        Q.    Okay.

10       A.    I was advised by the City that I was

11  unfit for duty.  I was told that I was unfit for

12  duty, and was advised to apply for disability

13  because the City had determined that I was unfit

14  for duty.

15       Q.    How long did you treat with Erica

16  Spangler?

17       A.    Oh, goodness, a couple of years

18  probably.  I am not sure of the exact timeline.

19       Q.    The City, your employer, never required

20  you to treat with Erica Spangler, did it?

21       A.    In order for me to come back to work

22  after the second incident in January I was told

23  that I needed to get some sort of, a diagnosis

24  as to what had occurred, and what would be done

1    to prevent another occurrence.  So, I had to get

2    a doctor's opinion and some sort of medication

3    and treatment that was, which is what I did.

4         Erica Spangler provided me with Topamax,

5    and I was required to submit a bulletin stating

6    what the diagnosis was, and what sort of

7    treatment was going to be given to prevent a

8    further occurrence.

9         Q.    Okay.  So, getting back to Exhibit 7

10   you testified before the Decatur Police Pension

11   Board, is that correct?

12        A.    Yes, sir.

13        Q.    You gave your testimony under oath, is

14   that correct?

15        A.    Yes, sir.

16        Q.    Did you testify truthfully?

17        A.    Yes.

18        Q.    Ms. Karr, I will show you what has been

19   marked Karr Deposition Exhibit 8, and ask that

20   you examine it.  Do you recognize this document?

21        (Whereupon said document was duly

22         marked, for purposes of identification,

23         as Karr Deposition Exhibit Number 8, as

24         of this date.)

1        A.    I do.

2        Q.    Is it a letter from Erica Spangler?

3        A.    Yes.

4        Q.    After Erica Spangler's name are the

5    initials APN and CNP.  Through your medical

6    training and experience do you understand what

7    those mean?

8        A.    APN is advanced practitioner nurse.

9    CNP is certified nurse practitioner.

10        Q.    Not the same as a medical doctor, is

11    that correct?

12        A.    Correct.

13        Q.    Now, this letter is dated March 20th,

14    2017, is that correct?

15        A.    Yes, sir.

16        Q.    In this letter Ms. Spangler notes that

17    you have a medical condition that does not

18    certify you as meeting the medical requirements

19    of NFPA 1582, is that correct?

20        A.    Yes.

21        Q.    Now, had Erica Spangler previously

22    prepared a written opinion regarding your

23    fitness for duty?

24        A.    I believe so, yes.

1      Q.    Do you recall when?

2      A.    Not exactly, no.

3      Q.    Was it within months of this opinion?

4      A.    I don't recall.

5      Q.    Okay.  What was her prior opinion?

6      A.    She initially stated that I was fit for

7  duty because at the time she had not been

8  presented with the standards by which to

9  determine if I was fit for duty.  As I said I

10  was simply told get a diagnosis, get on some

11  medication, tell us what that is, and we will

12  move forward.

13      Q.    Okay.  Showing you what has been marked

14  Karr Deposition Exhibit 9 this is a memorandum

15  from you to Chief Getz, is it not?

16      (Whereupon said document was duly

17       marked, for purposes of identification,

18       as Karr Deposition Exhibit Number 9, as

19       of this date.)

20      A.    Yes, sir.

21      Q.    Do you recall preparing this

22  memorandum?

23      A.    I do.

24      Q.    What is the date of this memorandum?

1          A.     March 24th, 2017.

2          Q.     On March 24th, 2017 did you have

3    available to you remaining earned unused sick

4    leave?

5          A.     I don't recall.

6          Q.     On March 24th, 2017 did you have

7    available to you any accrued unused leave

8    whatsoever?

9          A.     It says here that I had an accumulated

10   holiday and vacation time.

11         Q.     I know it says that.  Did you have any?

12         A.     I believe so.

13         Q.     Ms. Karr, showing you what has been

14   marked Karr Deposition Exhibit 10, do you

15   recognize this document?

16            (Whereupon said document was duly

17             marked, for purposes of identification,

18             as Karr Deposition Exhibit Number 10, as

19             of this date.)

20         A.     I do not.

21         Q.     Okay.  Well, I will represent to you

22   this is the closing statement that your lawyer,

23   Mr. Baker, submitted to the Police Pension

24   Board.  Do you have any reason to doubt its

1    accuracy?

2         A.    No, sir.

3              MR. BAKER:  Again we will stipulate

4    that this is accurate, that this is authentic of

5    what we filed.

6         Q.    Okay.  I am now showing you what has

7    been marked as Karr Deposition Exhibit 11.  Do

8    you recognize this document?

9         (Whereupon said document was duly

10        marked, for purposes of identification,

11        as Karr Deposition Exhibit Number 11, as

12        of this date.)

13        A.    Yes, sir.

14        Q.    What is it?

15        A.    It is a letter that I wrote to the

16   City.

17        Q.    And it is signed by you, is that

18   correct?

19        A.    Yes, sir.

20        Q.    And dated June 5th, 2018, is that

21   correct?

22        A.    Yes.

23        Q.    Okay.  Now, backing up on Exhibit 9

24   that was your request to take a leave from the

1    classified service?

2         A.    Yes, sir.

3         Q.    Do you recall how much you received in

4    payout of accumulated holiday and vacation time?

5         A.    I do not.

6         Q.    Do you recall whether you received any

7    payout of accumulated holiday and vacation time?

8         A.    I did, but I don't recall the amount.

9         Q.    As a result of your June 5th, 2018

10   letter to the City of Decatur were you, in fact,

11   placed on a Civil Service reinstatement

12   register?

13        A.    I believe I was, yes.

14        Q.    Did that put you in a position to be

15   reinstated to your prior position when a

16   position became open or vacant?

17        A.    Yes.

18        Q.    Did a position become available?

19        A.    Yes.

20        Q.    Were you offered it?

21        A.    I was.

22        Q.    Did you accept the position?

23        A.    I did.

24        Q.    Was the offer conditioned upon you

1    successfully completing fitness for duty exam,

2    drug screen, other pre-employment

3    technicalities?

4         A.   Yes, sir.

5         Q.   Did you go to see Dr. Kathuria at HSHS

6    Medical Group in Decatur for your fitness for

7    duty exam?

8         A.   Yes, sir.

9         Q.   Showing you what has been marked Karr

10   Deposition Exhibit 12.  I will ask that you

11   examine it.  Did you go to see Dr. Kathuria at

12   HSHS Medical Group St. Mary's in Decatur?

13        (Whereupon said document was duly

14         marked, for purposes of identification,

15         as Karr Deposition Exhibit Number 12, as

16         of this date.)

17        A.   Yes, sir.

18        Q.   Did you go to see him on or about

19   November 16th of 2018?

20        A.   Yes, sir.

21        Q.   Did Dr. Kathuria conduct an examination

22   to determine whether you were fit for duty as a

23   Decatur police officer?

24        A.   He did.  Mostly he asked a couple

1    questions, advised me that he had reviewed my

2    medical records, and it was his opinion that I

3    was not going to be found to be fit for duty.

4        Q.    Did he describe why?

5        A.    He said that based on my medical

6    records and the standards which he had been

7    provided I didn't qualify as fit for duty.

8        Q.    Did he say anything about seizures or

9    the medication that you were using?

10       A.    I don't recall all of the -- the exam

11   actually was not very long.  I don't recall the

12   exact words that he used.

13       Q.    Do you believe that the physical and

14   emotional demands on police officers are high?

15       A.    Of course.

16       Q.    Do you believe that the emotional

17   demands on police officers are higher even than

18   medical professions?

19       A.    I suppose that all depends on the

20   situation.

21       Q.    Okay.  Do you believe that performing

22   the duties of a police officer subjects

23   individuals to higher degree of risk of harm to

24   themselves than most other professions?

1        A.    I don't really have an opinion on that.

2        Q.    Do you believe that performing the

3  duties of a police officer subjects the public

4  to a higher degree of risk of harm than many

5  professions?

6        A.    I also don't have an opinion on that.

7        Q.    Do you have any reason to believe that

8  the City of Decatur Chief and people in Human

9  Resources did not rely on the written

10  documentation that we have gone through here

11  this morning?

12        A.    I am not sure I understand what you are

13  asking.

14        Q.    It is understandable.  It is a

15  difficult question.  I apologize.  I will try

16  and break it down.

17        Do you know of any reason that the City of

18  Decatur -- do you have any evidence that the

19  City of Decatur did not rely on the written

20  documents that we have gone through as these

21  exhibits today?

22        A.    I am not sure how to answer that

23  question.

24        Q.    You don't know -- you don't have any

 1      evidence that the City refused to read any of

 2      these documents, do you?

 3          A.    I would not have any knowledge of that.

 4          Q.    You wouldn't have any evidence that the

 5      City did not receive any of these, would you?

 6          A.    I wouldn't have any evidence of that.

 7               MR. ROBINSON:  That's all of the

 8      questions that I have.  Thank you.

 9               MR. BAKER:  All right.  I have a little

10      bit, not much.  I know I set my depositions for

11      later.  We can take them in whatever order just

12      to get done as quickly as possible.

13               MR. ROBINSON:  Obviously Miss Rogers is

14      here.  We will need a short break before we

15      start hers, but during that time I can see about

16      getting the Chief over here.

17           Do you have any idea how long estimate you

18      will be with him?

19               MR. BAKER:  I don't think either one of

20      them will be very long.

21               MR. ROBINSON:  Let's go off the record.

22           (Whereupon the deposition was in

23            recess.)

24

```
1                 CROSS EXAMINATION

2                 BY MR. BAKER:

3        Q.    Trudy, do you still have all of the

4    exhibits in front of you?

5        A.    Yes, sir, yes, sir.

6        Q.    If you would get Exhibit 1 and 2.

7        A.    Okay.

8        Q.    Are you there?

9        A.    Yes, sir.

10       Q.    Okay.  The Exhibit Number 1 do you see

11   up at the top of that there is some handwriting

12   that says FMLA?

13       A.    Yes, sir.

14       Q.    Is that your handwriting?

15       A.    No.

16       Q.    Do you know whose handwriting that is?

17       A.    I don't know.

18       Q.    Okay.  There is a stamp on there dated

19   received.  Do you see that?

20       A.    Yes, sir.

21       Q.    What is that date?

22       A.    June 23rd, 2014.

23       Q.    Do you recall if when this incident

24   occurred in May of 2014 you were required or
```

1      asked to submit for FMLA leave?

2           A.     I believe so, yes.

3           Q.     The second document, Exhibit 2, up at

4      the top it says update.  Do you see that?

5           A.     Yes.

6           Q.     Is that your handwriting?

7           A.     No.

8           Q.     Do you know whose handwriting that is?

9           A.     No.

10          Q.     The date on this is July 9, 2015.  Do

11     you see that?

12          A.     Yes.

13          Q.     You are certifying here, and it looks

14     like you actually, you filled it out on July

15     3rd, 2015.  Do you see that?

16          A.     Yes.

17          Q.     But it relates back to May of 2014,

18     right?

19          A.     Correct.

20          Q.     Do you recall why it is that you

21     submitted this document one year after this

22     incident?

23          A.     I do not recall.

24          Q.     Do you recall if you were asked to

1     update your FMLA leave from 2014 because you

2     hadn't utilized all of the hours that you had

3     requested, or you needed more hours, or anything

4     like that?

5          A.    I don't recall.

6          Q.    Do you know what the purpose of Exhibit

7     Number 2 is?

8          A.    I honestly don't remember.  I remember

9     having to fill out these papers as it was

10    requested by my command.

11         Q.    There has been discussion of two, or of

12    neurological instances, and do you recall how

13    many of those you had while you were employed by

14    the Decatur Police Department?

15         A.    Two.

16         Q.    Would it be fair to say that one of

17    those occurred in May of 2014?

18         A.    Yes.

19         Q.    That would have necessitated some leave

20    of absence from work?

21         A.    Yes.

22         Q.    The second one occurred in January of

23    2015?

24         A.    Yes.

1    Q.    Those are the only two?

2    A.    Yes.

3    Q.    So, as far as being hospitalized on May

4    14, 2014 and then again on May 19, 2014, you

5    don't recall being hospitalized so close to one

6    another, do you?

7    A.    No.

8    Q.    Do you believe that you were

9    hospitalized on both of those dates?

10   A.    I don't -- I honestly don't know.  I

11   was hospitalized -- it has been so long.  I was

12   hospitalized on two separate occasions.  I

13   believe I was at the hospital for a couple of

14   days after the first incident in May, but I

15   honestly don't remember the specifics.

16   Q.    But would it be fair to say during that

17   summer of 2014 there was only one

18   hospitalization?

19   A.    Yes.

20   Q.    I want you to look at Deposition

21   Exhibit 12, and keep Exhibits 1 and 2 with you.

22   A.    Good Heaven.  Which one?

23   Q.    Here, I will just show you my copy of

24   it.

    1          A.    All right, yes, sir.

    2          Q.    Exhibit Number 12, I believe, is the

    3   report by a physician.  Can you tell me the date

    4   on it?

    5          A.    11 -- November 16th, 2018.

    6          Q.    This is when you were seeking to come

    7   back to the Police Department, is that correct?

    8          A.    Yes, sir.

    9          Q.    The doctor who signed that is who?

   10          A.    Dr. Kathuria.

   11          Q.    Just because the names are similar in

   12   Exhibit 1 and 2 you have referenced a

   13   Dr. Kattah.  Do you see that?

   14          A.    Yes.

   15          Q.    Am I correct that those are two

   16   separate doctors?

   17          A.    Correct.

   18          Q.    All right.  Dr. Kathuria was a doctor

   19   who you had been sent to by the City?

   20          A.    Yes.

   21          Q.    Was Dr. Kattah a physician of your

   22   choosing, or was that a physician of the City's

   23   choosing?

   24          A.    Dr. Kattah was a physician of my

1    choosing.  He was a neurologic ophthalmologist,

2    and I was referred to him by, I believe, a

3    doctor in Bloomington.

4        Q.    Do you know what Dr. Kathuria, the

5    doctor you saw in 2018, do you know what his

6    specialty was?

7        A.    He is an occupational health doctor.

8        Q.    The last thing that I want you to look

9    at is Exhibit Number 9.

10        A.    Yes, sir.

11        Q.    This is your memo to Chief Getz dated

12    March 24, 2017?

13        A.    Yes, sir.

14        Q.    In this memo you request that you take

15    leave from the classified service, is that

16    correct?

17        A.    Yes, sir.

18        Q.    Prior to submitting this memo to Chief

19    Getz did you have any conversations with Chief

20    Getz about this?

21        A.    Yes, sir.  I received a phone call from

22    Chief Getz to tell me --

23        Q.    Hold on.  Do you recall when that phone

24    call occurred?

1      A.    It was, I believe it was on that same

2  day.

3      Q.    All right.  Was anybody else on the

4  phone with you and Chief Getz?

5      A.    Not to my knowledge.

6      Q.    What did Chief Getz say to you?

7      A.    He contacted me to let me know that

8  Dr. Petersen had found me to be unfit for duty,

9  and we talked about what to do moving forward.

10  He had asked me what I wanted him to do, and I

11  told him that this was not, you know, what -- I

12  needed his guidance.  So, he advised me that my

13  options were to resign, to be fired, or to take

14  a leave from the classified service.  The way he

15  explained it to me was that if I took the leave

16  from the classified service and applied for

17  disability, his opinion was that there was no

18  reason I shouldn't qualify for disability as the

19  City had found me unfit for duty.  And he said

20  that if I took the leave from the classified

21  service, that I would be protected, and that I

22  could just be able to retire instead of being --

23  obviously I did not want a termination on my

24  record because it would be hard to get another

1    job.  I wasn't going to resign because I thought

2    it wasn't -- it was just the City's opinion that

3    I couldn't do my job.  I still wanted to do my

4    job.  So, his advice to me was to take this

5    leave from the classified service, and then I

6    would be protected until in his words the

7    Pension Board approved my disability, and then I

8    could retire, and just move forward.  He advised

9    me exactly how to word this bulletin, and to

10   submit it to him, and I did as he directed.

11          MR. BAKER:  I have no further

12   questions.

13

14          REDIRECT EXAMINATION

15          BY MR. ROBINSON:

16   Q.    Miss Ownby, did Chief Getz describe the

17   basis on which you could be fired?

18   A.    The word he used is that they would

19   seek separation.

20   Q.    That was because you were out of

21   accrued unused leave time of all sorts, is that

22   correct?

23   A.    No.  It was because I was not -- the

24   way it was explained to me it was because I was

1    not fit for duty.

2         Q.     Now, you chose not to retire, is that

3    correct?

4         A.     I wasn't offered the option to retire.

5    I was told to take the leave from the classified

6    service, and when the disability, if the

7    disability was approved, then I could retire on

8    disability.

9         Q.     Didn't you just say Chief Getz offered

10   you three options?

11        A.     Yes.   The first one was to resign, not

12   retire, resign.   The other one was to be

13   terminated, and the other was to take this leave

14   from the classified service until such time that

15   my disability would be approved and I could

16   retire.

17        Q.     Have you subsequently retired?

18        A.     No.

19        Q.     Your request to take leave from the

20   classified service was granted, correct?

21        A.     Yes.

22        Q.     Now, you, I believe, testified that you

23   suffered only two neurological incidents while

24   employed at the Decatur Police Department?

1          A.    Yes.

2          Q.    Do you not describe minor stroke as a

3     neurological incident?

4          A.    That was the initial, the initial

5     possible diagnosis from the first incident.

6     They subsequently changed that, their opinion on

7     what the diagnosis was.

8          Q.    To what?

9          A.    To a possible seizure.

10         Q.    Okay.  So, it is really three

11    neurological incidents, is that correct?

12         A.    No.

13         Q.    Well --

14         A.    The diagnosis were for the same

15    incident.  They were just different diagnosis.

16         Q.    There was a May 14th incident, wasn't

17    there?

18         A.    May 14th and January.

19         Q.    And May 19th?

20              MR. BAKER:  No.

21         A.    No.  There was not two separate

22    incidents.

23         Q.    I know there is a January 11th

24    incident.  I recall that one.

1      A.     Yes.   That was the second.

2      Q.     You submitted, you submitted slips for

3   May 14th in which you stated that you were

4   unable to perform your work for 200 hours for

5   minor stroke.  You submitted a slip for May 19th

6   where you stated you were unable to perform your

7   duties for ten days due to seizure resulting in

8   hospitalization.  Are you saying these are the

9   same?

10      A.     I believe so.  I believe my attorney is

11   correct in that one has to do with FMLA, and the

12   other was a different.  I don't recall exactly.

13      Q.     But you are sure that on or around May

14   19th of 2014 you suffered a, you submitted a

15   sick slip stating that you could not perform

16   your duties because of seizure resulting in

17   hospitalization?

18      A.     Correct.

19      Q.     Then the same thing again on January

20   11th --

21      A.     Yes.

22      Q.     -- of 2015, is that correct?

23      A.     Correct.

24      Q.     Do you know whether the sick and injury

1    report dated June 20th is for the same incident

2    as the one dated July 3rd?

3              MR. BAKER:  Can we get years here?

4              MR. ROBINSON:  I am sorry.

5              MR. BAKER:  Years, can we have the

6    years included on it.

7         Q.    I am sorry.  There was -- Deposition

8    Exhibit 1 is a sick and injury report dated June

9    20, 2014 stating that you were unable to perform

10   your duties on May 14th, 2014, is that correct?

11        A.    Yes.

12        Q.    Exhibit 2 is a sick and injury report.

13   You dated it July 3rd, 2015, and it states that

14   you were unable to perform your work on May

15   19th, 2014 for the reason of seizure resulting

16   in hospitalization, is that correct?

17        A.    Yes.

18        Q.    On what do you base your belief that

19   these are for the same occurrence?

20        A.    Well, I honestly don't -- there was one

21   incident, and I honestly don't remember

22   exactly -- I really can't answer that.  I don't

23   remember.  It was the same incident.  There was

24   one incident.  I was off work for, I believe it

1    was approximately five weeks.  I did have to

2    fill out FMLA paperwork.  So, I think these are

3    two separate -- they are for the same incident.

4    I believe that they made an initial diagnosis,

5    and then changed the diagnosis, which would

6    explain the two separate things there.  But I

7    believe one thing was for FMLA because it states

8    the 200 hours, and I was told to fill out that

9    form.  Then the other -- I didn't go back to

10   work for awhile.  It was ten days it says.  So,

11   I am sorry, I don't really recall.  There was

12   one incident in May.  I can't -- aside from one

13   of them being for FMLA, and the other one being

14   an update on a diagnosis that's the only way

15   that I can answer your question.

16        Q.    Okay.  But on both slips you returned

17   to work June the 20th of 2014, is that correct?

18        A.    It appears so, yes.  Well, no, this one

19   says June the 20th, and the other one says July

20   3rd.

21        Q.    If you will look down underneath

22   attending physician date returned to work.

23        A.    Oh, I see, yes, uh-huh.

24        Q.    Then you continued to work at Decatur

1      Police Department until January the 11th of

2      2015?

3          A.    Yes.

4          Q.    That's when you suffered -- that's when

5      you completed a sick and injury report stating

6      that you couldn't perform your duties because of

7      seizure resulting in hospitalization?

8          A.    Correct.

9          Q.    How long were you off after that?

10         A.    I was on administrative leave.  I don't

11     remember the exact amount of time, until March

12     19th it looks like.

13         Q.    Do you recall why you submitted these

14     sick and injury reports in July of 2015 for May

15     of 2014 and January of 2015 inability to perform

16     your work?

17         A.    I don't recall.  These would have been

18     provided to me by my command then.  I would have

19     been directed to fill them out.  I don't recall

20     the reasoning behind the dates or anything.

21         Q.    They didn't tell you what to put on

22     them, did they?

23         A.    I don't recall.

24              MR. ROBINSON:  I have no further

1     questions.

2

3               RECROSS EXAMINATION

4               BY MR. BAKER:

5       Q.    Just real quick, Trudy.  On Exhibit 3

6     there is, up at the top right-hand corner it

7     says update.  Do you see that?

8       A.    Yes.

9       Q.    Is that your handwriting?

10      A.    No.

11              MR. BAKER:  I have no further

12    questions.

13              MR. ROBINSON:  Thank you.  We will

14    waive.  It is my deposition, I believe.  Oh, I

15    am sorry.  You will waive, or will you?

16              MR. BAKER:  I will, yes, yes.

17                   (Witness Excused)

18

19

20

21

22

23

24

```
1     STATE OF ILLINOIS      )
                             ) SS
2     COUNTY OF CHRISTIAN     )

3

4          I, Sandra K. Haines, a Notary Public and

5     Certified Shorthand Reporter, associated with

6     Haines Court Reporting, do hereby certify that

7     prior to the taking of the deposition herein,

8     and on June 22, 2020, the Deponent, TRUDY KARR

9     OWNBY was, by me, duly sworn/affirmed to testify

10    to the truth in relation to the matter in

11    controversy herein.  That on said date the

12    foregoing deposition was taken down

13    stenographically by me and afterwards reduced to

14    typewritten form by me, and that the foregoing

15    transcript contains a true and accurate

16    translation of all such shorthand notes.

17         Given under my hand and seal this 26th day

18    of June, 2020 at Taylorville, Illinois.

19

20

21

22                        Sandra K. Haines
                          Notary Public and CSR
23                        License No. 084-002423

24
```

63

**$26.00** [1] - 13:15
**'18** [1] - 12:3
**'19** [2] - 12:3, 12:4
**'89** [1] - 8:4
**'91** [6] - 6:23, 7:1, 7:2, 8:5, 8:22, 12:11
**084-002423** [2] - 1:20, 62:23
**1** [12] - 3:10, 15:23, 16:4, 18:16, 20:16, 22:6, 32:3, 47:6, 47:10, 50:21, 51:12, 58:8
**10** [3] - 3:19, 40:14, 40:18
**100** [1] - 26:22
**11** [4] - 3:20, 41:7, 41:11, 51:5
**11th** [7] - 23:10, 26:6, 26:9, 33:5, 56:23, 57:20, 60:1
**12** [5] - 3:21, 43:10, 43:15, 50:21, 51:2
**14** [1] - 50:4
**14th** [11] - 16:18, 20:7, 20:23, 21:14, 23:17, 31:13, 31:19, 56:16, 56:18, 57:3, 58:10
**1582** [1] - 38:19
**16** [1] - 3:10
**16th** [2] - 43:19, 51:5
**18** [1] - 3:11
**19** [1] - 50:4
**1971** [1] - 5:22
**1991** [1] - 8:10
**19th** [14] - 19:1, 20:10, 20:13, 21:2, 23:17, 31:16, 31:24, 32:22, 33:1, 56:19, 57:5, 57:14, 58:15, 60:12
**2** [13] - 3:11, 18:8, 18:12, 18:17, 21:5, 21:24, 32:3, 47:6, 48:3, 49:7, 50:21, 51:12, 58:12
**20** [2] - 8:2, 58:9
**200** [3] - 22:12, 57:4, 59:8
**2007** [4] - 7:13, 8:14, 9:5, 14:15
**2008** [5] - 7:3, 7:22, 8:11, 8:17, 8:21
**2014** [19] - 16:8, 16:18, 17:24, 19:1, 34:4, 47:22, 47:24, 48:17, 49:1, 49:17, 50:4, 50:17, 57:14, 58:9, 58:10, 58:15, 59:17, 60:15
**2015** [13] - 18:21, 23:6, 23:10, 33:7, 34:4, 48:10, 48:15, 49:23, 57:22, 58:13, 60:2, 60:14, 60:15
**2016** [2] - 27:22, 29:9
**2017** [9] - 12:1, 14:16, 30:24, 38:14, 40:1, 40:2, 40:6, 52:12
**2018** [7] - 7:24, 34:15, 41:20, 42:9, 43:19, 51:5, 52:5
**2019** [1] - 12:2
**2019-CV-2134** [1] - 1:8
**2020** [3] - 1:14, 62:8, 62:18

**20th** [7] - 16:8, 22:7, 26:14, 38:13, 58:1, 59:17, 59:19
**217)424-2871** [1] - 2:10
**217)428-0946** [1] - 1:23
**217)522-3445** [1] - 2:5
**22** [3] - 1:14, 3:12, 62:8
**23rd** [4] - 5:22, 16:9, 30:24, 47:22
**24** [2] - 3:13, 52:12
**24th** [3] - 40:1, 40:2, 40:6
**25471** [1] - 1:22
**26th** [1] - 62:17
**27** [1] - 3:14
**29** [1] - 27:22
**29th** [1] - 29:9
**3** [4] - 3:12, 22:19, 22:23, 61:5
**30** [1] - 3:15
**30(b)(6** [1] - 4:16
**317** [1] - 18:18
**318** [1] - 18:16
**34** [1] - 3:16
**37** [1] - 3:17
**39** [1] - 3:18
**3rd** [7] - 18:21, 21:24, 23:6, 48:15, 58:2, 58:13, 59:20
**4** [4] - 3:3, 3:13, 23:23, 24:3
**40** [1] - 3:19
**41** [1] - 3:20
**415** [1] - 2:4
**43** [1] - 3:21
**46** [1] - 3:3
**47** [1] - 3:4
**5** [3] - 3:14, 27:9, 27:14
**54** [2] - 3:4, 3:5
**5th** [2] - 41:20, 42:9
**6** [4] - 3:15, 30:9, 30:14, 30:17
**61** [2] - 3:5, 3:6
**62523-1196** [1] - 2:9
**62525-5471** [1] - 1:23
**62701** [1] - 2:4
**6th** [1] - 34:15
**7** [4] - 3:16, 34:13, 34:20, 37:9
**8** [3] - 3:17, 37:19, 37:23
**833** [2] - 18:17, 18:18
**9** [6] - 3:18, 39:14, 39:18, 41:23, 48:10, 52:9
**9:00** [1] - 1:15
**A.M** [1] - 1:15
**able** [1] - 53:22
**absence** [1] - 49:20
**accept** [1] - 42:22
**accrued** [2] - 40:7, 54:21
**accumulated** [3] - 40:9, 42:4, 42:7
**accuracy** [2] - 35:2, 41:1
**accurate** [3] - 35:6, 41:4, 62:15
**administrative** [2] - 34:14, 60:10

**advanced** [1] - 38:8
**advancement** [1] - 13:16
**advice** [1] - 54:4
**advised** [7] - 35:19, 35:21, 36:10, 36:12, 44:1, 53:12, 54:8
**afterwards** [1] - 62:13
**age** [1] - 5:23
**agent** [4] - 11:11, 11:12, 11:14, 11:16
**Agent** [1] - 11:21
**ago** [3] - 21:16, 24:22, 31:8
**ailed** [1] - 33:2
**allow** [1] - 28:23
**almost** [1] - 5:3
**ambulance** [2] - 31:14, 31:18
**amount** [3] - 26:11, 42:8, 60:11
**ANCHOR** [1] - 1:22
**Anderson** [2] - 1:15, 2:9
**answer** [7] - 5:11, 5:12, 32:11, 32:19, 45:22, 58:22, 59:15
**answered** [1] - 15:12
**anti** [1] - 29:18
**anti-seizure** [1] - 29:18
**APN** [2] - 38:5, 38:8
**apologize** [2] - 32:12, 45:15
**appealed** [1] - 15:20
**appear** [1] - 27:17
**APPEARANCES** [1] - 2:1
**appeared** [4] - 17:17, 23:14, 33:17, 33:23
**Appearing** [2] - 2:6, 2:12
**application** [3] - 15:2, 34:16, 36:7
**applied** [2] - 35:12, 53:16
**apply** [3] - 14:17, 35:21, 36:12
**approved** [3] - 54:7, 55:7, 55:15
**arrived** [1] - 33:9
**Ascension** [7] - 9:10, 9:12, 10:15, 10:22, 12:6, 13:4, 13:17
**aside** [1] - 59:12
**assist** [2] - 12:19, 12:22
**Assistant** [2] - 2:11, 4:14
**assistant** [2] - 25:11, 25:13
**associated** [1] - 62:5
**assumes** [1] - 32:10
**attending** [2] - 16:24, 59:22
**attention** [1] - 27:8
**attorney** [1] - 57:10
**Attorneys** [1] - 2:3
**atypical** [1] - 16:22
**authentic** [1] - 41:4
**available** [5] - 28:11, 29:2, 40:3, 40:7, 42:18
**awhile** [1] - 59:10
**back** [12] - 8:7, 10:8, 13:11, 17:24, 20:15, 20:19, 32:15,

36:21, 37:9, 48:17, 51:7, 59:9
**background** [1] - 25:8
**backing** [3] - 18:15, 22:6, 41:23
**BAKER** [19] - 2:3, 2:6, 10:2, 32:1, 32:8, 32:18, 35:5, 41:3, 46:9, 46:19, 47:2, 54:11, 56:20, 58:3, 58:5, 61:4, 61:11, 61:16
**baker** [2] - 4:13, 40:23
**Baker.....** [1] - 3:6
**Baker.......** [1] - 3:4
**balance** [2] - 31:6, 31:10
**base** [1] - 58:18
**based** [1] - 44:5
**basic** [2] - 31:8, 31:9
**basics** [1] - 5:8
**basis** [1] - 54:17
**bates** [2] - 18:16, 18:17
**became** [8] - 7:5, 7:12, 7:16, 8:13, 9:5, 12:14, 15:3, 42:16
**become** [2] - 14:17, 42:18
**becoming** [3] - 13:4, 13:6, 13:10
**begin** [1] - 19:14
**beginning** [1] - 18:2
**behalf** [2] - 2:6, 2:12
**behind** [2] - 14:7, 60:20
**belief** [1] - 58:18
**benefits** [2] - 34:16, 35:13
**beyond** [1] - 7:22
**birth** [1] - 5:21
**bit** [4] - 8:7, 14:6, 20:14, 46:10
**blanks** [1] - 9:24
**Bloomington** [3] - 8:6, 21:20, 52:3
**Board** [6] - 34:17, 35:8, 35:11, 37:11, 40:24, 54:7
**bored** [1] - 15:18
**born** [1] - 8:1
**box** [2] - 25:20, 27:24
**Box** [1] - 1:22
**boy** [1] - 4:21
**boy-Y** [1] - 4:21
**Braco** [7] - 27:18, 27:24, 28:6, 28:13, 29:6, 29:14, 30:5
**Braco's** [1] - 28:18
**Brain** [1] - 10:17
**break** [7] - 5:16, 5:17, 5:19, 10:1, 10:2, 45:16, 46:14
**bulletin** [2] - 37:5, 54:9
**BY** [6] - 2:6, 2:11, 4:7, 47:2, 54:15, 61:4
**capabilities** [1] - 30:1
**capable** [1] - 35:24
**care** [2] - 27:2, 27:4
**career** [2] - 13:17, 15:18
**case** [4] - 5:10, 5:12, 12:20,

14:1
caused [4] - 16:22, 17:6, 19:13
CENTRAL [1] - 1:3
certificate [1] - 12:11
certified [1] - 38:9
Certified [1] - 62:5
certify [5] - 16:17, 18:23, 23:9, 38:18, 62:6
certifying [1] - 48:13
challenge [2] - 14:21, 15:17
challenging [2] - 14:20, 15:14
Champaign [1] - 15:9
changed [2] - 56:6, 59:5
check [1] - 25:19
checks [1] - 27:24
Chief [11] - 39:15, 45:8, 46:16, 52:11, 52:18, 52:19, 52:22, 53:4, 53:6, 54:16, 55:9
choosing [3] - 51:22, 51:23, 52:1
chose [1] - 55:2
chosen [1] - 15:19
CHRISTIAN [1] - 62:2
City [20] - 4:23, 14:14, 15:5, 15:8, 35:13, 35:15, 35:19, 36:5, 36:10, 36:13, 36:19, 41:16, 42:10, 45:8, 45:17, 45:19, 46:1, 46:5, 51:19, 53:19
CITY [2] - 1:9, 2:8
City's [3] - 4:15, 51:22, 54:2
Civil [2] - 4:10, 42:11
claiming [1] - 28:21
classified [9] - 42:1, 52:15, 53:14, 53:16, 53:20, 54:5, 55:5, 55:14, 55:20
clear [1] - 5:15
Clinton [13] - 6:21, 6:22, 7:4, 7:9, 7:11, 7:15, 7:18, 8:10, 8:18, 8:21, 8:23, 9:2, 9:7
close [1] - 50:5
closing [1] - 40:22
CNP [2] - 38:5, 38:9
co [3] - 31:13, 31:17, 33:10
co-employees [3] - 31:13, 31:17, 33:10
command [2] - 49:10, 60:18
complete [3] - 18:18, 18:20, 24:11
completed [8] - 21:5, 23:4, 24:15, 27:17, 27:18, 28:19, 30:20, 60:5
completing [1] - 43:1
concerned [1] - 33:10
condition [3] - 19:14, 20:19, 38:17
conditioned [1] - 42:24
conduct [1] - 43:21
conducted [2] - 25:17, 31:3

confident [1] - 26:22
confused [2] - 8:7, 20:14
contacted [1] - 53:7
contains [1] - 62:15
continued [1] - 59:24
controversy [1] - 62:11
conversations [1] - 52:19
copy [1] - 50:23
corner [1] - 61:6
Corporate [1] - 25:3
Corporation [2] - 2:11, 4:14
correct [39] - 4:24, 7:13, 17:3, 21:9, 21:24, 22:4, 22:8, 22:13, 23:20, 24:12, 24:13, 30:6, 34:7, 34:8, 37:11, 37:14, 38:11, 38:12, 38:14, 38:19, 41:18, 41:21, 48:19, 51:7, 51:15, 51:17, 52:16, 54:22, 55:3, 55:20, 56:11, 57:11, 57:18, 57:22, 57:23, 58:10, 58:16, 59:17, 60:8
Counsel [2] - 2:11, 4:14
County [1] - 15:10
COUNTY [1] - 62:2
couple [7] - 14:9, 15:19, 21:15, 21:19, 36:17, 43:24, 50:13
course [1] - 44:15
Court [1] - 62:6
court [5] - 4:13, 5:13, 10:7, 18:6, 32:14
COURT [1] - 1:3
COVID [2] - 14:4, 14:5
cross [2] - 32:7, 47:1
Cross [1] - 3:4
CSR [3] - 1:17, 1:20, 62:22
current [2] - 5:23, 9:9
date [23] - 5:20, 16:5, 18:13, 22:24, 24:4, 27:15, 27:21, 29:5, 30:15, 32:23, 33:8, 34:21, 37:24, 39:19, 39:24, 40:19, 41:12, 43:16, 47:21, 48:10, 51:3, 59:22, 62:11
dated [10] - 16:8, 23:6, 38:13, 41:20, 47:18, 52:11, 58:1, 58:2, 58:8, 58:13
dates [3] - 33:4, 50:9, 60:20
days [10] - 15:19, 21:2, 21:15, 21:19, 22:3, 23:19, 26:10, 50:14, 57:7, 59:10
deal [1] - 32:6
DECATUR [2] - 1:9, 2:8
Decatur [36] - 1:16, 1:23, 2:9, 4:23, 7:5, 7:12, 7:16, 7:19, 8:13, 8:16, 9:3, 9:6, 9:7, 12:14, 13:4, 13:6, 14:14, 14:18, 15:3, 15:5, 15:9, 24:15, 27:18, 34:17, 35:19, 37:10, 42:10, 43:6, 43:12, 43:23, 45:8, 45:18, 45:19, 49:14, 55:24, 59:24
decided [1] - 14:20

Defendant [4] - 1:10, 1:14, 2:12, 4:3
degree [2] - 44:23, 45:4
demands [2] - 44:14, 44:17
Department [5] - 14:18, 49:14, 51:7, 55:24, 60:1
department [1] - 25:1
Deponent [1] - 62:8
Deposition [43] - 1:13, 3:10, 3:11, 3:12, 3:13, 3:14, 3:15, 3:16, 3:17, 3:18, 3:19, 3:20, 3:21, 15:23, 16:4, 18:8, 18:12, 18:16, 18:17, 20:15, 21:5, 22:18, 22:23, 23:23, 24:3, 27:9, 27:14, 30:9, 30:14, 34:13, 34:20, 37:19, 37:23, 39:14, 39:18, 40:14, 40:18, 41:7, 41:11, 43:10, 43:15, 50:20, 58:7
deposition [10] - 4:9, 5:5, 10:4, 18:3, 21:23, 22:18, 46:22, 61:14, 62:7, 62:12
depositions [1] - 46:10
describe [11] - 17:5, 19:12, 21:11, 25:9, 28:8, 31:12, 31:16, 33:12, 44:4, 54:16, 56:2
described [2] - 17:19, 33:23
describes [1] - 33:22
describing [1] - 31:5
description [2] - 12:6, 33:15
designated [1] - 4:15
detailed [1] - 25:23
determine [2] - 39:9, 43:22
determined [3] - 35:13, 35:16, 36:13
DeWitt [1] - 15:10
diagnosed [1] - 20:20
diagnosis [12] - 17:22, 20:6, 36:23, 37:6, 39:10, 56:5, 56:7, 56:14, 56:15, 59:4, 59:5, 59:14
difference [1] - 15:16
different [2] - 56:15, 57:12
difficult [1] - 45:15
difficulty [3] - 8:3, 8:24, 9:21
Direct [1] - 3:3
DIRECT [1] - 4:6
directed [2] - 54:10, 60:19
directing [1] - 27:8
directly [2] - 11:1, 11:12
disability [12] - 34:16, 35:12, 35:21, 36:7, 36:12, 53:17, 53:18, 54:7, 55:6, 55:7, 55:8, 55:15
discussing [1] - 31:5
discussion [1] - 49:11
disorder [1] - 29:20
dispatcher [2] - 14:23, 15:5
DISTRICT [2] - 1:3, 1:3
DMH [1] - 25:3

doctor [10] - 19:7, 25:14, 30:5, 33:1, 38:10, 51:9, 51:18, 52:3, 52:5, 52:7
doctor's [1] - 37:2
doctors [1] - 51:16
document [22] - 16:1, 16:2, 16:12, 18:9, 18:10, 22:21, 24:1, 27:10, 27:12, 30:11, 30:12, 34:18, 37:20, 37:21, 39:16, 40:15, 40:16, 41:8, 41:9, 43:13, 48:3, 48:21
documentation [1] - 45:10
documents [4] - 27:11, 32:3, 45:20, 46:2
done [2] - 36:24, 46:12
double [1] - 33:20
doubt [2] - 35:2, 40:24
down [5] - 5:14, 5:20, 45:16, 59:21, 62:12
Dr [29] - 17:2, 20:4, 26:24, 27:18, 27:24, 28:6, 28:13, 28:18, 29:6, 29:14, 30:5, 30:20, 30:23, 31:3, 33:13, 33:15, 33:22, 34:6, 34:9, 43:5, 43:11, 43:21, 51:10, 51:13, 51:18, 51:21, 51:24, 52:4, 53:8
drawing [1] - 9:24
drug [1] - 43:2
due [2] - 14:3, 57:7
duly [14] - 4:3, 16:2, 18:10, 22:21, 24:1, 27:12, 30:12, 34:18, 37:21, 39:16, 40:16, 41:9, 43:13, 62:9
during [4] - 12:19, 19:4, 46:15, 50:16
duties [12] - 12:17, 19:4, 21:3, 26:8, 35:20, 36:1, 44:22, 45:3, 57:7, 57:16, 58:10, 60:6
duty [22] - 25:2, 25:17, 28:7, 28:12, 28:22, 30:17, 34:10, 35:14, 36:11, 36:12, 36:14, 38:23, 39:7, 39:9, 43:1, 43:7, 43:22, 44:3, 44:7, 53:8, 53:19, 55:1
duty-employer [2] - 30:17, 34:10
earned [1] - 40:3
eight [2] - 5:24, 13:8
either [1] - 46:19
emergency [2] - 21:18, 27:3
emotional [2] - 44:14, 44:16
employed [4] - 4:23, 14:13, 49:13, 55:24
employees [3] - 31:13, 31:17, 33:10
employer [7] - 18:24, 23:9, 26:4, 27:6, 30:17, 34:10, 36:19
employment [2] - 9:9, 43:2
enjoyed [1] - 13:16
entire [2] - 7:19, 9:2

**Erica** [6] - 36:15, 36:20, 37:4, 38:2, 38:4, 38:21
**ERT** [1] - 28:12
**essential** [1] - 35:24
**estimate** [1] - 46:17
**event** [2] - 16:23, 17:9
**events** [1] - 33:12
**evidence** [5] - 32:10, 45:18, 46:1, 46:4, 46:6
**exact** [10] - 21:17, 26:11, 29:4, 32:23, 33:4, 33:8, 36:18, 44:12, 60:11
**exactly** [9] - 19:11, 21:21, 27:7, 28:24, 34:2, 39:2, 54:9, 57:12, 58:22
**exam** [8] - 25:2, 25:19, 28:1, 31:2, 31:9, 43:1, 43:7, 44:10
**Examination** [4] - 3:3, 3:4, 3:5, 3:6
**EXAMINATION** [4] - 4:6, 47:1, 54:14, 61:3
**examination** [5] - 25:17, 25:23, 29:13, 35:1, 43:21
**examine** [6] - 15:24, 22:20, 23:23, 30:10, 37:20, 43:11
**examined** [1] - 4:4
**Excused** [1] - 61:17
**exhibit** [2] - 18:5, 51:2
**Exhibit** [56] - 3:10, 3:11, 3:12, 3:13, 3:14, 3:15, 3:16, 3:17, 3:18, 3:19, 3:20, 3:21, 15:23, 16:4, 18:8, 18:12, 18:16, 18:17, 20:16, 21:5, 21:24, 22:6, 22:19, 22:23, 23:23, 24:3, 27:9, 27:14, 30:9, 30:14, 30:17, 34:13, 34:20, 37:9, 37:19, 37:23, 39:14, 39:18, 40:14, 40:18, 41:7, 41:11, 41:23, 43:10, 43:15, 47:6, 47:10, 48:3, 49:6, 50:21, 51:12, 52:9, 58:8, 58:12, 61:5
**exhibits** [2] - 45:21, 47:4
**Exhibits** [2] - 32:3, 50:21
**EXHIBITS** [1] - 3:8
**experience** [1] - 38:6
**explain** [2] - 32:1, 59:6
**explained** [2] - 53:15, 54:24
**extended** [3] - 14:1, 14:3, 14:9

**fact** [2] - 24:14, 42:10
**fair** [3] - 17:23, 49:16, 50:16
**false** [1] - 36:6
**familiar** [1] - 5:7
**far** [1] - 50:3
**Farm** [6] - 11:11, 11:12, 11:15, 11:21, 11:23, 11:24
**February** [1] - 30:24
**Federal** [1] - 4:10
**fell** [1] - 15:1

**felt** [2] - 15:15, 19:17
**few** [1] - 30:10
**field** [1] - 12:21
**figure** [1] - 8:8
**filed** [1] - 41:5
**fill** [5] - 16:15, 49:9, 59:2, 59:8, 60:19
**filled** [1] - 48:14
**filling** [1] - 16:6
**fine** [3] - 18:6, 32:8, 36:4
**finish** [1] - 5:10
**fired** [2] - 53:13, 54:17
**first** [11] - 4:3, 19:7, 20:2, 20:12, 21:21, 23:14, 24:18, 28:9, 50:14, 55:11, 56:5
**fit** [13] - 25:2, 25:17, 28:7, 28:21, 30:17, 34:9, 35:20, 39:6, 39:9, 43:22, 44:3, 44:7, 55:1
**fitness** [3] - 38:23, 43:1, 43:6
**five** [5] - 14:5, 21:2, 23:19, 26:10, 59:1
**floor** [1] - 14:5
**FMLA** [7] - 47:12, 48:1, 49:1, 57:11, 59:2, 59:7, 59:13
**follow** [2] - 20:4, 27:4
**follow-up** [2] - 20:4, 27:4
**following** [1] - 36:3
**follows** [1] - 4:5
**FOR** [1] - 1:3
**foregoing** [2] - 62:12, 62:14
**forgot** [1] - 10:6
**form** [10] - 18:18, 18:23, 24:8, 24:11, 24:15, 24:19, 25:6, 25:16, 59:9, 62:14
**forms** [2] - 28:19, 29:4
**forty** [1] - 5:24
**forty-eight** [1] - 5:24
**forward** [3] - 39:12, 53:9, 54:8
**free** [1] - 22:8
**front** [5] - 17:10, 19:18, 22:8, 33:16, 33:24, 47:4
**further** [5] - 28:10, 29:2, 37:8, 54:11, 60:24, 61:11
**Gary** [2] - 1:15, 2:9
**generally** [1] - 13:23
**Getz** [9] - 39:15, 52:11, 52:19, 52:20, 52:22, 53:4, 53:6, 54:16, 55:9
**gist** [1] - 31:8
**given** [3] - 5:5, 15:12, 37:7
**Given** [1] - 62:17
**goodness** [3] - 6:23, 9:18, 36:17
**graduated** [1] - 8:4
**granted** [1] - 55:20
**group** [2] - 11:7, 11:9
**Group** [2] - 43:6, 43:12
**guess** [2] - 8:6, 20:13
**guidance** [1] - 53:12
**guys** [1] - 14:24

**Haines** [5] - 1:17, 1:20, 62:4, 62:6, 62:22
**half** [1] - 10:19
**hand** [2] - 61:6, 62:17
**handwriting** [7] - 16:7, 47:11, 47:14, 47:16, 48:6, 48:8, 61:9
**hard** [1] - 53:24
**harm** [2] - 44:23, 45:4
**Hazmat** [1] - 28:12
**Health** [1] - 25:3
**health** [1] - 52:7
**hearing** [2] - 34:14, 34:24
**Heaven** [1] - 50:22
**hereby** [1] - 62:6
**herein** [3] - 4:2, 62:7, 62:11
**high** [2] - 8:4, 44:14
**higher** [3] - 44:17, 44:23, 45:4
**hold** [2] - 7:23, 52:23
**holiday** [3] - 40:10, 42:4, 42:7
**home** [1] - 17:19
**honestly** [8] - 16:13, 26:9, 33:3, 49:8, 50:10, 50:15, 58:20, 58:21
**Hospital** [7] - 9:11, 9:13, 10:15, 12:7, 13:18, 24:16, 27:19
**hospital** [18] - 10:20, 10:21, 10:23, 11:2, 11:3, 17:20, 20:3, 20:8, 20:11, 20:21, 20:24, 21:1, 21:12, 31:23, 32:22, 33:1, 33:6, 50:13
**hospitalization** [7] - 21:9, 21:11, 50:18, 57:8, 57:17, 58:16, 60:7
**hospitalized** [5] - 50:3, 50:5, 50:9, 50:11, 50:12
**hour** [2] - 1:15, 13:15
**hours** [5] - 22:13, 49:2, 49:3, 57:4, 59:8
**HSHS** [2] - 43:5, 43:12
**Human** [1] - 45:8
**husband** [3] - 6:8, 14:22, 15:4

**idea** [1] - 46:17
**identification** [12] - 16:3, 18:11, 22:22, 24:2, 27:13, 30:13, 34:19, 37:22, 39:17, 40:17, 41:10, 43:14
**ILLINOIS** [3] - 1:3, 1:9, 62:1
**Illinois** [11] - 1:16, 1:23, 2:4, 2:9, 6:21, 8:5, 8:18, 8:22, 15:10, 26:24, 62:18
**immediately** [1] - 19:20
**IN** [1] - 1:3
**inability** [1] - 60:15
**incident** [33] - 19:6, 19:7, 19:12, 20:2, 20:7, 20:10, 20:12, 20:23, 21:13, 21:21, 23:13, 23:14, 26:6, 31:13,

31:16, 31:17, 34:1, 36:4, 36:22, 47:23, 48:22, 50:14, 56:3, 56:5, 56:15, 56:16, 56:24, 58:1, 58:21, 58:23, 58:24, 59:3, 59:12
**incidents** [5] - 31:5, 31:19, 55:23, 56:11, 56:22
**include** [1] - 13:3
**included** [1] - 58:6
**includes** [1] - 33:16
**INDEX** [1] - 3:1
**individuals** [1] - 44:23
**information** [2] - 28:11, 29:2
**initial** [7] - 20:22, 21:13, 36:3, 56:4, 59:4
**initials** [2] - 25:9, 38:5
**injury** [9] - 16:11, 23:3, 23:8, 26:7, 57:24, 58:8, 58:12, 60:5, 60:14
**instance** [2] - 1:14, 4:2
**instances** [1] - 49:12
**instead** [1] - 53:22
**Institute** [1] - 27:1
**instrumentation** [1] - 12:20
**instruments** [1] - 12:23
**Insurance** [2] - 11:13, 11:15
**intentionally** [1] - 32:5
**issue** [1] - 30:3
**January** [16] - 23:10, 26:6, 26:9, 26:14, 31:20, 31:21, 33:5, 33:7, 36:22, 49:22, 56:18, 56:23, 57:19, 60:1, 60:15
**job** [9] - 10:20, 12:6, 28:23, 30:2, 35:24, 36:2, 54:1, 54:3, 54:4
**JOHN** [2] - 2:6, 2:11
**John** [1] - 4:13
**joined** [1] - 13:17
**Jon** [1] - 30:20
**Joseph's** [1] - 21:20
**July** [9] - 18:21, 21:24, 23:6, 48:10, 48:14, 58:2, 58:13, 59:19, 60:14
**June** [14] - 1:14, 12:2, 16:8, 16:9, 22:7, 41:20, 42:9, 47:22, 58:1, 58:8, 59:17, 59:19, 62:8, 62:18
**Karr** [39] - 4:9, 4:12, 4:17, 4:19, 4:22, 15:21, 15:22, 15:23, 16:4, 18:8, 18:12, 18:15, 18:17, 20:15, 22:17, 22:18, 22:23, 23:22, 24:3, 27:8, 27:14, 30:9, 30:14, 32:20, 34:12, 34:16, 34:20, 37:18, 37:19, 37:23, 39:14, 39:18, 40:13, 40:14, 40:18, 41:7, 41:11, 43:9, 43:15
**KARR** [4] - 1:6, 1:13, 4:1, 62:8
**Kathuria** [6] - 43:5, 43:11, 43:21, 51:10, 51:18, 52:4
**Kattah** [6] - 17:2, 20:5,

26:24, 51:13, 51:21, 51:24
**keep** [1] - 50:21
**kept** [1] - 21:19
**kind** [3] - 14:6, 15:18, 29:13
**knowledge** [2] - 46:3, 53:5
**known** [1] - 4:22
**KRAJEWSKI** [1] - 2:3
**labeled** [1] - 34:13
**Lake** [3] - 6:2, 6:4, 6:12
**last** [5] - 4:18, 4:20, 10:8,
10:12, 52:8
**Law** [1] - 2:3
**lawyer** [2] - 4:12, 40:22
**lawyers** [1] - 35:1
**leave** [16] - 40:4, 40:7, 41:24,
48:1, 49:1, 49:19, 52:15,
53:14, 53:15, 53:20, 54:5,
54:21, 55:5, 55:13, 55:19,
60:10
**left** [2] - 7:9, 15:7
**lethal** [1] - 28:11
**letter** [5] - 38:2, 38:13, 38:16,
41:15, 42:10
**License** [1] - 62:23
**life** [1] - 14:19
**lights** [1] - 17:18
**listed** [1] - 16:20
**little** [4] - 8:6, 14:6, 20:14,
46:9
**live** [9] - 6:1, 6:7, 6:11, 6:16,
6:20, 6:22, 7:8, 8:17, 9:1
**lived** [8] - 6:11, 6:19, 7:4,
7:10, 8:5, 8:10, 8:20, 9:7
**living** [2] - 7:15, 7:18
**LLC** [1] - 2:3
**look** [5] - 17:14, 22:9, 50:20,
52:8, 59:21
**looked** [2] - 17:18, 20:16
**looking** [1] - 16:14
**looks** [3] - 23:19, 48:13,
60:12
**loss** [2] - 17:24, 18:1
**lost** [1] - 17:11
**love** [1] - 15:1
**M.D** [1] - 30:21
**March** [10] - 12:1, 14:16,
34:15, 38:13, 40:1, 40:2,
40:6, 52:12, 60:11
**marked** [23] - 15:22, 16:3,
18:7, 18:11, 22:18, 22:22,
23:22, 24:2, 25:20, 27:13,
30:8, 30:13, 34:19, 37:19,
37:22, 39:13, 39:17, 40:14,
40:17, 41:7, 41:10, 43:9,
43:14
**married** [2] - 4:19, 5:2
**Mary's** [2] - 21:18, 43:12
**matter** [1] - 62:10
**mean** [5] - 25:10, 28:18,
28:20, 35:16, 38:7
**Medical** [2] - 43:6, 43:12
**medical** [13] - 19:13, 25:8,

25:13, 28:11, 29:21, 30:5,
38:5, 38:10, 38:17, 38:18,
44:2, 44:5, 44:18
**medication** [5] - 29:16,
29:18, 37:2, 39:11, 44:9
**meeting** [1] - 38:18
**memo** [3] - 52:11, 52:14,
52:18
**memorandum** [3] - 39:14,
39:22, 39:24
**Memorial** [2] - 24:15, 27:18
**memory** [5] - 17:11, 17:14,
17:15, 17:23, 18:1
**mentally** [2] - 14:21, 15:17
**Michigan** [9] - 6:2, 6:4, 6:12,
9:11, 10:16, 11:6, 11:8,
11:19, 13:14
**migraine** [1] - 16:23
**minor** [4] - 16:22, 20:20,
56:2, 57:5
**misleading** [2] - 32:4, 32:10
**Miss** [6] - 4:17, 15:21, 22:17,
32:20, 34:12, 46:13
**miss** [1] - 54:16
**moment** [3] - 9:22, 22:19,
27:9
**momentary** [1] - 18:1
**moments** [1] - 30:10
**month** [1] - 10:19
**months** [4] - 6:15, 9:19,
13:24, 39:3
**morning** [2] - 18:2, 45:11
**most** [1] - 44:24
**mostly** [3] - 15:16, 17:15,
43:24
**move** [2] - 39:12, 54:8
**moved** [8] - 6:23, 7:2, 7:10,
8:5, 8:22, 8:23, 9:20
**moving** [1] - 53:9
**MR** [29] - 2:6, 2:11, 4:7, 10:2,
10:6, 32:1, 32:6, 32:8,
32:14, 32:18, 35:5, 41:3,
46:7, 46:9, 46:13, 46:19,
46:21, 47:2, 54:11, 54:15,
56:20, 58:3, 58:4, 58:5,
60:24, 61:4, 61:11, 61:13,
61:16
**Murff** [1] - 11:17
**N-O-V-I** [1] - 9:16
**name** [6] - 4:17, 4:18, 4:20,
11:5, 25:10, 38:4
**names** [1] - 51:11
**necessitated** [1] - 49:19
**need** [3] - 5:15, 5:19, 46:14
**needed** [3] - 36:23, 49:3,
53:12
**neurologic** [1] - 52:1
**Neurological** [1] - 27:1
**neurological** [4] - 49:12,
55:23, 56:3, 56:11
**neurosurgeon's** [2] - 11:2,
11:5

**Neurosurgeons** [2] - 11:6,
11:9
**Neurosurgery** [1] - 10:16
**never** [3] - 15:8, 30:2, 36:19
**NFPA** [1] - 38:19
**nine** [4] - 6:15, 9:19, 13:2,
13:24
**NO** [1] - 1:8
**nobody** [1] - 17:19
**none** [1] - 34:5
**Nora** [1] - 4:20
**Notary** [3] - 1:17, 62:4, 62:22
**notes** [2] - 38:16, 62:16
**notice** [2] - 1:18, 4:11
**noticed** [1] - 19:20
**November** [4] - 27:21, 29:9,
43:19, 51:5
**Novi** [5] - 9:11, 9:14, 11:19,
11:21, 13:14
**Number** [28] - 3:10, 3:11,
3:12, 3:13, 3:14, 3:15,
3:16, 3:17, 3:18, 3:19,
3:20, 3:21, 16:4, 18:12,
22:23, 24:3, 27:14, 30:14,
34:20, 37:23, 39:18, 40:18,
41:11, 43:15, 47:10, 49:7,
51:2, 52:9
**nurse** [2] - 38:8, 38:9
**nystagmus** [1] - 31:7
**oath** [2] - 4:4, 37:13
**object** [1] - 32:9
**objection** [1] - 32:18
**obviously** [2] - 46:13, 53:23
**occasions** [1] - 50:12
**occupational** [1] - 52:7
**occurred** [8] - 20:23, 33:19,
34:3, 36:24, 47:24, 49:17,
49:22, 52:24
**occurrence** [5] - 17:1, 17:5,
37:1, 37:8, 58:19
**occurrences** [2] - 23:17,
33:13
**October** [2] - 5:22, 10:11
**OF** [5] - 1:3, 1:9, 2:8, 62:1,
62:2
**offer** [1] - 42:24
**offered** [4] - 26:14, 42:20,
55:4, 55:9
**office** [1] - 11:2
**officer** [26] - 7:6, 7:12, 7:16,
7:20, 8:13, 8:16, 9:3, 9:6,
9:7, 12:15, 13:4, 13:7,
13:10, 14:14, 14:18, 15:3,
15:13, 26:16, 28:24, 30:2,
35:20, 36:1, 36:3, 43:23,
44:22, 45:3
**officers** [3] - 15:20, 44:14,
44:17
**once** [1] - 33:21
**one** [27] - 17:21, 20:16,
23:20, 26:20, 29:1, 29:11,
33:22, 46:19, 48:21, 49:16,

49:22, 50:5, 50:17, 50:22,
55:11, 55:12, 56:24, 57:11,
58:2, 58:20, 58:24, 59:7,
59:12, 59:13, 59:18, 59:19
**One** [2] - 1:15, 2:9
**open** [1] - 42:16
**ophthalmologist** [1] - 52:1
**opinion** [12] - 26:15, 28:18,
37:2, 38:22, 39:3, 39:5,
44:2, 45:1, 45:6, 53:17,
54:2, 56:6
**opportunity** [1] - 5:8
**option** [1] - 55:4
**options** [2] - 53:13, 55:10
**order** [2] - 36:21, 46:11
**orientation** [2] - 13:20, 13:21
**outbreak** [1] - 14:4
**own** [1] - 27:2
**OWN** [1] - 4:20
**OWNBY** [3] - 1:13, 4:1, 62:9
**Ownby** [4] - 4:19, 4:20, 18:7,
54:16
**P.O** [1] - 1:22
**PA** [2] - 25:10, 25:11
**PA-C** [1] - 25:10
**page** [3] - 28:9, 28:10, 30:11
**papers** [1] - 49:9
**paperwork** [1] - 59:2
**pass** [1] - 18:5
**passing** [1] - 12:22
**path** [1] - 15:18
**pay** [1] - 13:13
**payout** [2] - 42:4, 42:7
**pending** [1] - 5:18
**Penny** [2] - 2:16, 4:15
**pension** [3] - 34:16, 35:13,
36:7
**Pension** [6] - 34:17, 35:8,
35:11, 37:10, 40:23, 54:7
**people** [3] - 17:15, 17:16,
45:8
**Peoria** [2] - 20:5, 27:1
**percent** [1] - 26:22
**perform** [19] - 16:17, 16:21,
17:6, 18:24, 19:4, 21:3,
22:2, 23:10, 26:8, 29:14,
30:1, 35:20, 57:4, 57:6,
57:15, 58:9, 58:14, 60:6,
60:15
**performed** [1] - 12:24
**performing** [3] - 35:24,
44:21, 45:2
**perhaps** [1] - 8:20
**period** [2] - 13:22, 19:4
**person** [1] - 25:3
**Peters** [1] - 24:14
**Petersen** [8] - 30:20, 30:23,
31:3, 33:13, 33:15, 33:22,
34:6, 53:8
**Petersen's** [1] - 34:9
**phone** [3] - 52:21, 52:23,
53:4

physical [7] - 24:8, 25:19, 28:1, 29:22, 30:1, 31:10, 44:13
physically [2] - 14:22, 15:17
physician [11] - 16:24, 23:16, 27:2, 27:4, 34:7, 34:10, 51:3, 51:21, 51:22, 51:24, 59:22
physician's [2] - 25:11, 25:13
physicians [1] - 26:21
picking [1] - 29:23
piece [1] - 8:19
placed [1] - 42:11
Plaintiff [3] - 1:7, 2:6, 4:9
Plaza [2] - 1:16, 2:9
point [1] - 14:19
police [28] - 7:5, 7:12, 7:16, 7:20, 8:13, 8:16, 9:3, 9:6, 9:7, 12:14, 13:4, 13:6, 13:10, 14:14, 14:17, 15:3, 15:13, 26:16, 28:24, 30:2, 35:20, 36:1, 36:2, 43:23, 44:14, 44:17, 44:22, 45:3
Police [9] - 14:18, 34:17, 35:11, 37:10, 40:23, 49:14, 51:7, 55:24, 60:1
position [7] - 25:20, 26:16, 42:14, 42:15, 42:16, 42:18, 42:22
possible [8] - 17:21, 19:8, 29:20, 32:24, 33:3, 46:12, 56:5, 56:9
practitioner [2] - 38:8, 38:9
pre [1] - 43:2
pre-employment [1] - 43:2
prefer [2] - 5:17, 6:24
prepare [1] - 12:20
prepared [2] - 25:23, 38:22
preparing [1] - 39:21
PRESENT [1] - 2:14
present [1] - 4:12
presented [1] - 39:8
prevent [2] - 37:1, 37:7
previously [1] - 38:21
primary [2] - 27:2, 27:4
problem [1] - 5:19
Procedure [1] - 4:11
proceedings [2] - 34:14, 35:3
process [1] - 15:2
professions [3] - 44:18, 44:24, 45:5
program [1] - 12:12
protected [2] - 53:21, 54:6
provided [6] - 17:22, 26:4, 28:23, 37:4, 44:7, 60:18
Providence [7] - 9:10, 9:13, 10:15, 10:22, 12:7, 13:5, 13:18
provider [1] - 25:5
Public [3] - 1:17, 62:4, 62:22

public [1] - 45:3
purpose [1] - 49:6
purposes [12] - 16:3, 18:11, 22:22, 24:2, 27:13, 30:13, 34:19, 37:22, 39:17, 40:17, 41:10, 43:14
pursuant [2] - 1:17, 4:10
put [4] - 14:6, 22:8, 42:14, 60:21

qualify [2] - 44:7, 53:18
questions [10] - 5:9, 19:24, 29:15, 31:9, 32:4, 44:1, 46:8, 54:12, 61:1, 61:12
quick [2] - 10:3, 61:5
quickly [1] - 46:12

ran [1] - 17:20
rate [1] - 13:13
rather [1] - 5:13
re [1] - 34:15
read [5] - 10:8, 10:9, 32:15, 32:16, 46:1
reading [1] - 28:20
ready [2] - 12:21, 30:11
real [2] - 10:3, 61:5
really [7] - 15:20, 21:16, 30:2, 45:1, 56:10, 58:22, 59:11
reason [13] - 14:11, 16:20, 19:3, 23:12, 26:2, 26:3, 26:13, 35:2, 40:24, 45:7, 45:17, 53:18, 58:15
reasoning [1] - 60:20
reasons [1] - 15:12
receive [1] - 46:5
received [5] - 12:11, 42:3, 42:6, 47:19, 52:21
recently [1] - 13:11
recess [2] - 10:5, 46:23
recognize [7] - 15:24, 16:7, 18:8, 22:20, 37:20, 40:15, 41:8
recollection [2] - 22:15, 26:11
recommendation [1] - 29:3
record [6] - 4:8, 5:15, 18:15, 32:11, 46:21, 53:24
records [3] - 29:22, 44:2, 44:6
RECROSS [1] - 61:3
Recross [1] - 3:6
Recross-Examination [1] - 3:6
red [2] - 33:16, 33:17
Redirect [1] - 3:5
rEDIRECT [1] - 54:14
Redirect-Examination [1] - 3:5
reduced [1] - 62:13
referenced [1] - 51:12
referrals [1] - 27:3
referred [1] - 52:2
reflect [1] - 4:8

refused [1] - 46:1
regarding [1] - 38:22
register [1] - 42:12
reinstated [1] - 42:15
reinstatement [1] - 42:11
relates [1] - 48:17
relation [1] - 62:10
rely [2] - 45:9, 45:19
remaining [1] - 40:3
remember [20] - 16:6, 16:13, 17:12, 19:15, 19:22, 21:4, 21:17, 21:21, 26:10, 28:4, 28:24, 29:4, 31:4, 31:5, 49:8, 50:15, 58:21, 58:23, 60:11
remembering [1] - 9:21
removed [1] - 14:4
repeat [2] - 20:17, 32:12
report [16] - 16:11, 16:14, 16:16, 23:3, 23:8, 25:6, 25:23, 26:4, 26:7, 34:13, 35:2, 51:3, 58:1, 58:8, 58:12, 60:5
Reporter [1] - 62:5
reporter [7] - 4:13, 5:14, 10:8, 10:9, 18:6, 32:15, 32:16
REPORTING [1] - 1:22
Reporting [1] - 62:6
reports [2] - 27:5, 60:14
represent [2] - 34:23, 40:21
request [3] - 41:24, 52:14, 55:19
requested [5] - 10:10, 29:21, 32:17, 49:3, 49:10
required [7] - 12:9, 16:14, 16:16, 25:2, 36:19, 37:5, 47:24
requirements [1] - 38:18
resign [4] - 53:13, 54:1, 55:11, 55:12
Resources [1] - 45:9
respond [1] - 19:24
restrictions [2] - 28:2, 28:22
result [2] - 24:8, 42:9
resulted [1] - 21:9
resulting [4] - 57:7, 57:16, 58:15, 60:7
results [2] - 25:19, 28:1
retire [7] - 53:22, 54:8, 55:2, 55:4, 55:7, 55:12, 55:16
retired [1] - 55:17
return [1] - 27:6
returned [3] - 26:16, 59:16, 59:22
review [1] - 27:10
reviewed [1] - 44:1
Richardson [3] - 6:13, 6:16, 6:19
ride [1] - 14:24
right-hand [1] - 61:6
risk [2] - 44:23, 45:4

Robinson [1] - 4:14
ROBINSON [12] - 2:11, 4:7, 10:6, 32:6, 32:14, 46:7, 46:13, 46:21, 54:15, 58:4, 60:24, 61:13
Robinson. [1] - 3:5
Robinson... [1] - 3:3
Rogers [3] - 2:16, 4:15, 46:13
room [3] - 21:18, 27:3, 29:24
Rule [1] - 4:15
Rules [1] - 4:10
Sandra [4] - 1:16, 1:20, 62:4, 62:22
Sarah [3] - 24:14, 24:21, 24:24, 25:5, 25:16, 25:22, 26:14, 26:21
saw [7] - 19:18, 24:19, 26:21, 26:23, 27:1, 33:1, 52:5
school [1] - 8:4
screen [1] - 43:2
seal [1] - 62:17
Seal [1] - 17:13
second [10] - 7:23, 20:6, 21:22, 23:13, 28:10, 34:1, 36:22, 48:3, 49:22, 57:1
see [22] - 8:1, 8:4, 15:1, 16:9, 20:17, 26:20, 26:23, 28:2, 29:6, 29:11, 43:5, 43:11, 43:18, 46:15, 47:10, 47:19, 48:4, 48:11, 48:15, 51:13, 59:23, 61:7
seeing [4] - 24:21, 24:24, 26:10, 30:23
seek [1] - 54:19
seeking [1] - 51:6
seizure [12] - 19:8, 21:3, 21:8, 23:14, 23:15, 29:18, 29:20, 56:9, 57:7, 57:16, 58:15, 60:7
seizures [1] - 44:8
sense [2] - 19:23, 20:1
sent [1] - 51:19
separate [5] - 50:12, 51:16, 56:21, 59:3, 59:6
separation [1] - 54:19
September [1] - 17:13
Sergeant [1] - 17:13
served [1] - 9:2
service [10] - 27:21, 42:1, 52:15, 53:14, 53:16, 53:21, 54:5, 55:6, 55:14, 55:20
Service [1] - 42:11
serving [1] - 7:19
set [1] - 46:10
Seventh [1] - 2:4
several [2] - 17:21, 30:11
severe [1] - 18:1
sewing [1] - 12:23
Sheers [8] - 24:14, 24:21, 24:24, 25:5, 25:16, 25:22, 26:14, 26:21

**short** [3] - 10:17, 11:10, 46:14
**Shorthand** [1] - 62:5
**shorthand** [1] - 62:16
**shortly** [1] - 7:5
**show** [4] - 15:21, 34:12, 37:18, 50:23
**showing** [9] - 15:22, 18:7, 22:17, 23:22, 30:8, 39:13, 40:13, 41:6, 43:9
**sick** [12] - 16:11, 17:7, 23:3, 23:8, 26:7, 40:3, 57:15, 57:24, 58:8, 58:12, 60:5, 60:14
**signature** [1] - 17:3
**signed** [2] - 41:17, 51:9
**similar** [4] - 19:6, 23:13, 31:17, 51:11
**simply** [1] - 39:10
**situation** [2] - 33:9, 44:20
**six** [1] - 13:24
**slip** [3] - 17:7, 57:5, 57:15
**slips** [2] - 57:2, 59:16
**sometime** [2] - 24:22, 26:17
**son** [1] - 8:1
**sorry** [10] - 6:3, 9:22, 9:23, 10:6, 21:4, 21:15, 58:4, 58:7, 59:11, 61:15
**sort** [6] - 12:23, 31:7, 31:11, 36:23, 37:2, 37:6
**sorts** [1] - 54:21
**sound** [2] - 22:3, 23:20
**South** [1] - 2:4
**Spangler** [6] - 36:16, 36:20, 37:4, 38:2, 38:16, 38:21
**Spangler's** [1] - 38:4
**specialty** [1] - 52:6
**specifics** [2] - 31:4, 50:15
**spell** [2] - 4:18, 9:15
**spent** [1] - 15:19
**Spine** [1] - 10:17
**Springfield** [1] - 2:4
**SS** [1] - 62:1
**St** [3] - 21:18, 21:20, 43:12
**stamp** [1] - 47:18
**stamped** [2] - 18:16, 18:18
**standards** [2] - 39:8, 44:6
**stands** [2] - 25:11, 25:12
**start** [1] - 46:15
**started** [8] - 5:4, 9:18, 9:20, 9:23, 10:11, 12:1, 14:15, 15:2
**State** [6] - 11:10, 11:12, 11:15, 11:21, 11:23, 11:24
**state** [2] - 4:17, 25:16
**STATE** [1] - 62:1
**statement** [1] - 40:22
**STATES** [1] - 1:3
**states** [3] - 28:10, 58:13, 59:7
**stating** [4] - 37:5, 57:15, 58:9, 60:5

**stenographically** [1] - 62:13
**sterile** [1] - 12:21
**still** [4] - 8:16, 15:5, 47:3, 54:3
**stipulate** [2] - 35:5, 41:3
**Street** [1] - 2:4
**strike** [1] - 32:20
**stroke** [5] - 16:22, 17:17, 20:20, 56:2, 57:5
**subjects** [2] - 44:22, 45:3
**submit** [4] - 27:5, 37:5, 48:1, 54:10
**submitted** [9] - 21:23, 22:7, 40:23, 48:21, 57:2, 57:5, 57:14, 60:13
**submitting** [1] - 52:18
**subsequently** [2] - 55:17, 56:6
**successfully** [1] - 43:1
**suddenly** [1] - 33:17
**suffered** [6] - 17:24, 18:2, 33:20, 55:23, 57:14, 60:4
**suggested** [1] - 19:7
**suggesting** [1] - 28:1
**suitable** [2] - 25:20, 26:15
**summary** [2] - 30:18, 34:10
**summer** [1] - 50:17
**suppose** [1] - 44:19
**surgeon** [2] - 12:19, 12:22
**surgery** [2] - 12:19, 14:4
**surgical** [8] - 12:8, 12:10, 12:13, 12:18, 13:1, 13:7, 13:12, 13:13
**sworn/affirmed** [2] - 4:4, 62:9

**tan** [1] - 33:23
**Taylorville** [1] - 62:18
**team** [1] - 28:12
**tech** [1] - 13:11
**technicalities** [1] - 43:3
**technician** [4] - 12:14, 12:18, 13:1, 13:14
**technologist** [5] - 12:8, 12:10, 12:13, 13:7, 13:12
**ten** [3] - 22:3, 57:7, 59:10
**terminated** [1] - 55:13
**termination** [1] - 53:23
**testified** [3] - 4:5, 37:10, 55:22
**testify** [2] - 37:16, 62:9
**testifying** [2] - 35:7, 35:10
**testimony** [3] - 10:10, 32:17, 37:13
**tests** [6] - 17:21, 20:4, 31:6, 31:7, 31:10
**Texas** [4] - 6:13, 6:17, 6:19, 7:10
**THE** [3] - 1:3, 1:3, 1:9
**themselves** [1] - 44:24
**three** [5] - 17:10, 19:19, 33:17, 55:10, 56:10
**timeline** [2] - 26:23, 36:18

**title** [1] - 12:6
**to-wit** [1] - 4:5
**today** [1] - 45:21
**together** [1] - 8:20
**took** [3] - 20:3, 53:15, 53:20
**top** [4] - 16:10, 47:11, 48:4, 61:6
**Topamax** [2] - 29:17, 37:4
**total** [1] - 13:1
**town** [1] - 9:13
**training** [2] - 12:9, 38:6
**transcript** [2] - 34:24, 62:15
**translation** [1] - 62:16
**treat** [4] - 23:16, 29:19, 36:15, 36:20
**treating** [1] - 26:21
**treatment** [2] - 37:3, 37:7
**triple** [2] - 17:11, 33:20
**TRUDY** [4] - 1:6, 1:13, 4:1, 62:8
**Trudy** [7] - 4:9, 4:12, 4:19, 4:22, 34:15, 47:3, 61:5
**true** [1] - 62:15
**truth** [1] - 62:10
**truthfully** [1] - 37:16
**try** [2] - 28:15, 45:15
**trying** [2] - 8:8, 8:19
**Tuesday** [1] - 34:15
**turn** [2] - 19:18, 20:15
**two** [16] - 12:12, 27:10, 29:1, 29:4, 31:20, 33:24, 36:3, 49:11, 49:15, 50:1, 50:12, 51:15, 55:23, 56:21, 59:3, 59:6
**typewritten** [1] - 62:14
**typical** [1] - 31:6

**unable** [13] - 16:17, 16:21, 17:6, 18:24, 19:4, 21:2, 22:2, 23:9, 26:7, 57:4, 57:6, 58:9, 58:14
**under** [3] - 28:1, 37:13, 62:17
**underneath** [1] - 59:21
**understandable** [1] - 45:14
**unfit** [9] - 35:14, 35:16, 35:18, 36:5, 36:11, 36:13, 53:8, 53:19
**UNITED** [1] - 1:3
**unrestricted** [2] - 28:7, 28:22
**unused** [3] - 40:3, 40:7, 54:21
**up** [10] - 16:10, 18:15, 20:4, 22:6, 27:4, 29:23, 41:23, 47:11, 48:3, 61:6
**update** [4] - 48:4, 49:1, 59:14, 61:7
**utilized** [1] - 49:2

**vacant** [1] - 42:16
**vacation** [3] - 40:10, 42:4, 42:7
**vaguely** [1] - 24:22
**van** [4] - 17:10, 19:18, 33:16, 33:23

**vans** [4] - 17:11, 19:19, 33:17, 33:24
**Veronica** [3] - 11:17, 11:20, 11:21
**vision** [2] - 17:11, 33:20
**vs** [1] - 1:8
**wait** [1] - 5:10
**waive** [2] - 61:14, 61:15
**walking** [1] - 29:23
**Walled** [3] - 6:2, 6:4, 6:12
**weapon** [2] - 28:12, 29:3
**weeks** [3] - 14:6, 14:10, 59:1
**weights** [1] - 29:23
**whatsoever** [1] - 40:8
**whole** [2] - 11:7, 17:14
**wit** [1] - 4:5
**witness** [2] - 4:2, 4:16
**Witness** [1] - 61:17
**word** [2] - 54:9, 54:18
**worded** [1] - 22:16
**words** [3] - 5:14, 44:12, 54:6
**work** [37] - 9:10, 10:14, 11:9, 11:22, 11:24, 12:13, 14:5, 14:24, 16:18, 16:21, 17:6, 17:8, 17:9, 17:12, 17:13, 19:1, 19:10, 19:16, 19:17, 19:19, 22:3, 23:10, 26:8, 26:17, 27:6, 28:2, 33:10, 36:21, 49:20, 57:4, 58:14, 58:24, 59:10, 59:17, 59:22, 59:24, 60:16
**worked** [13] - 9:12, 9:17, 10:14, 10:16, 11:10, 11:14, 11:15, 11:20, 11:23, 12:2, 13:7, 15:8, 15:9
**wounds** [1] - 12:23
**written** [3] - 38:22, 45:9, 45:19
**wrote** [2] - 21:8, 41:15

**year** [6] - 5:3, 6:6, 10:12, 12:12, 48:21
**years** [8] - 7:1, 12:24, 13:8, 36:3, 36:17, 58:3, 58:5, 58:6
**zero** [1] - 34:5