IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

TRUDY KARR,                              )
                                         )
                    Plaintiff,           )
                                         ) No. 19-cv-2134
          vs.                            )
                                         )
CITY OF DECATUR, ILLINOIS,               )
                                         )
                    Defendant.           )

Defendant's Motion for Summary Judgment
EXHIBIT C

DEPOSITION TRANSCRIPT – PENNY ROGERS

1

1

2

3             IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
4

5

6    TRUDY KARR,                    )
                                    )
7                    Plaintiff      )
                                    )
8      -vs-                         )NO. 2019-CV-2134
                                    )
9    THE CITY OF DECATUR, ILLINOIS, )
                                    )
10                   Defendant      )

11

12

13          Deposition of PENNY ROGERS taken at the

14   instance of the Plaintiff, on June 22, 2020, at

15   the hour of 11:00 A.M., at One Gary K. Anderson

16   Plaza, Decatur, Illinois, before Sandra K.

17   Haines, CSR and Notary Public, pursuant to

18   notice.

19

20                          Sandra K. Haines
                            CSR No. 084-002423
21

22              ANCHOR REPORTING
                P.O. Box 25471
23          Decatur, Illinois 62525-5471
                (217)428-0946
24

```
 1              APPEARANCES

 2

 3      BAKER, BAKER & KRAJEWSKI, LLC
        Attorneys at Law
 4      415 South Seventh Street
        Springfield, Illinois 62701
 5      (217)522-3445

 6          BY:  MR. JOHN A. BAKER
                 Appearing on behalf of the Plaintiff
 7

 8

        CITY OF DECATUR
 9      One Gary K. Anderson Plaza
        Decatur, Illinois  62523-1196
10      (217)424-2871

11          BY:  MR. JOHN T. ROBINSON
                 Assistant Corporation Counsel
12               Appearing on behalf of the Defendant

13

14                          PRESENT

15

16      Ms. Trudy Karr Ownby

17

18

19

20

21

22

23

24
```

3

```
 1                        INDEX

 2

 3     Direct Examination by Mr. Baker.... 4 - 56

 4

 5

 6                      EXHIBITS

 7
```

```
 8     Deposition Exhibit Number 1 .......     6

 9     Deposition Exhibit Number 2 .......     7

10     Deposition Exhibit Number 3 .......     7

11     Deposition Exhibit Number 4 .......    10

12     Deposition Exhibit Number 5 .......    36
```

```
13

14

15

16

17

18

19

20

21

22

23

24
```

1                    PENNY ROGERS

2    called as a witness herein, at the instance

3    of the Plaintiff, having been first duly

4    sworn/affirmed on her oath, was examined and

5    testified as follows, to-wit:

6                    DIRECT EXAMINATION

7                    BY MR. BAKER:

8        Q.    Ma'am, would you please state your full

9    name.

10       A.    Penny Christine Rogers.

11       Q.    Miss Rogers, are you employed by the

12   City of Decatur?

13       A.    Yes.

14       Q.    In what capacity are you employed?

15       A.    I am the Acting Human Resources

16   Manager.

17       Q.    How long have you held that position?

18       A.    Well, I have held that position since I

19   think it was July of 2018, but before that I was

20   Human Resources Manager from, let's see, August

21   of 2015 until June of 2018, I believe.

22       Q.    So, you were manager.  Then you stepped

23   away for a little while, and then became Acting

24   Manager?

1      A.    Well, I hired in as Personnel

2   Specialist in August of 2004.  Then in August of

3   2015 I became, I got promoted to Human Resources

4   Manager.  Then in the summer of 2018 there was

5   some restructuring in the organization.  So, I

6   went back to being Personnel Specialist, and

7   they thought they were going to fill the Human

8   Resources Manager position, and then they

9   decided not to fill it.  So, I am basically

10   Personnel Specialist and Acting Human Resources

11   Manager.

12      Q.    All right, okay.  I am going to show

13   you a document here.  You have been asked to be

14   here today, or I guess not asked to be here you

15   have been designated to be here pursuant to

16   Federal Rule of Civil Procedure 30(b)(6), and as

17   part of Federal Rule 30(b)(6) it enables me to

18   request that the opposing party, in this case

19   the City of Decatur, provide a witness to

20   testify.  I have identified areas for someone to

21   testify about, and as I understand it the City

22   has elected you to testify as to those areas?

23      A.    Yes.

24      Q.    Is that your understanding as well?

1        A.    Yes.

2        Q.    Okay.  As we look at the notice, which

3    I just provided you, which is Exhibit Number 1,

4    on the third page of that document we have a

5    rider that identifies five separate categories.

6    Do you see that?

7          (Whereupon said document was duly

8           marked, for purposes of identification,

9           as Deposition Exhibit Number 1, as of

10          this date.)

11       A.    Yes.

12       Q.    Are you prepared and able today to

13    testify as to those different categories?

14       A.    Yes.

15       Q.    Now, one of the things that I wanted to

16    discuss with you are the standards that are

17    relied upon for the City of Decatur for its

18    Police Department.  I believe I asked in the

19    deposition if a copy of those could be provided.

20    Do you have that for us?

21       A.    These are the complete standards for

22    neurology.

23       Q.    Okay.  I will mark this as Exhibit 2 to

24    your deposition.  I am going to look at this.

1        Here, let me mark this one as well.  I see you

2    have some other document that you are looking at

3    as well.

4            (Whereupon said document was duly

5             marked, for purposes of identification,

6             as Deposition Exhibit Number 2, as of

7             this date.)

8        A.    These are the NFPA standards in

9    neurology.  I think you had asked for that.

10       Q.    I will mark the NFPA standards as

11   Exhibit 3.

12           (Whereupon said document was duly

13            marked, for purposes of identification,

14            as Deposition Exhibit Number 3, as of

15            this date.)

16       A.    Two copies there.

17       Q.    Okay.  So, what are the standards that

18   are utilized by the City of Decatur Police

19   Department as we sit here today?

20       A.    The LEO standards published by ACOEM,

21   American College of Occupational and

22   Environmental Medicine.

23       Q.    This would be Exhibit Number 2?

24       A.    Yes.

1      Q.    Okay.  Now, you have also provided me

2   with Exhibit Number 3, and again if you would

3   describe what these are.  I know these are NFPA,

4   is that correct?

5      A.    Yes, National Fire Protection

6   Association, and those were utilized before

7   these LEO standards came into effect.  The LEO

8   standards are fairly new.  They didn't come

9   around until like the 2015 or 2016 time frame.

10   So, before that the Police Department used the

11   NFPA standards, which are usually used for

12   firefighters.

13      Q.    When did the City first begin using

14   NFPA standards?

15      A.    For police officers?

16      Q.    Yes, I am sorry, for police officers.

17      A.    Well, I actually was not even aware

18   that they were using that until November of 2016

19   when Dr. Braco told me that.

20      Q.    Okay.  So, what did Dr. Braco tell you

21   in November of 2016?

22      A.    It was after Miss Karr went for her

23   fitness for duty, and when he gave me the

24   results, and he quoted the LEO standards, and I

1  told him I wasn't familiar with that, he said

2  well, that up until -- well, that this is very

3  new.  Therefore, police officers had been --

4  whenever they went for their medical

5  pre-employment medical evaluation, they were

6  going against the NFPA standards.

7      Q.    Okay.  So, let me break this down.  You

8  had a conversation with Dr. Braco in November of

9  2016?

10     A.    Uh-huh.

11     Q.    Is that a yes?

12     A.    Yes.

13     Q.    That related to Trudy Karr?

14     A.    Yes.

15     Q.    Okay.  What was -- did you call him?

16  Did he call you?  What was the purpose of that

17  call?

18     A.    Well, I was the one that sent him

19  paperwork letting him know that she was coming

20  for her fitness for duty.  Then he was supposed

21  to send me the results.  So, I think he faxed me

22  the results.  So, when I got the results, I had

23  some questions.  So, I called him because I

24  wanted some explanation, and that's when he, we

1    got into that discussion.

2        Q.    When you called him, what questions did

3    you ask him?

4        A.    I asked him to elaborate on why he -- I

5    think he put her on restricted duty, I believe,

6    but she wasn't allowed to be on the ERT and some

7    other things, and I just wanted more

8    clarification because the job of the police

9    officer requires a lot, well, requires a lot of

10   these things that he had said she could not do.

11       Q.    I show you a document here.  I think I

12   am on Exhibit 4.  Exhibit Number 4 has a City

13   bates stamp on it of 264, and this is a physical

14   result form from Dr. Braco, is that correct?

15           (Whereupon said document was duly

16            marked, for purposes of identification,

17            as Deposition Exhibit Number 4, as of

18            this date.)

19       A.    Braco.

20       Q.    Braco, I am sorry, and is this what you

21   received from him when you placed the call?

22       A.    Actually I received something else

23   first.

24       Q.    Okay.  In the previous deposition there

1  was a Karr Deposition Exhibit Number 5.  In Karr

2  Exhibit 5 there was a two page document that has

3  bates stamped 411 and 412 on it.  Do you see

4  that?

5       A.   I recall that, the second document.

6       Q.   When you say second document, can you

7  just for clarity sake if you see at the bottom

8  there is what we call a bates stamp number?

9       A.   Okay.

10      Q.   You see it has 411 and a 412.  Will you

11  just so I make sure that we are clear on the

12  record what page you are referring to?

13      A.   412 of 833.  This is what I received

14  first.

15      Q.   All right.

16      A.   I felt like I needed more

17  clarification.  So, I called him, and then

18  that's when he told me about the LEO standards

19  and ACOEM, or published by ACOEM, and so then he

20  sent me this page, which has more clarification.

21      Q.   Okay.  So, if I understand you

22  correctly, you received 412 from him, and I am

23  assuming it would have been on or about November

24  29, 2016?

1       A.    Yes.

2       Q.    Because of what it said you had some

3   questions for him?

4       A.    Yes.

5       Q.    So, you called him?

6       A.    Yes.

7       Q.    And you spoke with Dr. Braco?

8       A.    Yes.

9       Q.    When you spoke with him, do you recall

10  what specific questions that you asked?

11       A.    I believe I asked him what further

12  medical information because it says until

13  further medical information is available for

14  review, recommend no lethal weapon use, no

15  Hazmat, or ERT team duty.  So, I believe I asked

16  him what medical information he needed.

17       Q.    Did he respond to that?

18       A.    I believe he did, and my recollection

19  is that I believe he felt like he was, he didn't

20  have all of the information as to what

21  medication Miss Karr was taking.

22       Q.    Why do you believe he felt that way?

23       A.    Because as I recall he told me that.

24       Q.    Do you know if he asked her what

1    medication she was taking?

2        A.    He said he did.

3        Q.    Do you know if she didn't tell him?

4        A.    She did tell him some of the

5    medications, but I believe he said that he

6    thought there might be other medications.

7        Q.    What did he say he based that on that

8    there might be other medications?

9        A.    I don't remember.

10        Q.    For police officers in the City of

11    Decatur do they have to submit the medications

12    that they are taking on a periodic basis?

13        A.    I don't know.  They don't send them to

14    HR.

15        Q.    So, you don't know if that's required

16    for them to do?

17        A.    Correct.

18        Q.    All right.  So, he told you he was --

19    did he tell you what information he needed or

20    how Trudy was to go about getting any

21    information?

22        A.    No.

23        Q.    Okay.  So, during that conversation you

24    also talked to him about the different standards

1    that are being used?

2        A.    Yes.

3        Q.    All right, and what did he say about

4    that?

5        A.    Well, I had never heard of the LEO

6    standards.  So, I was asking him what those

7    were, and he said that they are new standards

8    that police officers are supposed to be

9    evaluated against.

10        Q.    But if you weren't familiar with them,

11    how did you know about them?

12        A.    Because he put it on this -- well, I

13    guess this was then when he sent this new form

14    or the second form that's when I asked him about

15    that.

16        Q.    So, you had multiple conversations with

17    him?

18        A.    Yes.

19        Q.    Okay.  So, he sends you the first form?

20        A.    Yes.

21        Q.    You have questions for him, and he

22    tells you he doesn't know if he has all of the

23    medications, correct?

24        A.    Yes.

1     Q.    What else did he tell you during that

2  first conversation with him?

3     A.    He told me he didn't think Ms. Karr was

4  forthcoming on all of the medications that she

5  was taking.

6     Q.    Did he say what he based that on?

7     A.    I don't remember if he said that or

8  not.

9     Q.    So, it was Dr. Braco's statement to you

10  that it was his opinion that Trudy was not being

11  forthcoming in the medications that she had been

12  taking?

13     A.    Yes.

14     Q.    He didn't indicate what he based that

15  on?

16     A.    No.

17     Q.    So, what did you decide with him during

18  that meeting?

19     A.    Well, I told him I needed more

20  information.  So, that's when he sent me this

21  second, this 411 of 833.

22     Q.    I guess this is what confuses me.  On

23  11-29 this first one that you received, which is

24  Page 412, it says until further medical

1    information is available for review.  So, that's

2    the suggestion that he doesn't have all of the

3    medical information, correct?

4        A.    Correct.

5        Q.    That would be consistent with what he

6    told you he didn't feel as though he knew that

7    he had all of Trudy's prescription information?

8        A.    Yes.

9        Q.    Because he thought she wasn't being

10   forthcoming in what medications she was taking?

11       A.    Yes.

12       Q.    Okay.  So, do you know if between 412

13   and 411 these two different pages bates stamped

14   411 and bates stamped 412, do you know if in

15   between those times he received additional

16   documentation?

17       A.    I don't know.

18       Q.    How long after you had the conversation

19   with him about 412 did he receive 411?

20       A.    I believe within 24 hours.

21       Q.    Again you do not know if you received

22   or if he had received any additional

23   information?

24       A.    That is correct.

1      Q.    So, you received the second one, and he

2    references the LEO standards, correct?

3      A.    Yes.

4      Q.    And when you saw LEO standards on bates

5    stamp 411, was that the first time that you had

6    heard of LEO standards?

7      A.    Yes.

8      Q.    You were confused because you were not

9    aware of those; is that fair to say?

10      A.    Yes.

11      Q.    At that time were you familiar with the

12    NFPA standards?

13      A.    Yes.

14      Q.    So, because of that confusion you

15    contacted Dr. Braco again?

16          MR. ROBINSON:  I object, leading.

17      Q.    You can answer.

18      A.    I am not sure if I understand the

19    question.

20      Q.    Okay, let me rephrase it.  It probably

21    wasn't very good.  If I understood your

22    testimony, you received bates stamp Page 412.

23    Then you had a conversation with Dr. Braco.

24    Then you received bates stamp Page 411; is that

1      correct so far?

2           A.    Yes.

3           Q.    Bates stamp Page 411 references the LEO

4      standards, is that correct?

5           A.    Yes.

6           Q.    That was the first that you had heard

7      of the LEO standards, is that correct?

8           A.    Yes.

9           Q.    And so when you heard about these LEC

10     standards, is that what triggered you to call

11     Dr. Braco a second time?

12          A.    Yes.

13          Q.    All right.  Tell me about this second

14     conversation that you had with Dr. Braco.

15          A.    I asked him to explain the LEO

16     standards.  So, he explained to me that they

17     were fairly new, and then he said that in the

18     past the police officers were evaluated

19     according to the NFPA standards.

20          Q.    Okay.  Did you know that at the time

21     that the police officers had been analyzed or

22     evaluated based on NFPA?

23          A.    No.

24          Q.    What sort of a relationship does

1    Dr. Braco have with the City of Decatur?

2        A.    Well, at that time he was the main

3    doctor that we would send people for

4    pre-employment physicals.

5        Q.    Okay.  So, during the second

6    conversation did Dr. Braco indicate that he had

7    received any additional medical information

8    regarding Trudy?

9        A.    I don't remember.

10       Q.    And did he say how he was able to go

11   from 412, what he wrote on 412 to 411, what new

12   information that he had?

13       A.    I don't know if he necessarily -- well,

14   it says medical review is complete, but I don't

15   know if he necessarily had any new information.

16   I think he was just trying to give me more

17   information because I felt like this, the first

18   one that he gave me was kind of vague.  So, I

19   think that he was just trying to provide me with

20   more information without breaking

21   confidentiality.

22       Q.    All right.  So, your understanding was

23   that he was supplementing his earlier report by

24   the second report?

     1          A.    Yes, yes.

     2          Q.    Okay.  When he referenced the LEO

     3     standards, was there a discussion that you had

     4     with him about whether the City was going to use

     5     the LEO standards?

     6          A.    No.

     7          Q.    Who has the responsibility for the City

     8     of determining what standards are going to be

     9     used?

    10          A.    Ultimately I would say the City.

    11     However, I was basically trusting the physician

    12     to use what was appropriate.

    13          Q.    Well, for the City is there -- he told

    14     you they had been using NFPA standards, correct?

    15          A.    Yes.

    16          Q.    How were those NFPA standards

    17     originally adopted by the City?

    18          A.    They were used for firefighters --

    19          Q.    Right.

    20          A.    -- for pre-employment physicals.  So, I

    21     was pretty familiar with those standards

    22     whenever I would send the firefighters.  Then I

    23     don't -- I don't know how they started to use

    24     them for the police.

1      Q.    Was it something that -- would that be

2   something that the City would have had to have

3   approved?

4      A.    Not necessarily.  We were pretty

5   trusting that we would send them to a medical

6   doctor, and they knew the duties of the

7   positions that we would send, like we would send

8   job descriptions.  So, I don't know.  They never

9   told me that they were using NFPA standards.

10     Q.    Okay.  When you had this conversation,

11   did Dr. Braco say now they were using the LEO

12   standards?

13     A.    No.  He said this is -- well, I am

14   trying to remember.  He didn't really say we are

15   using LEO standards.  But I guess he just kind

16   of took it upon himself to use these standards

17   because I didn't even know they existed.  So, I

18   didn't tell him to use them.

19     Q.    Did he have the authority to determine

20   which standards the City was going to use for

21   its Police Department?

22     A.    I don't know.

23     Q.    At some point in time was there ever a

24   discussion amongst the City about formally

1    adopting the LEO standards?

2        A.    Yes.

3        Q.    Do you recall when that occurred?

4        A.    It would have been after this

5    conversation that I had with Dr. Braco, and I

6    believe the discussions were also held with

7    police administration and the Assistant City

8    Manager who was over Human Resources at the

9    time.  They took place over several different

10   occasions.

11       Q.    How many -- well, let me backtrack.

12   Who were the individuals who were involved in

13   those discussions?

14       A.    I believe it was Chief Getz and Deputy

15   Chief Brandel.

16       Q.    And then you?

17       A.    And Assistant City Manager Jerry Bauer.

18       Q.    Anything else?

19       A.    I believe Wendy Morthland might have

20   been involved in those conversations.  She is

21   the Corporation Counsel for the City.

22       Q.    Okay.  So, tell me about these

23   conversations.

24              MR. ROBINSON:  I am going to object to

1       conversations that she had with the Corporation

2       Counsel that are attorney-client privileged.  It

3       sounds as though there is a strong likelihood,

4       and I don't know what these conversations are,

5       but it sounds to me as though there is a strong

6       likelihood that if the Corporation Counsel was

7       involved in a meeting with Bauer, Getz, Brandel,

8       and Penny Frank at the time now Rogers, that

9       this would be attorney-client privileged.

10             MR. BAKER:  All right.  So, if I

11      understand correctly, the City as to my

12      questions of how the LEO standards were adopted

13      is going to invoke an attorney-client privilege

14      as to any of those questions?

15             MR. ROBINSON:  Again Counsel perhaps --

16      well, yes, to the extent that these

17      conversations are privileged.  Then yes, the

18      City invokes that privilege.  To the extent that

19      the discussions that you are asking about are

20      not privileged, then obviously the privilege

21      doesn't apply.  I don't think there is a

22      foundation at this point to know.

23          Q.    Okay.  So, tell me about the first

24      conversation with anybody that you can recall

1    about the LEO standards and adopting them after

2    you spoke with Dr. Braco.

3        A.    I am trying to remember because I know

4    we had the conversation, I had the conversation

5    with those people that I had just mentioned

6    shortly after I received this from Dr. Braco.

7        Q.    Okay.  Let me stop you there.  When you

8    say those people that you just mentioned, did

9    that include the Corporation Counsel?

10       A.    Yes.

11       Q.    Okay.  So, the first conversation that

12   you had after you received the documentation

13   from Dr. Braco involved the Corporation Counsel

14   being involved in that conversation?

15       A.    Yes.

16       Q.    Is that correct?

17       A.    Yes.

18       Q.    Do you recall where that conversation

19   occurred, or was it electronic?  Do you recall

20   the nature of that conversation?

21       A.    I believe it was upstairs in the third

22   floor conference room.

23       Q.    All right.  Was Trudy Karr discussed at

24   all during that conversation?

1          A.     Yes.

2          Q.     Besides the Corporation Counsel and

3     yourself do you recall who else was present for

4     that conversation?

5          A.     Assistant City Manager Jerry Bauer, and

6     I can't remember if Chief Getz and Deputy Chief

7     Brandel were in that conversation or not.  I

8     just don't remember if they were in that first

9     conversation.

10         Q.     Legal counsel was also present?

11         A.     Yes.

12         Q.     That would be Miss, is it Northland?

13         A.     Morthland with an M as in Mary.

14         Q.     I am sorry, Morthland.  Okay, the next

15     question I am going to ask you is about what was

16     discussed during that conversation.  My guess is

17     that Mr. Robinson is going to object to that.

18     So, let me ask the question.  He will invoke his

19     objection.  All right.  I assume he will, maybe

20     he won't.

21         During that conversation with the

22     individuals present when you talked about the

23     LEO standards do you recall what was discussed?

24              MR. ROBINSON:  Objection, privileged.

1          MR. BAKER:  Do I understand the City's

2     position to be that as to this first meeting

3     that occurred after the documentation from

4     Dr. Braco that the City is going to invoke the

5     attorney-client privilege as to that discussion?

6          MR. ROBINSON:  That's correct.

7     Q.    Ma'am, I assume that you are going to

8     comply with your attorney's directive on that?

9          MR. ROBINSON:  I will direct her not to

10    answer if that's what you are going for.  I will

11    direct her not to answer.

12    Q.    Okay.  Then that's fine.  That's fine.

13    Did you have subsequent communications with

14    anyone else about adopting these standards, or

15    excuse me, subsequent communications other than

16    that first meeting with anyone about adopting

17    these standards?

18    A.    Yes.

19    Q.    Do you recall when those second

20    discussions or communications occurred?

21    A.    It would have been probably the

22    beginning of 2017.

23    Q.    Do you recall who was present for those

24    conversations or communications?

1      A.    I am not, I am not a hundred percent

2   sure.

3      Q.    Okay.  Do you know if these

4   conversations or communications were on the

5   phone, in person meetings, or exchanging memos,

6   or e-mails?  Do you know which type of

7   communication they were?

8      A.    I think it was a combination of all of

9   those, on the phone, in person, and probably

10  e-mails.

11     Q.    Okay.  Do you recall who would have

12  been on the e-mail communications?

13     A.    Probably Chief Getz, and possibly

14  Assistant City Manager Jerry Bauer, and possibly

15  Deputy Chief Brandel.

16     Q.    Do you know if Wendy Morthland was

17  involved or if she was on those e-mails?

18     A.    I don't remember.

19     Q.    Do you recall any verbal communications

20  with anyone?

21     A.    I think I had a communication with the

22  personnel specialist at the time, Melissa

23  Rowcliff because she was then over, she was over

24  hiring new people, and she was the one that

1    scheduled the pre-employment physicals.  So, I

2    believe I had discussions with her about whether

3    or not we should start using the LEO standards.

4        Q.   When you had those conversations with

5    her, was anyone else present for those

6    conversations?

7        A.   I don't believe so.

8        Q.   Okay.  Tell me what was said during

9    your conversations with her.

10       A.   I brought it to her attention that

11   there is these new LEO standards, and we

12   probably need to look into maybe using these

13   standards for the police officers now that I

14   know that they exist.  And we might have even --

15   I don't remember for sure, but I might have even

16   reached out to other municipalities in Central

17   Illinois to see what they use.

18       Q.   You said you might have.  Do you recall

19   if you did?

20       A.   I think I did, but well, I don't really

21   remember though.  If seems like I did ask other

22   municipalities, but I don't really remember.

23       Q.   Is it common for you with your position

24   that you hold with the City to communicate with

1    other municipalities to see what sorts of

2    protocols that they use?

3        A.    Yes.

4        Q.    And so it might be that because you do

5    that you might have done it here, is that fair?

6        A.    Yes.

7        Q.    But you don't have a specific

8    recollection of having done it here?

9        A.    Yes.

10        Q.    Are there certain municipalities that

11    you frequently communicate about about these

12    sorts of issues?

13        A.    Yes.

14        Q.    Who would those be?

15        A.    City of Springfield, City of Peoria,

16    the Town of Normal, City of Champaign, those are

17    the main ones.

18        Q.    So, towns that are maybe a little bit

19    bigger than Decatur but roughly the same size

20    and deal with the same sorts of issues?

21        A.    Yes.

22        Q.    Again you don't recall if you did that

23    in this situation?

24        A.    Yes.

1     Q.    I am sorry, you said you had a

2  conversation, and I apologize, I forget the name

3  of the individual that you were speaking with,

4  but this is the HR person, HR specialist?

5     A.    Melissa Rowcliff.

6     Q.    So, you had a conversation with Miss

7  Rowcliff, and you said we might want to consider

8  utilizing the LEO standards for the Police

9  Department, is that correct?

10     A.    Yes.

11     Q.    So, did anything happen as a result of

12  that conversation, or was it just sort of you

13  informing her?

14     A.    Well, at that time we were also in the

15  process of switching hospitals or providers I

16  should say going from DMH to HSHS.  I believe

17  Melissa had a conversation with the person at

18  HSHS telling them that we are thinking about

19  switching over, and asking him if he had the LEO

20  standards.  And I seem to recall there was an

21  e-mail where they had ordered or you have to

22  subscribe to those standards, subscription, and

23  so they got those standards.

24     Q.    Just to clarify here, DMH stands for

1     Decatur Memorial Hospital?

2          A.    Yes.

3          Q.    HSHS is Hospital Sisters?

4          A.    Health System.

5          Q.    So, you were changing, the City was

6     changing medical providers who do things like

7     pre-employment physicals and fitness for duty

8     evaluations?

9          A.    Yes.

10         Q.    You were going from DMH to HSHS?

11         A.    Yes.

12         Q.    Do you recall when that changeover

13    actually occurred?

14         A.    Well, it was gradual.  I believe

15    actually some of the positions I believe even in

16    2016 we were having HSHS do kind of as a trial

17    to see if we were happy with them.  Then by I

18    think the fall of 2017 I think we had completely

19    switched.

20         Q.    So, it was a gradual transition during

21    the 2016 into 2017 time frame?

22         A.    Yes.

23         Q.    So, this conversation that you had with

24    Miss Row --

1      A.     Rowcliff.

2      Q.     -- Rowcliff, thank you, do you recall

3   when that occurred?

4      A.     It probably started shortly after I got

5   these results from Dr. Braco in November of

6   2016.

7      Q.     Okay.  At some point in time you

8   understand she reached out to HSHS to see if

9   they actually had the LEO standards?

10     A.     Yes.

11     Q.     And HSHS agreed to obtain the LEO

12  standards?

13     A.     Yes.

14     Q.     Okay.  Anything else?  So, I take it

15  with Miss Rowcliff you had a series of

16  conversations?

17     A.     Yes.

18     Q.     Did you have any other conversations

19  about the adoption of the LEO standards with

20  anyone?

21     A.     I believe I probably did with Chief

22  Getz and Deputy Chief Brandel.

23     Q.     Do you recall when those occurred?

24     A.     No.

1      Q.     Is there a formal process for the City

2   to adopt these standards?

3      A.     No.

4      Q.     Who within the City has the authority

5   to adopt the standards?

6      A.     I believe HR basically just in

7   agreement with the department, which in this

8   case would be the Police Department.

9      Q.     So, if I understand you correctly, it

10  was you and the Police Department, you being HR,

11  the Police Department decided to adopt the LEO

12  standards?

13     A.     And I believe Assistant City Manager

14  Jerry Bauer was involved in probably that

15  decision as well.

16     Q.     Was anybody from the Corporation

17  Counsel's Office involved in that decision?

18     A.     I don't remember.

19     Q.     Okay.  Was there a justification given

20  for why the City was going to adopt the LEO

21  standards?

22     A.     Yes, because they were specific to

23  police officers.

24     Q.     Did the City look at any other

1       potential standards outside of LEO and NFPA?

2            A.    No.

3            Q.    So, when did the LEO standards, when

4       did the City officially adopt the LEO standards?

5            A.    I believe it was in the fall of 2017.

6            Q.    How is that accomplished?  Is there

7       some sort of a vote?  Is there some sort of a

8       memo?  How does that work?

9            A.    There is no vote, and I don't recall

10      there being any memo.  I believe there were

11      either telephone, probably telephone

12      conversations with HSHS administration that

13      that's what we were going to be using.

14           Q.    Where you told HSHS that that's what

15      the City of Decatur is going to be using?

16           A.    Yes.

17           Q.    As far as making the decision was this

18      done in one meeting?  Was it done in a series of

19      memos or e-mails, or how was it finalized or

20      formalized?

21           A.    It was probably several conversations,

22      and I don't -- it was probably a combination of

23      meetings, phone calls, and possible e-mails.

24           Q.    Did the Corporation Counsel make a

1   recommendation as to what standards should be

2   utilized?

3       A.    I don't remember.

4       Q.    When it was determined that the

5   standards were going to go to the LEO standards,

6   did the City discuss or in the meetings that you

7   were in did you discuss Trudy Karr's case at all

8   in adopting those standards?

9       A.    Can you repeat the question.

10      Q.    When the decision process was being

11  made to adopt the LEO standards, to formally

12  adopt the LEO standards, was Trudy Karr's

13  situation discussed as part of the reasoning for

14  adopting the standards?

15      A.    Well, her situation is what made us,

16  was kind of like what made us aware of the

17  standards.  I don't really remember.

18      Q.    I am going to show you a document.  Do

19  you mind giving me back Karr Deposition Exhibit

20  5 just to make sure I don't get it too out of

21  place.  I think that's it.

22          All right, ma'am, I have just handed you a

23  document that has bates stamped numbers on it

24  from 371 through 373.  This appears to me to be

1    handwritten notes.  Are you familiar with these

2    particular notes?

3           (Whereupon said document was duly

4            marked, for purposes of identification,

5            as Deposition Exhibit Number 5, as of

6            this date.)

7    A.    Yes.

8    Q.    Are these, in fact, notes that you

9    took, or did somebody else take these?

10   A.    I took them.

11   Q.    Okay.  Is that true for all three pages

12   of these notes?

13   A.    Yes.

14   Q.    Okay.  The first, the top of Page 371

15   it says meeting with Lindsey Whitfield and

16   Dr. Braco on 1-12-17.

17   A.    Yes.

18   Q.    So, can I take it from this that the

19   three of you met to discuss these issues on

20   January 12th, 2017?

21   A.    Yes.

22   Q.    Do you recall where that meeting

23   occurred?

24   A.    I believe it occurred at the DMH

1    Corporate Health.

2         Q.    Okay.  Again you wrote these notes?

3         A.    Yes.

4         Q.    Was anybody else present besides the

5    three of you?

6         A.    I don't believe so.  I probably would

7    have written it down if there was.

8         Q.    Do you recall how long this meeting

9    lasted?

10        A.    Probably about 30 minutes.  I think

11   Dr. Braco got called out a couple times like

12   there was some interruption.  So, I would say

13   probably about 30 minutes.

14        Q.    So, what was the stated purpose of the

15   meeting?

16        A.    Well, I wanted to be very thorough with

17   the City's decision on Trudy's status.  I just

18   felt like I needed to get more information

19   especially since I was not familiar with the LEO

20   standards.  So, I wanted to get more information

21   about that.

22        Q.    Okay.

23        A.    And then I just notice on the bottom it

24   talks about discussing this with John Robinson.

1        Q.    I see that, but Mr. Robinson was not

2    present at the meeting, correct?

3        A.    No, no.

4        Q.    I am correct about that statement?

5        A.    I mean yes, you are correct.

6        Q.    I understood what you meant.  I just

7    wanted to make it clear for the record.

8        A.    Yes, yes.

9        Q.    Okay.  Now, the first notation says

10    must be off, ten years off seizure medicine per

11    standards.  Do you see that?

12        A.    Yes.

13        Q.    Do you understand that to mean that the

14    standards said you have to be off seizure

15    medicine for ten years in order to perform the

16    role of a police officer?

17        A.    Yes.

18        Q.    Was it your understanding that's what

19    the LEO standards required?

20        A.    Yes.

21        Q.    The next thing says atypical seizure

22    disorder.  Then it says same as epilepsy.  Do

23    you see that?

24        A.    Yes.

1        Q.    Was Dr. Braco saying that atypical

2    seizure disorder is the same thing as epilepsy?

3        A.    I am not sure if he said it was the

4    same thing, or that it should be treated the

5    same.

6        Q.    Okay.  Then there is just some

7    handwritten LEO standards by ACOEM.  Then you go

8    down to say first time it was published was

9    2016.  Old standards used firefighter standards,

10    common practice for providers.  Do you see that?

11        A.    Yes.

12        Q.    Does that mean that using the

13    firefighter standards were common in the past

14    for police officers as well?

15        A.    Yes.

16        Q.    That's what you are getting directly

17    from Dr. Braco's statement?

18        A.    Yes.

19        Q.    Then it says Dr. Braco spoke with Dr.

20    Dan is that Sams?

21        A.    Either Sams or Samo.

22        Q.    From the Northwestern Medical Group who

23    helped write the standards.  He said she would

24    not be cleared for CPD, is that correct?

1      A.    Yes, which would be Chicago Police

2  Department.

3      Q.    So, in that reference what you are

4  saying is that according to Dr. Braco when he

5  spoke to Dr. Sams or Samo, Braco was told that

6  Trudy would not be cleared to return to work for

7  the Chicago Police Department?

8      A.    Yes.

9      Q.    Did he say why that was?

10     A.    Due to this atypical seizure disorder.

11     Q.    Because she had been diagnosed with the

12  atypical seizure disorder that was the reason?

13     A.    Well, that and it must be off the

14  seizure medicine ten years.

15     Q.    Okay.  So, she was diagnosed with the

16  atypical seizure disorder, and had been off of

17  medicine, or had not been off of medicine for

18  ten years.  So, therefore, she was not able to

19  return?

20     A.    Yes.

21     Q.    The second to last line of writing it

22  says I will give counsel to Trudy after we get

23  standards and discuss with John Robinson.  Am I

24  reading that correctly?

1          A.    Yes.

2          Q.    When you say counsel, what is that?

3          A.    Well, I am not really sure.  It might

4     mean I will call Trudy, but I am not sure.

5          Q.    The next page atypical seizure

6     disorder, do you see that?

7          A.    Yes.

8          Q.    What was your reason for writing that

9     down?

10          A.    I believe I was kind of gathering my

11     thoughts, and that's what he had said on the

12     first page.

13          Q.    That's what he said that Trudy had been

14     diagnosed with?

15          A.    Right.  So, I think I was summarizing.

16          Q.    Okay.  You said need to notify police

17     physician?

18          A.    Yes.

19          Q.    Who was the police physician?

20          A.    I believe it was Dr. Braco.

21          Q.    So, then do you know what this

22     reference means needs to notify police

23     physician?

24          A.    I am not really sure, but I think it

1    had something to do with notifying him,

2    Dr. Braco.

3         Q.    Number three, what does that say?

4         A.    Intoxicated, and then I don't know what

5    that symbol is, and then essential job.

6         Q.    Do you know what you meant by that?

7         A.    I must have been jotting down notes

8    quickly.  So, I am not really sure.

9         Q.    Was that a reference to Trudy?

10        A.    I believe it was, and we weren't saying

11   she was intoxicated necessarily, but I think on

12   some of the reports that the other police

13   officers submitted about some of her behaviors,

14   and I believe there was an incident that

15   happened at Casey's, and where the person said

16   that she appeared to be intoxicated.  I believe

17   that's why I wrote that down.

18        Q.    Okay.  So, you are not saying Trudy was

19   or wasn't intoxicated.  You are just referencing

20   that that was something that you had read that

21   somebody had made that allegation that she

22   appeared to be intoxicated?

23        A.    Yes, yes.

24        Q.    The next one said community reports

1    complaints from the public.  Is that referencing

2    Trudy?

3         A.    Yes, and I believe Dr. Braco used that

4    term community reports.  That's why I wrote that

5    down because we told them that there had been

6    complaints from the public, like that Casey's

7    incident, and then other police officers.

8         Q.    Okay.  So, why would you tell Dr. Braco

9    that?

10         A.    So he would have an understanding of

11    the behaviors.

12         Q.    Did you provide him with a copy of the

13    police reports from the Casey's incident?

14         A.    I don't believe so.

15         Q.    So, you just summarized for him what

16    the police report said?

17         A.    Well, it wasn't the police.  I never

18    saw the police report.

19         Q.    Okay.

20         A.    But it was bulletins that other police

21    officers submitted to the Chief.

22         Q.    Did you send those bulletins to him?

23         A.    I don't believe so.

24         Q.    So, did you summarize what those

1    bulletins said, or did you read them verbatim to

2    him?

3         A.    It would have been a summary.

4         Q.    Did you do that before he met with

5    Trudy?

6         A.    Yes.  It would have been to give him

7    some background as to why I was sending her for

8    fitness for duty.

9         Q.    Did you also give him the documentation

10   from her incidents that occurred in the past,

11   the 2014 and 2015 incidents?

12        A.    I believe so.

13        Q.    Do you recall what information you gave

14   him on those?

15        A.    I believe it was just like a brief

16   letter that just said that she had similar

17   incidents in 2014, 2015.

18        Q.    This was a letter that you authored --

19        A.    Yes.

20        Q.    -- to Dr. Braco directly?

21        A.    Yes.

22        Q.    Where you outlined for him exactly what

23   the concerns that you had were?

24        A.    Yes.

1     Q.    Going down here it says -- I take it

2    that's Katie Anderson, hospital attorney?

3     A.    Yes.   That was Decatur Memorial

4    Hospital's attorney.

5     Q.    Okay.   Did you personally have a

6    conversation with Katie Anderson?

7     A.    No.   Well, I take that back.   I

8    honestly don't remember if I did or not.

9     Q.    Okay.   Really the reason I am trying to

10   ask about the legal stuff is because of the

11   attorney-client privilege.   I am respectful of

12   that, and if there is an issue there that's

13   privileged, I want to make sure that we do that.

14      So, is that a reference that, your

15   understanding is that Katie Anderson would be

16   consulted on these issues?

17     A.    I believe this Dr. Braco and Lindsey

18   said they had to talk to her.   They had to

19   consult with her before they could give any

20   additional information.

21     Q.    Additional information about what?

22     A.    About the reasons for, the reason why

23   they, or why Dr. Braco said Trudy was not fit

24   for duty.

1       Q.    So, before Dr. Braco could disclose any

2   more information he wanted to talk with the

3   City's attorney?

4       A.    The hospital's attorney.

5       Q.    I see, okay, I got you.  Katie Anderson

6   was the hospital's attorney.

7       A.    Yes.

8       Q.    I see.  Do you know if Dr. Braco did,

9   in fact, speak to Katie Anderson?

10      A.    I don't know if he did.  This Lindsey

11   Whitfield she was like the administrator at DMH

12   Corporate Health.  So, I think any conversations

13   with Katie Anderson probably took place with

14   Lindsey Whitfield.

15      Q.    Well, subsequent to this meeting with

16   you, Lindsey Whitfield, and Dr. Braco did you

17   receive any additional information about Trudy's

18   condition from Dr. Braco?

19      A.    No.

20      Q.    The next thing says write Corporate

21   Health about our contract with them for, is that

22   FFO?

23      A.    Fitness for duty, FFD.

24      Q.    Who is Corporate Health?

1        A.    Decatur Memorial Hospital Corporate

2    Health.

3        Q.    So, what was this a reference to?

4        A.    I believe Corporation Counsel wanted me

5    to look at the contract.

6            MR. ROBINSON:  Penny, you need not

7    answer any questions about your conversations

8    with either myself or any other member of the

9    City legal staff.

10        A.    Okay.

11        Q.    That's true, but I also think that if

12    your answer to a question is well, I can't

13    answer it unless I talk about conversations with

14    legal staff, you need to let me know about that

15    so that the privilege can be properly invoked --

16        A.    Okay.

17        Q.    -- if this makes sense.  Does that make

18    sense?

19        A.    Yes.  I believe this section it was

20    conversations that I had with our Legal

21    Department.

22        Q.    When you say this section, we are on

23    page bates stamped 372, is that correct?

24        A.    Yes.

1      Q.    Okay, and would that be at number one

2   where it says write Corporate Health about our

3   contact with them, that's a conversation that

4   you had with Legal?

5      A.    Yes.

6      Q.    When it goes all of the way down to

7   John will contact Katie Anderson, is all of that

8   block right there conversations that you had

9   with your Corporation Counsel's Office?

10     A.    It looks like it, it appears to be, so

11  yes.

12     Q.    If I were to ask you questions about

13  what you have written here, would you invoke the

14  attorney-client privilege?

15     A.    Yes.

16          MR. BAKER:  John, you would invoke the

17  attorney-client privilege?

18          MR. ROBINSON:  I would object based on

19  the privilege, and direct her not to answer.  I

20  think we have been more than generous in

21  providing information here.

22          MR. BAKER:  You can invoke the

23  privilege.  I have my opinions about it, but

24  that's fine.  You have a right to invoke the

1   privilege.  I just wanted to make sure if I

2   asked her the question, the privilege would be

3   invoked as to that, and I am correct on that,

4   right?

5          MR. ROBINSON:  That's correct.

6      Q.   The third page of notes, this is bates

7   stamped 373, are these your notes?

8      A.   Yes.

9      Q.   Okay.  What are these notes from?

10     A.   A telephone conversation I had with

11  Dr. Braco.

12     Q.   Do you recall when the conversation

13  that you had with Dr. Braco was?

14     A.   I believe it was on or around November

15  29, 2016 after I received the results.

16     Q.   Okay.  So, we talked about this

17  earlier, you had the two separate results, and I

18  think you had two conversations with Dr. Braco,

19  one after you received each one, is that

20  correct?

21     A.   Yes.

22     Q.   So, this first FFD, Trudy Karr, I

23  assume that's fitness for duty?

24     A.   Yes.

1      Q.    Six doctors, several medications, drug
2    interaction in meds, might cause memory loss, do
3    you see that?
4      A.    Yes.
5      Q.    Is that what Dr. Braco was telling you?
6      A.    Yes.
7      Q.    Okay.  Then it says four safety
8    sensitive meds she is taking that CDL people
9    can't take.  Do you see that?
10     A.    Yes.
11     Q.    I think when you say CDL, you are
12   talking about commercial driver's license?
13     A.    Yes.
14     Q.    So, it is my understanding of reading
15   this is that Dr. Braco was saying to you that
16   Trudy Karr is now taking four separate
17   medications that would essentially preclude her
18   from obtaining a commercial driver's license?
19     A.    Yes.
20     Q.    He said no firearms, Hazmat, ERT while
21   on this medication, is that correct?
22     A.    Yes.
23     Q.    Did he tell you what those medications
24   were?

1      A.    I don't believe he did.  Otherwise I

2  think I would have written them down.

3      Q.    Now, the next line has Trudy, and then

4  a phone number, which I believe is Trudy's phone

5  number.  Is that your understanding?

6      A.    Yes.

7      Q.    Is this a new entry from a new

8  telephone conversation that you would have had,

9  or would this be a continuation of notes from

10  your telephone conversation with Dr. Braco?

11      A.    I believe this is a conversation that I

12  had with Trudy.

13      Q.    When we see Trudy and her phone number,

14  that signals that you had a conversation with

15  Trudy, and these are your notes from that

16  conversation?

17      A.    Yes.

18      Q.    Would the rest of this page bates

19  stamped 373 be notes from your conversation with

20  Trudy?

21      A.    I should probably read it just to make

22  sure.

23      Q.    Yes, please, please, absolutely.

24      A.    Okay.  It is just that paragraph.

1          Q.    Okay.  So, the paragraph that ends

2     supervisory ordered EAP get paid.

3          A.    I believe so.

4          Q.    Okay.  So, anyway these are the notes

5     that you had on a conversation with Trudy,

6     correct?

7          A.    Yes.

8          Q.    So, because you write on here next

9     appointment is 12-2-16, I am assuming that this

10    conversation would have occurred after you spoke

11    with Dr. Braco but before December 2nd?

12         A.    Yes.

13         Q.    What was your purpose in contacting

14    Trudy, do you recall?

15         A.    I believe I was giving her, telling her

16    the results of the fitness for duty.

17         Q.    Okay.  Down at the bottom here it says

18    hours, is that two to ten for Trudy?

19         A.    Yes.

20         Q.    Is this a reference from part of your

21    conversation with her?

22         A.    No.  I believe I had spoken with

23    somebody at the Decatur Police Department

24    administration like a deputy chief because she

1    was supposed to go to EAP, and there was a

2    question as to whether she would get paid or not

3    while she was going to EAP.

4         Q.    I see.  That's what that references?

5         A.    Yes.

6         Q.    Down at the bottom I can't completely

7    make this out, it looks like 44-60?

8         A.    Yes.  I am not really sure what that

9    is.

10        Q.    If you don't know, you don't know.  I

11   just couldn't make it out.

12        A.    Oh, I thought of something that it

13   might be.  It might be some kind of a case

14   number from EAP.

15        Q.    I see.

16        A.    Because then it says that she has

17   appointments on December 7th and December 9th

18   with EAP.

19        Q.    I see, and EAP would be the City's

20   Employees Assistance Program?

21        A.    Yes.

22        Q.    So, you had the conversation, going

23   back to the first page, Page 371 with Dr. Braco

24   and Lindsey Whitfield on January 12th, 2017, or

1      you had a conversation with him on that date?

2           A.    Yes.

3           Q.    Had the LEO standards been adopted by

4      the City as of that date?

5           A.    No.

6           Q.    When in relation to January 20, 2017

7      were the standards, the LEO standards adopted by

8      the City?

9           A.    What do you mean by adopted?

10          Q.    Well, when did the City say these are

11     going to be the standards we are going to use

12     for our Police Department?  When did they make

13     the decision that officially these are our

14     standards?

15          A.    I am really not sure.

16          Q.    But we know it was after 1-12-17, is

17     that fair?

18          A.    You mean like for new police officers?

19          Q.    Well, just for utilizing the standards,

20     whether it be for a fitness for duty, whether it

21     be for new police officers?

22          A.    Well, Dr. Braco utilized it November of

23     2016.

24          Q.    But what authority did Dr. Braco have

1    to determine what the City's standards were

2    going to be?

3        A.    I don't know.  I guess he just took it

4    upon himself to use those standards.

5        Q.    All right, but did the City officially

6    ever say these are the standards we are going to

7    use?

8        A.    Not at that time.

9        Q.    At some point in time did the City say

10   that?

11       A.    Yes, but I don't remember when.

12       Q.    And do you recall who was involved in

13   making that final decision?

14       A.    I don't recall exactly, but I would

15   think it would have been Chief Getz, and Deputy

16   Chief Brandel, and possibly Assistant City

17   Manager Jerry Bauer, and myself.

18       Q.    Legal counsel, would they have been

19   involved with that?

20       A.    I don't remember.

21       Q.    Okay.  Do you believe that they were,

22   the decision to adopt the LEO standards was made

23   after 1-12-2017?

24       A.    Yes.

1    Q.    Do you have an approximation date of

2  when between 2017 and 2018 that decision would

3  have been made?

4    A.    No.

5    Q.    Was the decision to adopt those

6  standards, was it formalized in any way through

7  a writing of some sort?

8    A.    Not that I recall.  Although -- I do

9  take that back.  I seem to remember an e-mail

10  though that was sent, I believe, by Melissa

11  Rowcliff to our contact person at HSHS when we

12  started switching over.  So, it would have been

13  sometime in 2017, but that e-mail went out

14  directing them to use the LEO standards.  That's

15  when they said that they were getting a

16  subscription to them.

17        MR. BAKER:  I have no further

18  questions.

19        MR. ROBINSON:  I have no questions.

20        MR. BAKER:  John, do you want to

21  reserve or waive?

22        MR. ROBINSON:  We will waive.

23            (Witness Excused)

24

57

```
1    STATE OF ILLINOIS      )
                            ) SS
2    COUNTY OF CHRISTIAN    )

3

4         I, Sandra K. Haines, a Notary Public and

5    Certified Shorthand Reporter, associated with

6    Haines Court Reporting, do hereby certify that

7    prior to the taking of the deposition herein,

8    and on June 22, 2020, the Deponent, PENNY ROGERS

9    was, by me, duly sworn/affirmed to testify to

10   the truth in relation to the matter in

11   controversy herein.  That on said date the

12   foregoing deposition was taken down

13   stenographically by me and afterwards reduced to

14   typewritten form by me, and that the foregoing

15   transcript contains a true and accurate

16   translation of all such shorthand notes.

17        Given under my hand and seal this 26th day

18   of June, 2020 at Taylorville, Illinois.

19

20

21

22                         Sandra K. Haines
                           Notary Public and CSR
23                         License No. 084-002423

24
```

**084-002423** [2] - 1:20, 57:23
**1** [3] - 3:8, 6:3, 6:9
**1-12-17** [2] - 36:16, 54:16
**1-12-2017** [1] - 55:23
**10** [1] - 3:11
**11-29** [1] - 15:23
**11:00** [1] - 1:15
**12-2-16** [1] - 52:9
**12th** [1] - 36:20, 53:24
**2** [4] - 3:9, 6:23, 7:6, 7:23
**20** [1] - 54:6
**2004** [1] - 5:2
**2014** [2] - 44:11, 44:17
**2015** [5] - 4:21, 5:3, 8:9, 44:11, 44:17
**2016** [11] - 8:9, 8:18, 8:21, 9:9, 11:24, 31:16, 31:21, 32:6, 39:9, 49:15, 54:23
**2017** [9] - 26:22, 31:18, 31:21, 34:5, 36:20, 53:24, 54:6, 56:2, 56:13
**2018** [4] - 4:19, 4:21, 5:4, 56:2
**2019-CV-2134** [1] - 1:8
**2020** [3] - 1:14, 57:8, 57:18
**217)424-2871** [1] - 2:10
**217)428-0946** [1] - 1:23
**217)522-3445** [1] - 2:5
**22** [2] - 1:14, 57:8
**24** [1] - 16:20
**25471** [1] - 1:22
**264** [1] - 10:13
**26th** [1] - 57:17
**29** [2] - 11:24, 49:15
**2nd** [1] - 52:11
**3** [4] - 3:10, 7:11, 7:14, 8:2
**30** [2] - 37:10, 37:13
**30(b)(6** [2] - 5:16, 5:17
**36** [1] - 3:12
**371** [3] - 35:24, 36:14, 53:23
**372** [1] - 47:23
**373** [3] - 35:24, 49:7, 51:19
**4** [5] - 3:3, 3:11, 10:12, 10:17
**411** [10] - 11:3, 11:10, 15:21, 16:13, 16:14, 16:19, 17:5, 17:24, 18:3, 19:11
**412** [11] - 11:3, 11:10, 11:13, 11:22, 15:24, 16:12, 16:14, 16:19, 17:22, 19:11
**415** [1] - 2:4
**44-60** [1] - 53:7
**5** [5] - 3:12, 11:1, 11:2, 35:20, 36:5
**56** [1] - 3:3
**6** [1] - 3:8
**62523-1196** [1] - 2:9
**62525-5471** [1] - 1:23
**62701** [1] - 2:4
**7** [2] - 3:9, 3:10
**7th** [1] - 53:17
**833** [2] - 11:13, 15:21
**9th** [1] - 53:17

**A.M** [1] - 1:15
**able** [3] - 6:12, 19:10, 40:18
**absolutely** [1] - 51:23
**accomplished** [1] - 34:6
**according** [2] - 18:19, 40:4
**accurate** [1] - 57:15
**ACOEM** [4] - 7:20, 11:19, 39:7
**Acting** [3] - 4:15, 4:23, 5:10
**additional** [6] - 16:15, 16:22, 19:7, 45:20, 45:21, 46:17
**administration** [3] - 22:7, 34:12, 52:24
**administrator** [1] - 46:11
**adopt** [9] - 33:2, 33:5, 33:11, 33:20, 34:4, 35:11, 35:12, 55:22, 56:5
**adopted** [5] - 20:17, 23:12, 54:3, 54:7, 54:9
**adopting** [6] - 22:1, 24:1, 26:14, 26:16, 35:8, 35:14
**adoption** [1] - 32:19
**afterwards** [1] - 57:13
**agreed** [1] - 32:11
**agreement** [1] - 33:7
**allegation** [1] - 42:21
**allowed** [1] - 10:6
**American** [1] - 7:21
**analyzed** [1] - 18:21
**ANCHOR** [1] - 1:22
**Anderson** [9] - 1:15, 2:9, 45:2, 45:6, 45:15, 46:5, 46:9, 46:13, 48:7
**answer** [7] - 17:17, 26:10, 26:11, 47:7, 47:12, 47:13, 48:19
**anyway** [1] - 52:4
**apologize** [1] - 30:2
**APPEARANCES** [1] - 2:1
**appeared** [2] - 42:16, 42:22
**Appearing** [2] - 2:6, 2:12
**apply** [1] - 23:21
**appointment** [1] - 52:9
**appointments** [1] - 53:17
**appropriate** [1] - 20:12
**approved** [1] - 21:3
**approximation** [1] - 56:1
**areas** [2] - 5:20, 5:22
**Assistance** [1] - 53:20
**assistant** [1] - 25:5
**Assistant** [6] - 2:11, 22:7, 22:17, 27:14, 33:13, 55:16
**associated** [1] - 57:5
**Association** [1] - 8:6
**assume** [3] - 25:19, 26:7, 49:23
**assuming** [2] - 11:23, 52:9
**attention** [1] - 28:10
**attorney** [12] - 23:2, 23:9, 23:13, 26:5, 45:2, 45:4, 45:11, 46:3, 46:4, 46:6, 48:14, 48:17

**attorney's** [1] - 26:8
**attorney-client** [7] - 23:2, 23:9, 23:13, 26:5, 45:11, 48:14, 48:17
**Attorneys** [1] - 2:3
**atypical** [5] - 38:21, 39:1, 40:10, 40:12, 40:16, 41:5
**August** [2] - 4:20, 5:2
**authored** [1] - 44:18
**authority** [3] - 21:19, 33:4, 54:24
**available** [2] - 12:13, 16:1
**aware** [3] - 8:17, 17:9, 35:16
**back** [5] - 5:6, 35:19, 45:7, 53:23, 56:9
**background** [1] - 44:7
**backtrack** [1] - 22:11
**BAKER** [10] - 2:3, 2:6, 4:7, 23:10, 26:1, 48:16, 48:22, 56:17, 56:20
**Baker...** [1] - 3:3
**based** [5] - 13:7, 15:6, 15:14, 18:22, 48:18
**basis** [1] - 13:12
**bates** [13] - 10:13, 11:3, 11:8, 16:13, 16:14, 17:4, 17:22, 17:24, 18:3, 35:23, 47:23, 49:6, 51:18
**Bauer** [6] - 22:17, 23:7, 25:5, 27:14, 33:14, 55:17
**became** [2] - 4:23, 5:3
**begin** [1] - 8:13
**beginning** [1] - 26:22
**behalf** [2] - 2:6, 2:12
**behaviors** [2] - 42:13, 43:11
**between** [3] - 16:12, 16:15, 56:2
**bigger** [1] - 29:19
**bit** [1] - 29:18
**block** [1] - 48:8
**bottom** [4] - 11:7, 37:23, 52:17, 53:6
**Box** [1] - 1:22
**Braco** [47] - 8:19, 8:20, 9:8, 10:14, 10:19, 10:20, 12:7, 17:15, 17:23, 18:11, 18:14, 19:1, 19:6, 21:11, 22:5, 24:2, 24:6, 24:13, 26:4, 32:5, 36:16, 37:11, 39:1, 39:19, 40:4, 40:5, 41:20, 42:2, 43:3, 43:8, 44:20, 45:17, 45:23, 46:1, 46:8, 46:16, 46:18, 49:11, 49:13, 49:18, 50:5, 50:15, 51:10, 52:11, 53:23, 54:22, 54:24
**Braco's** [2] - 15:9, 39:17
**Brandel** [6] - 22:15, 23:7, 25:7, 27:15, 32:22, 55:16
**break** [1] - 9:7
**breaking** [1] - 19:20
**brief** [1] - 44:15
**brought** [1] - 28:10

**bulletins** [3] - 43:20, 43:22, 44:1
**BY** [3] - 2:6, 2:11, 4:7
**capacity** [1] - 4:14
**case** [4] - 5:18, 33:8, 35:7, 53:13
**Casey's** [3] - 42:15, 43:6, 43:13
**categories** [2] - 6:5, 6:13
**CDL** [2] - 50:8, 50:11
**Central** [1] - 28:16
**CENTRAL** [1] - 1:3
**certain** [1] - 29:10
**Certified** [1] - 57:5
**certify** [1] - 57:6
**Champaign** [1] - 29:16
**changeover** [1] - 31:12
**changing** [2] - 31:5, 31:6
**Chicago** [2] - 40:1, 40:7
**Chief** [11] - 22:14, 22:15, 25:6, 27:13, 27:15, 32:21, 32:22, 43:21, 55:15, 55:16
**chief** [1] - 52:24
**CHRISTIAN** [1] - 57:2
**Christine** [1] - 4:10
**CITY** [2] - 1:9, 2:8
**City** [45] - 4:12, 5:19, 5:21, 6:17, 7:18, 8:13, 10:12, 13:10, 19:1, 20:4, 20:7, 20:10, 20:13, 20:17, 21:2, 21:20, 21:24, 22:7, 22:17, 22:21, 23:11, 23:18, 25:5, 26:4, 27:14, 28:24, 29:15, 29:16, 31:5, 33:1, 33:4, 33:13, 33:20, 33:24, 34:4, 34:15, 35:6, 47:9, 54:4, 54:8, 54:10, 55:5, 55:9, 55:16
**City's** [5] - 26:1, 37:17, 46:3, 53:19, 55:1
**Civil** [1] - 5:16
**clarification** [3] - 10:8, 11:17, 11:20
**clarify** [1] - 30:24
**clarity** [1] - 11:7
**clear** [2] - 11:11, 38:7
**cleared** [2] - 39:24, 40:6
**client** [7] - 23:2, 23:9, 23:13, 26:5, 45:11, 48:14, 48:17
**College** [1] - 7:21
**combination** [2] - 27:8, 34:22
**coming** [1] - 9:19
**commercial** [2] - 50:12, 50:18
**common** [3] - 28:23, 39:10, 39:13
**communicate** [2] - 28:24, 29:11
**communication** [2] - 27:7, 27:21
**communications** [7] - 26:13,

26:15, 26:20, 26:24, 27:4, 27:12, 27:19
**community** [2] - 42:24, 43:4
**complaints** [2] - 43:1, 43:6
**complete** [2] - 6:21, 19:14
**completely** [2] - 31:18, 53:6
**comply** [1] - 26:8
**concerns** [1] - 44:23
**condition** [1] - 46:18
**conference** [1] - 24:22
**confidentiality** [1] - 19:21
**confused** [1] - 17:8
**confuses** [1] - 15:22
**confusion** [1] - 17:14
**consider** [1] - 30:7
**consistent** [1] - 16:5
**consult** [1] - 45:19
**consulted** [1] - 45:16
**contact** [4] - 48:3, 48:7, 56:11
**contacted** [1] - 17:15
**contacting** [1] - 52:13
**contains** [1] - 57:15
**continuation** [1] - 51:9
**contract** [2] - 46:21, 47:5
**controversy** [1] - 57:11
**conversation** [42] - 9:8, 13:23, 15:2, 16:18, 17:23, 18:14, 19:6, 21:10, 22:5, 23:24, 24:4, 24:11, 24:14, 24:18, 24:20, 24:24, 25:4, 25:7, 25:9, 25:16, 25:21, 30:2, 30:6, 30:12, 30:17, 31:23, 45:6, 48:3, 49:10, 49:12, 51:8, 51:10, 51:11, 51:14, 51:16, 51:19, 52:5, 52:10, 52:21, 53:22, 54:1
**conversations** [21] - 14:16, 22:20, 22:23, 23:1, 23:4, 23:17, 26:24, 27:4, 28:4, 28:6, 28:9, 32:16, 32:18, 34:12, 34:21, 46:12, 47:7, 47:13, 47:20, 48:8, 49:18
**copies** [1] - 7:16
**copy** [2] - 6:19, 43:12
**Corporate** [6] - 37:1, 46:12, 46:20, 46:24, 47:1, 48:2
**Corporation** [11] - 2:11, 22:21, 23:1, 23:6, 24:9, 24:13, 25:2, 33:16, 34:24, 47:4, 48:9
**correct** [25] - 8:4, 10:14, 13:17, 14:23, 16:3, 16:4, 16:24, 17:2, 18:1, 18:4, 18:7, 20:14, 24:16, 26:6, 30:9, 38:2, 38:4, 38:5, 39:24, 47:23, 49:3, 49:5, 49:20, 50:21, 52:6
**correctly** [4] - 11:22, 23:11, 33:9, 40:24
**counsel** [4] - 25:10, 40:22, 41:2, 55:18
**Counsel** [10] - 2:11, 22:21,

23:2, 23:6, 23:15, 24:9, 24:13, 25:2, 34:24, 47:4
**Counsel's** [2] - 33:17, 48:9
**COUNTY** [1] - 57:2
**couple** [1] - 37:11
**Court** [1] - 57:6
**COURT** [1] - 1:3
**CPD** [1] - 39:24
**CSR** [3] - 1:17, 1:20, 57:22
**Dan** [1] - 39:20
**date** [9] - 6:10, 7:7, 7:15, 10:18, 36:6, 54:1, 54:4, 56:1, 57:11
**deal** [1] - 29:20
**DECATUR** [2] - 1:9, 2:8
**Decatur** [15] - 1:16, 1:23, 2:9, 4:12, 5:19, 6:17, 7:18, 13:11, 19:1, 29:19, 31:1, 34:15, 45:3, 47:1, 52:23
**December** [3] - 52:11, 53:17
**decide** [1] - 15:17
**decided** [2] - 5:9, 33:11
**decision** [10] - 33:15, 33:17, 34:17, 35:10, 37:17, 54:13, 55:13, 55:22, 56:2, 56:5
**Defendant** [2] - 1:10, 2:12
**Department** [13] - 6:18, 7:19, 8:10, 21:21, 30:9, 33:8, 33:10, 33:11, 40:2, 40:7, 47:21, 52:23, 54:12
**department** [1] - 33:7
**Deponent** [1] - 57:8
**Deposition** [13] - 1:13, 3:8, 3:9, 3:10, 3:11, 3:12, 6:9, 7:6, 7:14, 10:17, 11:1, 35:19, 36:5
**deposition** [5] - 6:19, 6:24, 10:24, 57:7, 57:12
**Deputy** [5] - 22:14, 25:6, 27:15, 32:22, 55:15
**deputy** [1] - 52:24
**describe** [1] - 8:3
**descriptions** [1] - 21:8
**designated** [1] - 5:15
**determine** [2] - 21:19, 55:1
**determined** [1] - 35:4
**determining** [1] - 20:8
**diagnosed** [3] - 40:11, 40:15, 41:14
**different** [4] - 6:13, 13:24, 16:13, 22:9
**direct** [3] - 26:9, 26:11, 48:19
**Direct** [1] - 3:3
**DIRECT** [1] - 4:6
**directing** [1] - 56:14
**directive** [1] - 26:8
**directly** [2] - 39:16, 44:20
**disclose** [1] - 46:1
**discuss** [3] - 6:16, 35:6, 35:7, 36:19, 40:23
**discussed** [4] - 24:23, 25:16, 25:23, 35:13

**discussing** [1] - 37:24
**discussion** [4] - 10:1, 20:3, 21:24, 26:5
**discussions** [5] - 22:6, 22:13, 23:19, 26:20, 28:2
**disorder** [6] - 38:22, 39:2, 40:10, 40:12, 40:16, 41:6
**DISTRICT** [2] - 1:3, 1:3
**DMH** [5] - 30:16, 30:24, 31:10, 36:24, 46:11
**doctor** [2] - 19:3, 21:6
**doctors** [1] - 50:1
**document** [14] - 5:13, 6:4, 6:7, 7:2, 7:4, 7:12, 10:11, 10:15, 11:2, 11:5, 11:6, 35:18, 35:23, 36:3
**documentation** [4] - 16:16, 24:12, 26:3, 44:9
**done** [4] - 29:5, 29:8, 34:18
**down** [13] - 9:7, 37:7, 39:8, 41:9, 42:7, 42:17, 43:5, 45:1, 48:6, 51:2, 52:17, 53:6, 57:12
**Dr** [48] - 8:19, 8:20, 9:8, 10:14, 12:7, 15:9, 17:15, 17:23, 18:11, 18:14, 19:1, 19:6, 21:11, 22:5, 24:2, 24:6, 24:13, 26:4, 32:5, 36:16, 37:11, 39:1, 39:17, 39:19, 40:4, 40:5, 41:20, 42:2, 43:3, 43:8, 44:20, 45:17, 45:23, 46:1, 46:8, 46:16, 46:18, 49:11, 49:13, 49:18, 50:5, 50:15, 51:10, 52:11, 53:23, 54:22, 54:24
**driver's** [2] - 50:12, 50:18
**drug** [1] - 50:1
**due** [1] - 40:10
**duly** [7] - 4:3, 6:7, 7:4, 7:12, 10:15, 36:3, 57:9
**during** [9] - 13:23, 15:1, 15:17, 19:5, 24:24, 25:16, 25:21, 28:8, 31:20
**duties** [1] - 21:6
**duty** [11] - 8:23, 9:20, 10:5, 12:15, 31:7, 44:8, 45:24, 46:23, 49:23, 52:16, 54:20
**e-mail** [4] - 27:12, 30:21, 56:9, 56:13
**e-mails** [5] - 27:6, 27:10, 27:17, 34:19, 34:23
**EAP** [6] - 52:2, 53:1, 53:3, 53:14, 53:18, 53:19
**effect** [1] - 8:7
**either** [3] - 34:11, 39:21, 47:8
**elaborate** [1] - 10:4
**elected** [1] - 5:22
**electronic** [1] - 24:19
**employed** [2] - 4:11, 4:14
**Employees** [1] - 53:20
**employment** [5] - 9:5, 19:4, 20:20, 28:1, 31:7
**enables** [1] - 5:17

**ends** [1] - 52:1
**entry** [1] - 51:7
**Environmental** [1] - 7:22
**epilepsy** [2] - 38:22, 39:2
**ERT** [3] - 10:6, 12:15, 50:20
**especially** [1] - 37:19
**essential** [1] - 42:5
**essentially** [1] - 50:17
**evaluated** [3] - 14:9, 18:18, 18:22
**evaluation** [1] - 9:5
**evaluations** [1] - 31:8
**exactly** [2] - 44:22, 55:14
**Examination** [1] - 3:3
**EXAMINATION** [1] - 4:6
**examined** [1] - 4:4
**exchanging** [1] - 27:5
**excuse** [1] - 26:15
**Excused** [1] - 56:23
**Exhibit** [19] - 3:8, 3:9, 3:10, 3:11, 3:12, 6:3, 6:9, 6:23, 7:6, 7:11, 7:14, 7:23, 8:2, 10:12, 10:17, 11:1, 11:2, 35:19, 36:5
**exhibit** [1] - 10:12
**EXHIBITS** [1] - 3:6
**exist** [1] - 28:14
**existed** [1] - 21:17
**explain** [1] - 18:15
**explained** [1] - 18:16
**explanation** [1] - 9:24
**extent** [2] - 23:16, 23:18
**fact** [2] - 36:8, 46:9
**fair** [2] - 17:9, 29:5, 54:17
**fairly** [2] - 8:8, 18:17
**fall** [2] - 31:18, 34:5
**familiar** [6] - 9:1, 14:10, 17:11, 20:21, 36:1, 37:19
**far** [2] - 18:1, 34:17
**faxed** [1] - 9:21
**Federal** [2] - 5:16, 5:17
**felt** [5] - 11:16, 12:19, 12:22, 19:17, 37:18
**FFD** [2] - 46:23, 49:22
**FFO** [1] - 46:22
**fill** [2] - 5:7, 5:9
**final** [1] - 55:13
**finalized** [1] - 34:19
**fine** [3] - 26:12, 48:24
**Fire** [1] - 8:5
**firearms** [1] - 50:20
**firefighter** [2] - 39:9, 39:13
**firefighters** [3] - 8:12, 20:18, 20:22
**first** [21] - 4:3, 8:13, 10:23, 11:14, 14:19, 15:2, 15:23, 17:5, 18:6, 19:17, 23:23, 24:11, 25:8, 26:2, 26:16, 36:14, 38:9, 39:8, 41:12, 49:22, 53:23
**fit** [1] - 45:23
**fitness** [8] - 8:23, 9:20, 31:7,

44:8, 46:23, 49:23, 52:16,
54:20
**five** [1] - 6:5
**floor** [1] - 24:22
**follows** [1] - 4:5
**FOR** [1] - 1:3
**foregoing** [2] - 57:12, 57:14
**forget** [1] - 30:2
**form** [5] - 10:14, 14:13,
14:14, 14:19, 57:14
**formal** [1] - 33:1
**formalized** [2] - 34:20, 56:6
**formally** [2] - 21:24, 35:11
**forthcoming** [3] - 15:4,
15:11, 16:10
**foundation** [1] - 23:22
**four** [2] - 50:7, 50:16
**frame** [2] - 8:9, 31:21
**Frank** [1] - 23:8
**frequently** [1] - 29:11
**full** [1] - 4:8
**further** [4] - 12:11, 12:13,
15:24, 56:17
**Gary** [2] - 1:15, 2:9
**gathering** [1] - 41:10
**generous** [1] - 48:20
**Getz** [6] - 22:14, 23:7, 25:6,
27:13, 32:22, 55:15
**given** [1] - 33:19
**Given** [1] - 57:17
**gradual** [2] - 31:14, 31:20
**Group** [1] - 39:22
**guess** [6] - 5:14, 14:13,
15:22, 21:15, 25:16, 55:3
**Haines** [5] - 1:17, 1:20, 57:4,
57:6, 57:22
**hand** [1] - 57:17
**handed** [1] - 35:22
**handwritten** [2] - 36:1, 39:7
**happy** [1] - 31:17
**Hazmat** [2] - 12:15, 50:20
**Health** [6] - 37:1, 46:12,
46:21, 46:24, 47:2, 48:2
**health** [1] - 31:4
**heard** [4] - 14:5, 17:6, 18:6,
18:9
**held** [3] - 4:17, 4:18, 22:6
**helped** [1] - 39:23
**hereby** [1] - 57:6
**herein** [3] - 4:2, 57:7, 57:11
**himself** [2] - 21:16, 55:4
**hired** [1] - 5:1
**hiring** [1] - 27:24
**hold** [1] - 28:24
**honestly** [1] - 45:8
**Hospital** [3] - 31:1, 31:3,
47:1
**hospital** [1] - 45:2
**hospital's** [2] - 46:4, 46:6
**Hospital's** [1] - 45:4
**hospitals** [1] - 30:15
**hour** [1] - 1:15

**hours** [2] - 16:20, 52:18
**HR** [5] - 13:14, 30:4, 33:6,
33:10
**HSHS** [10] - 30:16, 30:18,
31:3, 31:10, 31:16, 32:8,
32:11, 34:12, 34:14, 56:11
**Human** [6] - 4:15, 4:20, 5:3,
5:7, 5:10, 22:8
**hundred** [1] - 27:1
**identification** [5] - 6:8, 7:5,
7:13, 10:16, 36:4
**identified** [1] - 5:20
**identifies** [1] - 6:5
**ILLINOIS** [3] - 1:3, 1:9, 57:1
**Illinois** [6] - 1:16, 1:23, 2:4,
2:9, 28:17, 57:18
**IN** [1] - 1:3
**incident** [3] - 42:14, 43:7,
43:13
**incidents** [3] - 44:10, 44:11,
44:17
**include** [1] - 24:9
**INDEX** [1] - 3:1
**indicate** [2] - 15:14, 19:6
**individual** [1] - 30:3
**individuals** [2] - 22:12, 25:22
**information** [24] - 12:12,
12:13, 12:16, 12:20, 13:19,
13:21, 15:20, 16:1, 16:3,
16:7, 16:23, 19:7, 19:12,
19:15, 19:17, 19:20, 37:18,
37:20, 44:13, 45:20, 45:21,
46:2, 46:17, 48:21
**informing** [1] - 30:13
**instance** [2] - 1:14, 4:2
**interaction** [1] - 50:2
**interruption** [1] - 37:12
**intoxicated** [5] - 42:4, 42:11,
42:16, 42:19, 42:22
**invoke** [7] - 23:13, 25:18,
26:4, 48:13, 48:16, 48:22,
48:24
**invoked** [2] - 47:15, 49:3
**invokes** [1] - 23:18
**involved** [10] - 22:12, 22:20,
23:7, 24:13, 24:14, 27:17,
33:14, 33:17, 55:12, 55:19
**issue** [1] - 45:12
**issues** [4] - 29:12, 29:20,
36:19, 45:16
**January** [3] - 36:20, 53:24,
54:6
**Jerry** [5] - 22:17, 25:5, 27:14,
33:14, 55:17
**job** [3] - 10:8, 21:8, 42:5
**John** [5] - 37:24, 40:23, 48:7,
48:16, 56:20
**JOHN** [2] - 2:6, 2:11
**jotting** [1] - 42:7
**July** [1] - 4:19
**June** [4] - 1:14, 4:21, 57:8,
57:18

**justification** [1] - 33:19
**Karr** [11] - 2:16, 8:22, 9:13,
11:1, 12:21, 15:3, 24:23,
35:19, 49:22, 50:16
**KARR** [1] - 1:6
**Karr's** [2] - 35:7, 35:12
**Katie** [7] - 45:2, 45:6, 45:15,
46:5, 46:9, 46:13, 48:7
**kind** [6] - 19:18, 21:15,
31:16, 35:16, 41:10, 53:13
**KRAJEWSKI** [1] - 2:3
**last** [1] - 40:21
**lasted** [1] - 37:9
**Law** [1] - 2:3
**leading** [1] - 17:16
**Legal** [2] - 47:20, 48:4
**legal** [5] - 25:10, 45:10, 47:9,
47:14, 55:18
**LEO** [43] - 7:20, 8:7, 8:24,
11:18, 14:5, 17:2, 17:4,
17:6, 18:3, 18:7, 18:9,
18:15, 20:2, 20:5, 21:11,
21:15, 22:1, 23:12, 24:1,
25:23, 28:3, 28:11, 30:8,
30:19, 32:9, 32:11, 32:19,
33:11, 33:20, 34:1, 34:3,
34:4, 35:5, 35:11, 35:12,
37:19, 38:19, 39:7, 54:3,
54:7, 55:22, 56:14
**lethal** [1] - 12:14
**letter** [2] - 44:16, 44:18
**letting** [1] - 9:19
**license** [2] - 50:12, 50:18
**License** [1] - 57:23
**likelihood** [2] - 23:3, 23:6
**Lindsey** [6] - 36:15, 45:17,
46:10, 46:14, 46:16, 53:24
**line** [2] - 40:21, 51:3
**little** [2] - 4:23, 29:18
**LLC** [1] - 2:3
**look** [5] - 6:2, 6:24, 28:12,
33:24, 47:5
**looking** [1] - 7:2
**looks** [2] - 48:10, 53:7
**loss** [1] - 50:2
**ma'am** [3] - 4:8, 26:7, 35:22
**mail** [4] - 27:12, 30:21, 56:9,
56:13
**mails** [5] - 27:6, 27:10,
27:17, 34:19, 34:23
**main** [1] - 19:2, 29:17
**Manager** [12] - 4:16, 4:20,
4:24, 5:4, 5:8, 5:11, 22:8,
22:17, 25:5, 27:14, 33:13,
55:17
**manager** [1] - 4:22
**mark** [3] - 6:23, 7:1, 7:10
**marked** [5] - 6:8, 7:5, 7:13,
10:16, 36:4
**Mary** [1] - 25:13
**matter** [1] - 57:10
**mean** [6] - 38:5, 38:13,

39:12, 41:4, 54:9, 54:18
**means** [1] - 41:22
**meant** [2] - 38:6, 42:6
**Medical** [1] - 39:22
**medical** [11] - 9:4, 9:5, 12:12,
12:13, 12:16, 15:24, 16:3,
19:7, 19:14, 21:5, 31:6
**medication** [3] - 12:21, 13:1,
50:21
**medications** [11] - 13:5,
13:6, 13:8, 13:11, 14:23,
15:4, 15:11, 16:10, 50:1,
50:17, 50:23
**medicine** [5] - 38:10, 38:15,
40:14, 40:17
**Medicine** [1] - 7:22
**meds** [2] - 50:2, 50:8
**meeting** [11] - 15:18, 23:7,
26:2, 26:16, 34:18, 36:15,
36:22, 37:8, 37:15, 38:2,
46:15
**meetings** [3] - 27:5, 34:23,
35:6
**Melissa** [4] - 27:22, 30:5,
30:17, 56:10
**member** [1] - 47:8
**memo** [2] - 34:8, 34:10
**Memorial** [3] - 31:1, 45:3,
47:1
**memory** [1] - 50:2
**memos** [2] - 27:5, 34:19
**mentioned** [2] - 24:5, 24:8
**met** [2] - 36:19, 44:4
**might** [11] - 13:6, 13:8,
22:19, 28:14, 28:15, 28:18,
29:4, 29:5, 30:7, 41:3,
50:2, 53:13
**mind** [1] - 35:19
**minutes** [2] - 37:10, 37:13
**Miss** [6] - 8:22, 12:21, 25:12,
30:6, 31:24, 32:15
**miss** [1] - 4:11
**Morthland** [4] - 22:19, 25:13,
25:14, 27:16
**MR** [19] - 2:6, 2:11, 4:7,
17:16, 22:24, 23:10, 23:15,
25:24, 26:6, 26:9, 47:6,
48:16, 48:18, 48:22, 49:5,
56:17, 56:19, 56:20, 56:22
**multiple** [1] - 14:16
**municipalities** [4] - 28:16,
28:22, 29:1, 29:10
**must** [3] - 38:10, 40:13, 42:7
**name** [2] - 4:9, 30:2
**National** [1] - 8:5
**nature** [1] - 24:20
**necessarily** [4] - 19:13,
19:15, 21:4, 42:11
**need** [4] - 28:12, 41:16, 47:6,
47:14
**needed** [5] - 11:16, 12:16,
13:19, 15:19, 37:18

**needs** [1] - 41:22
**neurology** [2] - 6:22, 7:9
**never** [3] - 14:5, 21:8, 43:17
**new** [13] - 8:8, 9:3, 14:7, 14:13, 18:17, 19:11, 19:15, 27:24, 28:11, 51:7, 54:18, 54:21
**next** [7] - 25:14, 38:21, 41:5, 42:24, 46:20, 51:3, 52:8
**NFPA** [13] - 7:8, 7:10, 8:3, 8:11, 8:14, 9:6, 17:12, 18:19, 18:22, 20:14, 20:16, 21:9, 34:1
**NO** [1] - 1:8
**Normal** [1] - 29:16
**Northland** [1] - 25:12
**Northwestern** [1] - 39:22
**Notary** [3] - 1:17, 57:4, 57:22
**notation** [1] - 38:9
**notes** [14] - 36:1, 36:2, 36:8, 36:12, 37:2, 42:7, 49:6, 49:7, 49:9, 51:9, 51:15, 51:19, 52:4, 57:16
**notice** [3] - 1:18, 6:2, 37:23
**notify** [2] - 41:16, 41:22
**notifying** [1] - 42:1
**November** [7] - 8:18, 8:21, 9:8, 11:23, 32:5, 49:14, 54:22
**number** [7] - 11:8, 42:3, 48:1, 51:4, 51:5, 51:13, 53:14
**Number** [15] - 3:8, 3:9, 3:10, 3:11, 3:12, 6:3, 6:9, 7:6, 7:14, 7:23, 8:2, 10:12, 10:17, 11:1, 36:5
**numbers** [1] - 35:23
**oath** [1] - 4:4
**object** [4] - 17:16, 22:24, 25:17, 48:18
**objection** [2] - 25:19, 25:24
**obtain** [1] - 32:11
**obtaining** [1] - 50:18
**obviously** [1] - 23:20
**occasions** [1] - 22:10
**Occupational** [1] - 7:21
**occurred** [11] - 22:3, 24:19, 26:3, 26:20, 31:13, 32:3, 32:23, 36:23, 36:24, 44:10, 52:10
**OF** [5] - 1:3, 1:9, 2:8, 57:1, 57:2
**Office** [2] - 33:17, 48:9
**officer** [2] - 10:9, 38:16
**officers** [15] - 8:15, 8:16, 9:3, 13:10, 14:8, 18:18, 18:21, 28:13, 33:23, 39:14, 42:13, 43:7, 43:21, 54:18, 54:21
**officially** [3] - 34:4, 54:13, 55:5
**old** [1] - 39:9
**One** [2] - 1:15, 2:9

**one** [12] - 6:15, 7:1, 9:18, 15:23, 17:1, 19:18, 27:24, 34:18, 42:24, 48:1, 49:19
**ones** [1] - 29:17
**opinion** [1] - 15:10
**opinions** [1] - 48:23
**opposing** [1] - 5:18
**order** [1] - 38:15
**ordered** [2] - 30:21, 52:2
**organization** [1] - 5:5
**originally** [1] - 20:17
**otherwise** [1] - 51:1
**outlined** [1] - 44:22
**outside** [1] - 34:1
**Ownby** [1] - 2:16
**P.O** [1] - 1:22
**Page** [6] - 15:24, 17:22, 17:24, 18:3, 36:14, 53:23
**page** [10] - 6:4, 11:2, 11:12, 11:20, 41:5, 41:12, 47:23, 49:6, 51:18, 53:23
**pages** [2] - 16:13, 36:11
**paid** [2] - 52:2, 53:2
**paperwork** [1] - 9:19
**paragraph** [2] - 51:24, 52:1
**part** [3] - 5:17, 35:13, 52:20
**particular** [1] - 36:2
**party** [1] - 5:18
**past** [3] - 18:18, 39:13, 44:10
**Penny** [1] - 23:8
**PENNY** [3] - 1:13, 4:1, 57:8
**penny** [2] - 4:10, 47:6
**people** [5] - 19:3, 24:5, 24:8, 27:24, 50:8
**Peoria** [1] - 29:15
**per** [1] - 38:10
**percent** [1] - 27:1
**perform** [1] - 38:15
**perhaps** [1] - 23:15
**periodic** [1] - 13:12
**person** [8] - 27:5, 27:9, 30:4, 30:17, 42:15, 56:11
**personally** [1] - 45:5
**Personnel** [3] - 5:1, 5:6, 5:10
**personnel** [1] - 27:22
**phone** [6] - 27:5, 27:9, 34:23, 51:4, 51:13
**physical** [1] - 10:13
**physicals** [4] - 19:4, 20:20, 28:1, 31:7
**physician** [4] - 20:11, 41:17, 41:19, 41:23
**place** [3] - 22:9, 35:21, 46:13
**placed** [1] - 10:21
**Plaintiff** [4] - 1:7, 1:14, 2:6, 4:3
**Plaza** [2] - 1:16, 2:9
**point** [4] - 21:23, 23:22, 32:7, 55:9
**Police** [12] - 6:18, 7:18, 8:10, 21:21, 30:8, 33:8, 33:10, 33:11, 40:1, 40:7, 52:23,

54:12
**police** [26] - 8:15, 8:16, 9:3, 10:8, 13:10, 14:8, 18:18, 18:21, 20:24, 22:7, 28:13, 33:23, 38:16, 39:14, 41:16, 41:19, 41:22, 42:12, 43:7, 43:13, 43:16, 43:17, 43:18, 43:20, 54:18, 54:21
**position** [5] - 4:17, 4:18, 5:8, 26:2, 28:23
**positions** [2] - 21:7, 31:15
**possible** [1] - 34:23
**possibly** [3] - 27:13, 27:14, 55:16
**potential** [1] - 34:1
**practice** [1] - 39:10
**pre** [5] - 9:5, 19:4, 20:20, 28:1, 31:7
**pre-employment** [5] - 9:5, 19:4, 20:20, 28:1, 31:7
**preclude** [1] - 50:17
**prepared** [1] - 6:12
**prescription** [1] - 16:7
**present** [7] - 25:3, 25:10, 25:22, 26:23, 28:5, 37:4, 38:2
**PRESENT** [1] - 2:14
**pretty** [2] - 20:21, 21:4
**previous** [1] - 10:24
**privilege** [12] - 23:13, 23:18, 23:20, 26:5, 45:11, 47:15, 48:14, 48:17, 48:19, 48:23, 49:1, 49:2
**privileged** [6] - 23:2, 23:9, 23:17, 23:20, 25:24, 45:13
**Procedure** [1] - 5:16
**process** [3] - 30:15, 33:1, 35:10
**Program** [1] - 53:20
**promoted** [1] - 5:3
**properly** [1] - 47:15
**Protection** [1] - 8:5
**protocols** [1] - 29:2
**provide** [3] - 5:19, 19:19, 43:12
**provided** [3] - 6:3, 6:19, 8:1
**providers** [3] - 30:15, 31:6, 39:10
**providing** [1] - 48:21
**public** [2] - 43:1, 43:6
**Public** [3] - 1:17, 57:4, 57:22
**published** [3] - 7:20, 11:19, 39:8
**purpose** [3] - 9:16, 37:14, 52:13
**purposes** [5] - 6:8, 7:5, 7:13, 10:16, 36:4
**pursuant** [2] - 1:17, 5:15
**put** [2] - 10:5, 14:12
**questions** [11] - 9:23, 10:2, 12:3, 12:10, 14:21, 23:12, 23:14, 47:7, 48:12, 56:18,

56:19
**quickly** [1] - 42:8
**quoted** [1] - 8:24
**reached** [2] - 28:16, 32:8
**read** [3] - 42:20, 44:1, 51:21
**reading** [2] - 40:24, 50:14
**really** [10] - 21:14, 28:20, 28:22, 35:17, 41:3, 41:24, 42:8, 45:9, 53:8, 54:15
**reason** [4] - 40:12, 41:8, 45:9, 45:22
**reasoning** [1] - 35:13
**reasons** [1] - 45:22
**receive** [2] - 16:19, 46:17
**received** [16] - 10:21, 10:22, 11:13, 11:22, 15:23, 16:15, 16:21, 16:22, 17:1, 17:22, 17:24, 19:7, 24:6, 24:12, 49:15, 49:19
**recollection** [2] - 12:18, 29:8
**recommend** [1] - 12:14
**recommendation** [1] - 35:1
**record** [2] - 11:12, 38:7
**reduced** [1] - 57:13
**reference** [6] - 40:3, 41:22, 42:9, 45:14, 47:3, 52:20
**referenced** [1] - 20:2
**references** [3] - 17:2, 18:3, 53:4
**referencing** [2] - 42:19, 43:1
**referring** [1] - 11:12
**regarding** [1] - 19:8
**related** [1] - 9:13
**relation** [2] - 54:6, 57:10
**relationship** [1] - 18:24
**relied** [1] - 6:17
**remember** [18] - 13:9, 15:7, 19:9, 21:14, 24:3, 25:6, 25:8, 27:18, 28:15, 28:21, 28:22, 33:18, 35:3, 35:17, 45:8, 55:11, 55:20, 56:9
**repeat** [1] - 35:9
**rephrase** [1] - 17:20
**report** [4] - 19:23, 19:24, 43:16, 43:18
**Reporter** [1] - 57:5
**REPORTING** [1] - 1:22
**Reporting** [1] - 57:6
**reports** [4] - 42:12, 42:24, 43:4, 43:13
**request** [1] - 5:18
**required** [2] - 13:15, 38:19
**requires** [2] - 10:9
**reserve** [1] - 56:21
**Resources** [6] - 4:15, 4:20, 5:3, 5:8, 5:10, 22:8
**respectful** [1] - 45:11
**respond** [1] - 12:17
**responsibility** [1] - 20:7
**rest** [1] - 51:18
**restricted** [1] - 10:5
**restructuring** [1] - 5:5

**result** [2] - 10:14, 30:11
**results** [8] - 8:24, 9:21, 9:22, 32:5, 49:15, 49:17, 52:16
**return** [2] - 40:6, 40:19
**review** [3] - 12:14, 16:1, 19:14
**rider** [1] - 6:5
**ROBINSON** [12] - 2:11, 17:16, 22:24, 23:15, 25:24, 26:6, 26:9, 47:6, 48:18, 49:5, 56:19, 56:22
**Robinson** [4] - 25:17, 37:24, 38:1, 40:23
**ROGERS** [3] - 1:13, 4:1, 57:8
**Rogers** [3] - 4:10, 4:11, 23:8
**role** [1] - 38:16
**room** [1] - 24:22
**roughly** [1] - 29:19
**Row** [1] - 31:24
**Rowcliff** [7] - 27:23, 30:5, 30:7, 32:1, 32:2, 32:15, 56:11
**Rule** [2] - 5:16, 5:17

**safety** [1] - 50:7
**sake** [1] - 11:7
**Samo** [2] - 39:21, 40:5
**Sams** [3] - 39:20, 39:21, 40:5
**Sandra** [4] - 1:16, 1:20, 57:4, 57:22
**saw** [2] - 17:4, 43:18
**scheduled** [1] - 28:1
**seal** [1] - 57:17
**second** [11] - 11:5, 11:6, 14:14, 15:21, 17:1, 18:11, 18:13, 19:5, 19:24, 26:19, 40:21
**section** [2] - 47:19, 47:22
**see** [23] - 4:20, 6:6, 7:1, 11:3, 11:7, 11:10, 28:17, 29:1, 31:17, 32:8, 38:1, 38:11, 38:23, 39:10, 41:6, 46:5, 46:8, 50:3, 50:9, 51:13, 53:4, 53:15, 53:19
**seem** [2] - 30:20, 56:9
**seizure** [9] - 38:10, 38:14, 38:21, 39:2, 40:10, 40:12, 40:14, 40:16, 41:5
**send** [8] - 9:21, 13:13, 19:3, 20:22, 21:5, 21:7, 43:22
**sending** [1] - 44:7
**sends** [1] - 14:19
**sense** [2] - 47:17, 47:18
**sensitive** [1] - 50:8
**sent** [5] - 9:18, 11:20, 14:13, 15:20, 56:10
**separate** [3] - 6:5, 49:17, 50:16
**series** [2] - 32:15, 34:18
**Seventh** [1] - 2:4
**several** [3] - 22:9, 34:21, 50:1
**Shorthand** [1] - 57:5

**shorthand** [1] - 57:16
**shortly** [2] - 24:6, 32:4
**show** [3] - 5:12, 10:11, 35:18
**signals** [1] - 51:14
**similar** [1] - 44:16
**Sisters** [1] - 31:3
**sit** [1] - 7:19
**situation** [2] - 29:23, 35:13, 35:15
**six** [1] - 50:1
**size** [1] - 29:19
**someone** [1] - 5:20
**sometime** [1] - 56:13
**sorry** [4] - 8:16, 10:20, 25:14, 30:1
**sort** [5] - 18:24, 30:12, 34:7, 56:7
**sorts** [3] - 29:1, 29:12, 29:20
**sounds** [2] - 23:3, 23:5
**South** [1] - 2:4
**speaking** [1] - 30:3
**Specialist** [3] - 5:2, 5:6, 5:10
**specialist** [2] - 27:22, 30:4
**specific** [3] - 12:10, 29:7, 33:22
**spoken** [1] - 52:22
**Springfield** [2] - 2:4, 29:15
**SS** [1] - 57:1
**staff** [2] - 47:9, 47:14
**stamp** [6] - 10:13, 11:8, 17:5, 17:22, 17:24, 18:3
**stamped** [7] - 11:3, 16:13, 16:14, 35:23, 47:23, 49:7, 51:19
**standards** [89] - 6:16, 6:21, 7:8, 7:10, 7:17, 7:20, 8:7, 8:8, 8:11, 8:14, 8:24, 9:6, 11:18, 13:24, 14:6, 14:7, 17:2, 17:4, 17:6, 17:12, 18:4, 18:7, 18:10, 18:16, 18:19, 20:3, 20:5, 20:8, 20:14, 20:16, 20:21, 21:9, 21:12, 21:15, 21:16, 21:20, 22:1, 23:12, 24:1, 25:23, 26:14, 26:17, 28:3, 28:11, 28:13, 30:8, 30:20, 30:22, 30:23, 32:9, 32:12, 32:19, 33:2, 33:5, 33:12, 33:21, 34:1, 34:3, 34:4, 35:1, 35:5, 35:8, 35:11, 35:12, 35:14, 35:17, 37:20, 38:11, 38:14, 38:19, 39:7, 39:9, 39:13, 39:23, 40:23, 54:3, 54:7, 54:11, 54:14, 54:19, 55:1, 55:4, 55:6, 55:22, 56:6, 56:14
**stands** [1] - 30:24
**start** [1] - 28:3
**started** [3] - 20:23, 32:4, 56:12
**STATE** [1] - 57:1
**state** [1] - 4:8
**statement** [3] - 15:9, 38:4, 39:17

**STATES** [1] - 1:3
**status** [1] - 37:17
**stenographically** [1] - 57:13
**stepped** [1] - 4:22
**stop** [1] - 24:7
**Street** [1] - 2:4
**strong** [2] - 23:3, 23:5
**stuff** [1] - 45:10
**submit** [1] - 13:11
**submitted** [2] - 42:13, 43:21
**subscribe** [1] - 30:22
**subscription** [2] - 30:22, 56:16
**subsequent** [3] - 26:13, 26:15, 46:15
**suggestion** [1] - 16:2
**summarize** [1] - 43:24
**summarized** [1] - 43:15
**summarizing** [1] - 41:15
**summary** [1] - 44:3
**summer** [1] - 5:4
**supervisory** [1] - 52:2
**supplementing** [1] - 19:23
**supposed** [3] - 9:20, 14:8, 53:1
**switched** [1] - 31:19
**switching** [3] - 30:15, 30:19, 56:12
**sworn/affirmed** [2] - 4:4, 57:9
**symbol** [1] - 42:5
**System** [1] - 31:4

**talks** [1] - 37:24
**Taylorville** [1] - 57:18
**team** [1] - 12:15
**telephone** [5] - 34:11, 49:10, 51:8, 51:10
**ten** [5] - 38:10, 38:15, 40:14, 40:18, 52:18
**term** [1] - 43:4
**testified** [1] - 4:5
**testify** [5] - 5:20, 5:21, 5:22, 6:13, 57:9
**testimony** [1] - 17:22
**THE** [3] - 1:3, 1:3, 1:9
**therefore** [2] - 9:3, 40:18
**thinking** [1] - 30:18
**third** [3] - 6:4, 24:21, 49:6
**thorough** [1] - 37:16
**thoughts** [1] - 41:11
**three** [4] - 36:11, 36:19, 37:5, 42:3
**to-wit** [1] - 4:5
**today** [3] - 5:14, 6:12, 7:19
**took** [6] - 21:16, 22:9, 36:9, 36:10, 46:13, 55:3
**top** [1] - 36:14
**Town** [1] - 29:16
**towns** [1] - 29:18
**transcript** [1] - 57:15
**transition** [1] - 31:20

**translation** [1] - 57:16
**treated** [1] - 39:4
**trial** [1] - 31:16
**triggered** [1] - 18:10
**Trudy** [27] - 2:16, 9:13, 13:20, 15:10, 19:8, 24:23, 35:7, 35:12, 40:6, 40:22, 41:4, 41:13, 42:9, 42:18, 43:2, 44:5, 45:23, 49:22, 50:16, 51:3, 51:12, 51:13, 51:15, 51:20, 52:5, 52:14, 52:18
**TRUDY** [1] - 1:6
**Trudy's** [4] - 16:7, 37:17, 46:17, 51:4
**true** [3] - 36:11, 47:11, 57:15
**trusting** [2] - 20:11, 21:5
**truth** [1] - 57:10
**trying** [5] - 19:16, 19:19, 21:14, 24:3, 45:9
**two** [6] - 7:16, 11:2, 16:13, 49:17, 49:18, 52:18
**type** [1] - 27:6
**typewritten** [1] - 57:14
**ultimately** [1] - 20:10
**under** [1] - 57:17
**understood** [2] - 17:21, 38:6
**UNITED** [1] - 1:3
**unless** [1] - 47:13
**up** [1] - 9:2
**upstairs** [1] - 24:21
**utilized** [4] - 7:18, 8:6, 35:2, 54:22
**utilizing** [2] - 30:8, 54:19
**vague** [1] - 19:18
**verbal** [1] - 27:19
**verbatim** [1] - 44:1
**vote** [2] - 34:7, 34:9
**vs** [1] - 1:8
**waive** [2] - 56:21, 56:22
**weapon** [1] - 12:14
**Wendy** [2] - 22:19, 27:16
**Whitfield** [5] - 36:15, 46:11, 46:14, 46:16, 53:24
**wit** [1] - 4:5
**Witness** [1] - 56:23
**witness** [2] - 4:2, 5:19
**work** [2] - 34:8, 40:6
**write** [4] - 39:23, 46:20, 48:2, 52:8
**writing** [3] - 40:21, 41:8, 56:7
**written** [3] - 37:7, 48:13, 51:2
**wrote** [4] - 19:11, 37:2, 42:17, 43:4
**years** [4] - 38:10, 38:15, 40:14, 40:18
**yourself** [1] - 25:3

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

TRUDY KARR,                              )
                                         )
                    Plaintiff,           )
                                         ) No. 19-cv-2134
        vs.                              )
                                         )
CITY OF DECATUR, ILLINOIS,               )
                                         )
                    Defendant.           )

Defendant's Motion for Summary Judgment
EXHIBIT D

DEPOSITION TRANSCRIPT – CHIEF JAMES GETZ

1

```
 1

 2

 3                IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF ILLINOIS
 4

 5

 6   TRUDY KARR,                      )
                                      )
 7                    Plaintiff       )
                                      )
 8      -vs-                          )NO. 2019-CV-2134
                                      )
 9   THE CITY OF DECATUR, ILLINOIS,   )
                                      )
10                    Defendant       )

11

12

13        Deposition of JAMES GETZ taken at the

14   instance of the Plaintiff, on June 22, 2020, at

15   the hour of 12:15 P.M., at One Gary K. Anderson

16   Plaza, Decatur, Illinois, before Sandra K.

17   Haines, CSR and Notary Public, pursuant to

18   notice.

19

20                            Sandra K. Haines
                              CSR No. 084-002423
21

22                    ANCHOR REPORTING
                       P.O. Box 25471
23              Decatur, Illinois 62525-5471
                      (217)428-0946
24
```

2

1                    APPEARANCES

2

3         BAKER, BAKER & KRAJEWSKI, LLC
          Attorneys at Law
4         415 South Seventh Street
          Springfield, Illinois 62701
5         (217)522-3445

6             BY:  MR. JOHN A. BAKER
                   Appearing on behalf of the Plaintiff

7

8

          CITY OF DECATUR
9         One Gary K. Anderson Plaza
          Decatur, Illinois  62523-1196
10        (217)424-2871

11            BY:  MR. JOHN T. ROBINSON
                   Assistant Corporation Counsel
12                 Appearing on behalf of the Defendant

13

14
                            PRESENT
15

16        Ms. Trudy Karr Ownby

17

18                           INDEX

19

20        Direct Examination by Mr. Baker...... 3 - 20

21

22                         EXHIBITS

23

24        Deposition Exhibit Number 6..........     7

1                          JAMES GETZ

2      called as a witness herein, at the instance

3      of the Plaintiff, having been first duly

4      sworn/affirmed on his oath, was examined and

5      testified as follows, to-wit:

6                          DIRECT EXAMINATION

7                          BY MR. BAKER:

8          Q.    Good afternoon, Chief, my name is John

9      Baker.

10         A.    Hi, John.

11         Q.    I represent Trudy Karr.  I assume you

12     have been through a deposition before?

13         A.    Yes.  It has been some years.

14         Q.    You know what I am going to do?

15         A.    Yes.

16         Q.    I am just going to ask you some

17     questions.  If you don't understand something,

18     let me know, and I will clarify it.  I don't

19     think it is going to take very long, but if you

20     need to get up for any reason, let me know.  We

21     will certainly arrange for that.

22          How long have you been the Chief?

23         A.    I have been the Chief since February,

24     officially since February of 2016, so about four

1     and a half years.

2          Q.     I take it before that you were employed

3     by the City of Decatur Police Department?

4          A.     Yes.

5          Q.     How long have you been with the

6     department?

7          A.     Twenty-one years in about a month, so

8     start of July of 1999.

9          Q.     Sworn throughout that entire time?

10         A.     Yes, sir.

11         Q.     How many sworn officers are employed by

12    the City?

13         A.     Currently 145.

14         Q.     Throughout the period of time that you

15    have been the Chief has that number been fairly

16    consistent?

17         A.     No.  It has not.  Our max number, our

18    allotted number over the years was 162.  For the

19    most part I think maybe there may have been a

20    few years 165, but within the last two years it

21    went from 162 down to 147.  I am currently at

22    145.

23         Q.     I assume that's just through attrition?

24         A.     Through attrition, yes.

1          Q.     What are your responsibilities as Chief

2     of Police just generally?

3          A.     Well, it is basically you are the CEO

4     of the company.  This company just happens to be

5     law enforcement.  So, I am responsible for the

6     145, currently 145 sworn officers, and their

7     actions, and responding to the public, and

8     responding to the City Council, and the Mayor.

9     Also have civilian employees I also supervise.

10    So, just basically the supervision, and budget,

11    and management of a Police Department, a

12    company.

13         Q.     Who do you report directly to?

14         A.     The City Manager.

15         Q.     The way the City works there is

16    actually a Mayor and a City Manager?

17         A.     Yes, sir.

18         Q.     The City Manager then would report

19    to --

20         A.     Reports to the Mayor and the Council,

21    yes.

22         Q.     You issued some memorandums relating to

23    Trudy and placing her on medical leaves of

24    absence.  Do you recall those?

1          A.    I do.

2          Q.    Okay.  When you issued those, did you

3     consult with anybody when you decided to issue

4     those?

5          A.    Yes.  I am trying to go back to the

6     first few.  We always consult with Human

7     Resources Department, and then at that time it

8     would have been the Assistant City Manager Jerry

9     Bauer, who was here then.

10          Q.    Would you have consulted with Legal

11     Counsel at that time?

12          A.    I think Legal Counsel was involved as

13     well.

14          Q.    Did you personally speak with Legal

15     Counsel, do you recall?

16          A.    I don't remember.

17          Q.    I want to show you a document that I am

18     just going to mark as Exhibit 6.  These are

19     several memorandums that were written.  The

20     first one was issued November 30, 2016.  The

21     second one was issued January 9, 2017.  The next

22     one was dated 1-23-2017.  The next one is a memo

23     dated February 23rd, 2017.  The next one is a

24     personnel memorandum dated March 3, 2017.  Your

1     signature appears on all of these?

2          (Whereupon said document was duly

3           marked, for purposes of identification,

4           as Deposition Exhibit Number 6, as of

5           this date.)

6     A.     Yes, sir.

7     Q.     Okay.  With these you would have

8     consulted with others before you put these

9     together, is that correct?

10    A.     Yes, yes.

11    Q.     This first one, the November 30th, do

12    you recall who you consulted with on that?

13    A.     It would have been the HR Department,

14    and I think Penny Frank, or Penny Rogers now,

15    would have been heavily involved with that.  I

16    do not recall French Wilson was here at that

17    point or not.

18    Q.     Did they recommend to you that you

19    issue this directive?

20    A.     Yes.

21    Q.     You went along with what their

22    recommendations were?

23    A.     Yes, I did.

24    Q.     All right.  As far as the medical

1    issues did you review any of the medical reports

2    yourself?

3        A.    I reviewed the, basically the

4    general -- didn't go into great detail -- I

5    think the not fit for duty or fit for duty page.

6    It would have been more like a face sheet that

7    was the summary that accompanied the fit for

8    duty process.

9        Q.    Okay.  Did you review any of the

10   underlying medical records?

11       A.    I did not go into the medical records,

12   no.

13       Q.    Did you have any conversations with the

14   medical provider who did the fitness for duty

15   evaluation?

16       A.    I did not.

17       Q.    As far as actually drafting this

18   memorandum would that have been you, or would

19   that have been somebody else?

20       A.    I would have drafted that.

21       Q.    So, if I understand it, you would have

22   had a conversation with HR.  HR would have

23   recommended this is what you do.  You agreed

24   with that, and put it together?

1              A.      Yes, sir.

2              Q.      Is that a fair summary?

3              A.      That's a fair summary.

4              Q.      Okay.  Same questions for the next one.

5       Did you work -- this is the one that's issued

6       January 9 effective January 4th.  Do you recall

7       if you consulted with anyone when you were

8       putting this together?

9              A.      I did.

10             Q.      Who did you consult?

11             A.      That would have been Jerry Bauer.

12             Q.      At the time Mr. Bauer was the Assistant

13      City Manager?

14             A.      Yes, sir.

15             Q.      Did you consult with anybody else?

16             A.      HR would have been part of those

17      conversations.  They were a direct report to

18      Jerry Bauer.

19             Q.      Was this Mr. Bauer sort of recommending

20      that you issue this memo?

21             A.      Yes, yes.

22             Q.      Did he tell you why that he was

23      recommending that this be issued?

24             A.      At that point, yes, the fit for duty

1    that we completed on November 29th showed that

2    Trudy was not fit for duty.  And then based on

3    that the decision came down on January 4th to

4    issue this memo just because the results of the

5    fit for duty that was completed November 29th.

6         Q.    You said the decision came down.  Who

7    did it come down from?

8         A.    That would have been Jerry Bauer who

9    talked us through that.

10        Q.    So, would it be fair for me to say that

11   it would have been Jerry Bauer who recommended

12   that you issue this order?

13        A.    Yes, absolutely.

14        Q.    You would have followed through with

15   his recommendation?

16        A.    Yes.

17        Q.    I think you said earlier you reported

18   to the City Manager?

19        A.    Uh-huh.

20        Q.    At that time was there a City Manager?

21        A.    Boy, you know what, I just don't

22   recall.  Because we have had several City

23   Manager changes over the last few years.  I

24   think Tim Gleason was the City Manager at that

1   time, but I am not a hundred percent sure on

2   that.

3       Q.    In your role as Chief of Police would

4   you also take directives from the Assistant City

5   Manager?

6       A.    I would.

7       Q.    That would be part of your chain of

8   command?

9       A.    Correct.

10      Q.    The next one dated 1-23, this

11  memorandum, it says that you were, or that Trudy

12  was being returned to administrative leave with

13  pay until further ordered.  Who did you consult

14  with about this one?

15      A.    That was Jerry Bauer as well and HR.

16      Q.    Did Jerry Bauer and HR tell you to

17  issue this memorandum?

18      A.    Yes.

19      Q.    And you did so based on their

20  recommendation?

21      A.    I did.

22      Q.    The next one is a memo dated February

23  23, 2017.  Do you see that?

24      A.    Yes.

1      Q.    This particular memo directs Ms. Karr

2   to undergo a physical examination and a

3   psychiatric examination each conducted pursuant

4   to NFPA standards.  Do you see that?

5      A.    I do.

6      Q.    Was that your directive, or were you

7   forwarding on a directive from somebody else?

8      A.    This was my directive.  However, it was

9   put together with City Legal and Human Resources

10   working together.

11      Q.    How do you know City Legal was involved

12   in this?

13      A.    I remember them drafting the language

14   for this.

15      Q.    So, as far as drafting this you were

16   not involved in the actual drafting of this

17   language?

18      A.    No.

19      Q.    This document references the NFPA

20   standards.  Do you see that?

21      A.    Yes.

22      Q.    Do you know why the NFPA standards were

23   being utilized in February of 2017?

24      A.    Yes.  So, as I recall the original fit

1    for duty test that we did in November of 2016

2    that was using the LEO standards by ACOEM, and

3    there was two things with that.  One, that

4    wasn't standard that was used when Trudy hired

5    on, and the report at that time that the doctor

6    completed, and I can't remember the name of the

7    doctor at the time, or I can't remember it now.

8         Q.    Braco?

9         A.    It was Braco, yes, just the face sheet

10   of their summary he gave us just wasn't detailed

11   enough.

12        Q.    Do you know who made the decision that

13   the NFPA standards would be used for this?

14        A.    So, that would have been done between

15   City Legal, HR, and Assistant City Manager, and

16   like I say it was based on that was the testing

17   that was used at the time when Trudy would have

18   started.

19        Q.    How do you know what their decision was

20   based on?

21        A.    That was a discussion that we had.

22        Q.    You were involved in that discussion?

23        A.    Yes.

24        Q.    When you were involved in that

1    discussion, was City Legal involved in that

2    discussion?

3         A.    Yes.

4         Q.    So, don't answer this question because

5    he is going to object, but I want to get it on

6    the record.

7         What happened in the conversation that you

8    had with City Legal, and HR, and others that

9    immediately preceded the issuance of this

10   particular directive?

11        MR. ROBINSON:  Objection to the extent

12   it's not already been answered the City asserts

13   attorney-client privilege.

14        Q.    Okay.  The next memo is dated, issued

15   3-3-17 effective March 2, 2017.  Who was

16   involved in the decision to have this particular

17   memo issued?

18        A.    The Assistant City Manager Bauer as I

19   recall, myself, and Human Resources.

20        Q.    Did you play a role in making the

21   decision that this memo would be issued, or did

22   you just comply with what they suggested that

23   you do?

24        A.    I think there was probably discussion,

1    but I don't recall sitting down and actually

2    having that discussion, but I would imagine all

3    of us would have had that discussion of why when

4    we were doing this.

5        Q.    So, you are saying that because of the

6    nature of what was being done it would be

7    typical for there to be a conversation?

8        A.    Yes.

9        Q.    However, as you sit here today you

10   don't specifically recall a conversation or what

11   transpired during that conversation?

12       A.    Right.

13       Q.    At some point in time Trudy prepared a

14   document that had her removed and placed on the

15   certified list, is that correct?

16       A.    Removed from the classified service,

17   and placed on the -- heck, I can't remember the

18   name of the list, but yes, yes, it is very

19   uncommon for us to use.

20       Q.    I have got it.  I have the memo

21   somewhere in here.  Just so I make sure I get

22   the memo correct I will show you --

23       A.    Yes.

24       Q.    -- just so you can look it.  This is

1    Karr Deposition Exhibit Number 9 that I am

2    showing you.  That's a one page memo.  Would you

3    agree with me, sir?

4        A.    Yes, sir.

5        Q.    Okay, and when we were just talking

6    about that, Trudy being moved from the

7    classified service, take a leave from the

8    classified service?

9        A.    Correct, and so you are placed on

10   another roster, another list.

11       Q.    There is a notation here received,

12   Chief Getz, 3-24-17?

13       A.    Yes, sir.

14       Q.    So, what I understand that to mean

15   that's essentially your receipt.  You are

16   acknowledging that you have gotten this from

17   Trudy?

18       A.    Yes, sir.

19       Q.    Do you recall having a conversation

20   with Trudy immediately before this?

21       A.    I do.

22       Q.    All right, and who was present for that

23   conversation?

24       A.    Well, I know Trudy and I were, but I

1     don't know if anybody was there or not to be

2     honest with you.

3         Q.    Was it an in person conversation, or

4     was it a phone conversation?

5         A.    I believe it would have been an in

6     person.

7         Q.    Okay, and can you tell me what

8     transpired during that conversation?

9         A.    Well, going back on memory I can

10    remember it really boiled down to three things:

11    That Trudy had failed the, was determined not

12    fit for duty, she was basically running out of

13    time, accumulated time, and so it came down to

14    she could ask for a leave of absence from the

15    classified service, she could resign, or I could

16    terminate her, and that was basically the

17    summary of that conversation.

18        Q.    Okay.  Was there a discussion, and that

19    was you telling her what her options were?

20        A.    Yes.

21        Q.    And the grounds for termination would

22    have been what?

23        A.    Well, she couldn't do the job anymore.

24    She was medically said not to be fit for duty,

1    and there was no lateral position for long term

2    not fit for duty person.  I mean that was why.

3        Q.    As far as the option to take a leave

4    from the classified service how did you know

5    that was an option available to her?

6        A.    That would have been a discussion that

7    I had with Jerry Bauer.

8        Q.    So, as far as you making or telling

9    Trudy these were her options, that would have

10   been based on discussions that you would have

11   had with Mr. Bauer?

12       A.    Yes, sir.

13       Q.    Was anybody else involved in those

14   discussions?

15       A.    I don't remember.

16       Q.    Did Trudy when you had the conversation

17   with her make a decision at that time as to

18   which option she was going to take?

19       A.    Yes.

20       Q.    What did she say?

21       A.    That was a request to leave the

22   classified service.

23       Q.    Did she say why she was going to do

24   that?

1        A.    I don't recall that, no.

2        Q.    Did you recommend that that was the

3   best way for her to proceed?

4        A.    I think I would have given her the

5   options, but I don't know that I would have gave

6   her a recommendation.

7        Q.    But you gave her essentially the three

8   choices?

9        A.    Yes.

10        Q.    Resign, fire, leave classified service?

11        A.    Yes.

12        Q.    At some point in time do you recall the

13   City adopting the LEO standards?

14        A.    I do not recall that, no.  I know that

15   that's what they switched to.  I don't remember

16   when they did that.

17        Q.    Do you know if you were involved in

18   those decisions?

19        A.    I was not.

20        Q.    So, you were told these are what the

21   standards are going to be?

22        A.    (Witness nodding in the affirmative.)

23        Q.    Is that yes?

24        A.    Yes.

 1            MR. BAKER:  I have no further

 2    questions.

 3            MR. ROBINSON:  Okay.  Thank you.  I

 4    have no questions, but there are many issues

 5    that weren't raised on direct.  So, I have no

 6    questions.

 7            MR. BAKER:  Okay, very good.

 8            MR. ROBINSON:  We will waive signature.

 9               (Witness Excused)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

21

```
 1    STATE OF ILLINOIS        )
                               ) SS
 2    COUNTY OF CHRISTIAN      )

 3

 4           I, Sandra K. Haines, a Notary Public and

 5    Certified Shorthand Reporter, associated with

 6    Haines Court Reporting, do hereby certify that

 7    prior to the taking of the deposition herein,

 8    and on June 22, 2020, the Deponent, JAMES GETZ

 9    was, by me, duly sworn/affirmed to testify to

10    the truth in relation to the matter in

11    controversy herein.  That on said date the

12    foregoing deposition was taken down

13    stenographically by me and afterwards reduced to

14    typewritten form by me, and that the foregoing

15    transcript contains a true and accurate

16    translation of all such shorthand notes.

17           Given under my hand and seal this 26th day

18    of June, 2020 at Taylorville, Illinois.

19

20

21

22                          Sandra K. Haines
                            Notary Public and CSR
23                          License No. 084-002423

24
```

**084-002423** [2] - 1:20, 21:23
**1-23** [1] - 11:10
**1-23-2017** [1] - 6:22
**12:15** [1] - 1:15
**145** [4] - 4:13, 4:22, 5:6
**147** [1] - 4:21
**162** [2] - 4:18, 4:21
**165** [1] - 4:20
**1999** [1] - 4:8
**2** [1] - 14:15
**20** [1] - 2:20
**2016** [3] - 3:24, 6:20, 13:1
**2017** [6] - 6:21, 6:23, 6:24, 11:23, 12:23, 14:15
**2019-CV-2134** [1] - 1:8
**2020** [3] - 1:14, 21:8, 21:18
**217)424-2871** [1] - 2:10
**217)428-0946** [1] - 1:23
**217)522-3445** [1] - 2:5
**22** [2] - 1:14, 21:8
**23** [1] - 11:23
**23rd** [1] - 6:23
**25471** [1] - 1:22
**26th** [1] - 21:17
**29th** [2] - 10:1, 10:5
**3** [2] - 2:20, 6:24
**3-24-17** [1] - 16:12
**3-3-17** [1] - 14:15
**30** [1] - 6:20
**30th** [1] - 7:11
**415** [1] - 2:4
**4th** [2] - 9:6, 10:3
**6** [2] - 6:18, 7:4
**6.........** [1] - 2:24
**62523-1196** [1] - 2:9
**62525-5471** [1] - 1:23
**62701** [2] - 2:4
**7** [1] - 2:24
**9** [3] - 6:21, 9:6, 16:1
**absence** [2] - 5:24, 17:14
**absolutely** [1] - 10:13
**accompanied** [1] - 8:7
**accumulated** [1] - 17:13
**accurate** [1] - 21:15
**acknowledging** [1] - 16:16
**ACOEM** [1] - 13:2
**actions** [1] - 5:7
**actual** [1] - 12:16
**administrative** [1] - 11:12
**adopting** [1] - 19:13
**affirmative** [1] - 19:22
**afternoon** [1] - 3:8
**afterwards** [1] - 21:13
**agree** [1] - 16:3
**agreed** [1] - 8:23
**allotted** [1] - 4:18
**ANCHOR** [1] - 1:22
**Anderson** [2] - 1:15, 2:9
**answer** [1] - 14:4
**answered** [1] - 14:12
**APPEARANCES** [1] - 2:1
**Appearing** [2] - 2:6, 2:12

**arrange** [1] - 3:21
**asserts** [1] - 14:12
**Assistant** [6] - 2:11, 6:8, 9:12, 11:4, 13:15, 14:18
**associated** [1] - 21:5
**assume** [2] - 3:11, 4:23
**attorney** [1] - 14:13
**attorney-client** [1] - 14:13
**Attorneys** [1] - 2:3
**attrition** [2] - 4:23, 4:24
**available** [1] - 18:5
**back** [2] - 6:5, 17:9
**Baker** [1] - 3:9
**BAKER** [6] - 2:3, 2:6, 3:7, 20:1, 20:7
**Baker.....** [1] - 2:20
**based** [6] - 10:2, 11:19, 13:16, 13:20, 18:10
**Bauer** [12] - 6:9, 9:11, 9:12, 9:18, 9:19, 10:8, 10:11, 11:15, 11:16, 14:18, 18:7, 18:11
**behalf** [2] - 2:6, 2:12
**best** [1] - 19:3
**between** [1] - 13:14
**boiled** [1] - 17:10
**Box** [1] - 1:22
**boy** [1] - 10:21
**Braco** [2] - 13:8, 13:9
**budget** [1] - 5:10
**BY** [3] - 2:6, 2:11, 3:7
**CENTRAL** [1] - 1:3
**CEO** [1] - 5:3
**certainly** [1] - 3:21
**Certified** [1] - 21:5
**certified** [1] - 15:15
**certify** [1] - 21:6
**chain** [1] - 11:7
**changes** [1] - 10:23
**Chief** [7] - 3:8, 3:22, 3:23, 4:15, 5:1, 11:3, 16:12
**choices** [1] - 19:8
**CHRISTIAN** [1] - 21:2
**City** [23] - 4:3, 4:12, 5:8, 5:14, 5:15, 5:16, 5:18, 6:8, 9:13, 10:18, 10:20, 10:22, 10:24, 11:4, 12:9, 12:11, 13:15, 14:1, 14:8, 14:12, 14:18, 19:13
**CITY** [2] - 1:9, 2:8
**civilian** [1] - 5:9
**clarify** [1] - 3:18
**classified** [7] - 15:16, 16:7, 16:8, 17:15, 18:4, 18:22, 19:10
**client** [1] - 14:13
**command** [1] - 11:8
**company** [3] - 5:4, 5:12
**completed** [3] - 10:1, 10:5, 13:6
**comply** [1] - 14:22
**conducted** [1] - 12:3

**consistent** [1] - 4:16
**consult** [5] - 6:3, 6:6, 9:10, 9:15, 11:13
**consulted** [4] - 6:10, 7:8, 7:12, 9:7
**contains** [1] - 21:15
**controversy** [1] - 21:11
**conversation** [12] - 8:22, 14:7, 15:7, 15:10, 15:11, 16:19, 16:23, 17:3, 17:4, 17:8, 17:17, 18:16
**conversations** [2] - 8:13, 9:17
**Corporation** [1] - 2:11
**correct** [5] - 7:9, 11:9, 15:15, 15:22, 16:9
**Council** [2] - 5:8, 5:20
**Counsel** [4] - 2:11, 6:11, 6:12, 6:15
**COUNTY** [1] - 21:2
**COURT** [1] - 1:3
**Court** [1] - 21:6
**CSR** [3] - 1:17, 1:20, 21:22
**date** [2] - 7:5, 21:11
**dated** [6] - 6:22, 6:23, 6:24, 11:10, 11:22, 14:14
**DECATUR** [1] - 1:9, 2:8
**Decatur** [4] - 1:16, 1:23, 2:9, 4:3
**decided** [1] - 6:3
**decision** [7] - 10:3, 10:6, 13:12, 13:19, 14:16, 14:21, 18:17
**decisions** [1] - 19:18
**Defendant** [2] - 1:10, 2:12
**department** [1] - 4:6
**Department** [4] - 4:3, 5:11, 6:7, 7:13
**Deponent** [1] - 21:8
**Deposition** [4] - 1:13, 2:24, 7:4, 16:1
**deposition** [3] - 3:12, 21:7, 21:12
**detail** [1] - 8:4
**detailed** [1] - 13:10
**determined** [1] - 17:11
**direct** [2] - 9:17, 20:5
**Direct** [1] - 2:20
**DIRECT** [1] - 3:6
**directive** [5] - 7:19, 12:6, 12:7, 14:8, 14:10
**directives** [1] - 11:4
**directly** [1] - 5:13
**directs** [1] - 12:1
**discussion** [9] - 13:21, 13:22, 14:1, 14:2, 14:24, 15:2, 15:3, 17:18, 18:6
**discussions** [2] - 18:10, 18:14
**DISTRICT** [2] - 1:3, 1:3
**doctor** [2] - 13:5, 13:7
**document** [4] - 6:17, 7:2,

12:19, 15:14
**done** [2] - 13:14, 15:6
**down** [8] - 4:21, 10:3, 10:6, 10:7, 15:1, 17:10, 17:13, 21:12
**drafted** [1] - 8:20
**drafting** [4] - 8:17, 12:13, 12:15, 12:16
**duly** [3] - 3:3, 7:2, 21:9
**during** [2] - 15:11, 17:8
**duty** [11] - 8:5, 8:8, 8:14, 9:24, 10:2, 10:5, 13:1, 17:12, 17:24, 18:2
**effective** [2] - 9:6, 14:15
**employed** [2] - 4:2, 4:11
**employees** [1] - 5:9
**enforcement** [1] - 5:5
**entire** [1] - 4:9
**essentially** [2] - 16:15, 19:7
**evaluation** [1] - 8:15
**Examination** [1] - 2:20
**examination** [2] - 12:2, 12:3
**EXAMINATION** [1] - 3:6
**examined** [1] - 3:4
**Excused** [1] - 20:9
**Exhibit** [4] - 2:24, 6:18, 7:4, 16:1
**EXHIBITS** [1] - 2:22
**extent** [1] - 14:11
**face** [2] - 8:6, 13:9
**failed** [1] - 17:11
**fair** [3] - 9:2, 9:3, 10:10
**fairly** [1] - 4:15
**far** [5] - 7:24, 8:17, 12:15, 18:3, 18:8
**February** [5] - 3:23, 3:24, 6:23, 11:22, 12:23
**few** [4] - 4:20, 6:6, 10:23
**fire** [1] - 19:10
**first** [4] - 3:3, 6:6, 6:20, 7:11
**fit** [10] - 8:5, 8:7, 9:24, 10:2, 10:5, 12:24, 17:12, 17:24, 18:2
**fitness** [1] - 8:14
**followed** [1] - 10:14
**follows** [1] - 3:5
**FOR** [1] - 1:3
**foregoing** [2] - 21:12, 21:14
**form** [1] - 21:14
**forwarding** [1] - 12:7
**four** [1] - 3:24
**Frank** [1] - 7:14
**French** [1] - 7:16
**further** [2] - 11:13, 20:1
**Gary** [2] - 1:15, 2:9
**general** [1] - 8:4
**generally** [1] - 5:2
**Getz** [1] - 16:12
**GETZ** [3] - 1:13, 3:1, 21:8
**given** [1] - 19:4
**Given** [1] - 21:17
**Gleason** [1] - 10:24

**great** [1] - 8:4
**grounds** [1] - 17:21
**Haines** [5] - 1:17, 1:20, 21:4, 21:6, 21:22
**half** [1] - 4:1
**hand** [1] - 21:17
**heavily** [1] - 7:15
**heck** [1] - 15:17
**hereby** [1] - 21:6
**herein** [3] - 3:2, 21:7, 21:11
**hi** [1] - 3:10
**hired** [1] - 13:4
**honest** [1] - 17:2
**hour** [1] - 1:15
**HR** [8] - 7:13, 8:22, 9:16, 11:15, 11:16, 13:15, 14:8
**Human** [3] - 6:6, 12:9, 14:19
**hundred** [1] - 11:1
**identification** [1] - 7:3
**ILLINOIS** [3] - 1:3, 1:9, 21:1
**Illinois** [5] - 1:16, 1:23, 2:4, 2:9, 21:18
**imagine** [1] - 15:2
**immediately** [2] - 14:9, 16:20
**IN** [1] - 1:3
**INDEX** [1] - 2:18
**instance** [2] - 1:14, 3:2
**involved** [10] - 6:12, 7:15, 12:11, 12:16, 13:22, 13:24, 14:1, 14:16, 18:13, 19:17
**issuance** [1] - 14:9
**issue** [6] - 6:3, 7:19, 9:20, 10:4, 10:12, 11:17
**issued** [9] - 5:22, 6:2, 6:20, 6:21, 9:5, 9:23, 14:14, 14:17, 14:21
**issues** [2] - 8:1, 20:4
**JAMES** [3] - 1:13, 3:1, 21:8
**January** [4] - 6:21, 9:6, 10:3
**Jerry** [8] - 6:8, 9:11, 9:18, 10:8, 10:11, 11:15, 11:16, 18:7
**job** [1] - 17:23
**JOHN** [2] - 2:6, 2:11
**John** [2] - 3:8, 3:10
**July** [1] - 4:8
**June** [3] - 1:14, 21:8, 21:18
**Karr** [4] - 2:16, 3:11, 12:1, 16:1
**KARR** [1] - 1:6
**KRAJEWSKI** [1] - 2:3
**language** [2] - 12:13, 12:17
**last** [2] - 4:20, 10:23
**lateral** [1] - 18:1
**Law** [1] - 2:3
**law** [1] - 5:5
**leave** [6] - 11:12, 16:7, 17:14, 18:3, 18:21, 19:10
**leaves** [1] - 5:23
**Legal** [8] - 6:10, 6:12, 6:14, 12:9, 12:11, 13:15, 14:1, 14:8

**LEO** [2] - 13:2, 19:13
**License** [1] - 21:23
**list** [3] - 15:15, 15:18, 16:10
**LLC** [1] - 2:3
**look** [1] - 15:24
**management** [1] - 5:11
**Manager** [12] - 5:14, 5:16, 5:18, 6:8, 9:13, 10:18, 10:20, 10:23, 10:24, 11:5, 13:15, 14:18
**March** [2] - 6:24, 14:15
**mark** [1] - 6:18
**marked** [1] - 7:3
**matter** [1] - 21:10
**max** [1] - 4:17
**Mayor** [3] - 5:8, 5:16, 5:20
**mean** [2] - 16:14, 18:2
**medical** [6] - 5:23, 7:24, 8:1, 8:10, 8:11, 8:14
**medically** [1] - 17:24
**memo** [11] - 6:22, 9:20, 10:4, 11:22, 12:1, 14:14, 14:17, 14:21, 15:20, 15:22, 16:2
**memorandum** [4] - 6:24, 8:18, 11:11, 11:17
**memorandums** [2] - 5:22, 6:19
**memory** [1] - 17:9
**month** [1] - 4:7
**most** [1] - 4:19
**moved** [1] - 16:6
**MR** [8] - 2:6, 2:11, 3:7, 14:11, 20:1, 20:3, 20:7, 20:8
**name** [3] - 3:8, 13:6, 15:18
**nature** [1] - 15:6
**need** [1] - 3:20
**next** [7] - 6:21, 6:22, 6:23, 9:4, 11:10, 11:22, 14:14
**NFPA** [4] - 12:4, 12:19, 12:22, 13:13
**NO** [1] - 1:8
**Notary** [3] - 1:17, 21:4, 21:22
**notation** [1] - 16:11
**notes** [1] - 21:16
**notice** [1] - 1:18
**November** [5] - 6:20, 7:11, 10:1, 10:5, 13:1
**Number** [3] - 2:24, 7:4, 16:1
**number** [3] - 4:15, 4:17, 4:18
**oath** [1] - 3:4
**object** [1] - 14:5
**objection** [1] - 14:11
**OF** [5] - 1:3, 1:9, 2:8, 21:1, 21:2
**officers** [2] - 4:11, 5:6
**officially** [1] - 3:24
**One** [2] - 1:15, 2:9
**one** [14] - 4:7, 6:20, 6:21, 6:22, 6:23, 7:11, 9:4, 9:5, 11:10, 11:14, 11:22, 13:3, 16:2
**option** [3] - 18:3, 18:5, 18:18

**options** [3] - 17:19, 18:9, 19:5
**order** [1] - 10:12
**ordered** [1] - 11:13
**original** [1] - 12:24
**Ownby** [2] - 2:16
**P.M** [1] - 1:15
**P.O** [1] - 1:22
**page** [2] - 8:5, 16:2
**part** [3] - 4:19, 9:16, 11:7
**particular** [3] - 12:1, 14:10, 14:16
**pay** [1] - 11:13
**Penny** [2] - 7:14
**percent** [1] - 11:1
**period** [1] - 4:14
**person** [3] - 17:3, 17:6, 18:2
**personally** [1] - 6:14
**personnel** [1] - 6:24
**phone** [1] - 17:4
**physical** [1] - 12:2
**placed** [3] - 15:14, 15:17, 16:9
**placing** [1] - 5:23
**Plaintiff** [4] - 1:7, 1:14, 2:6, 3:3
**play** [1] - 14:20
**Plaza** [2] - 1:16, 2:9
**point** [4] - 7:17, 9:24, 15:13, 19:12
**Police** [4] - 4:3, 5:2, 5:11, 11:3
**position** [1] - 18:1
**preceded** [1] - 14:9
**prepared** [1] - 15:13
**PRESENT** [1] - 2:14
**present** [1] - 16:22
**privilege** [1] - 14:13
**proceed** [1] - 19:3
**process** [1] - 8:8
**provider** [1] - 8:14
**psychiatric** [1] - 12:3
**Public** [3] - 1:17, 21:4, 21:22
**public** [1] - 5:7
**purposes** [1] - 7:3
**pursuant** [2] - 1:17, 12:3
**put** [3] - 7:8, 8:24, 12:9
**putting** [1] - 9:8
**questions** [5] - 3:17, 9:4, 20:2, 20:4, 20:6
**raised** [1] - 20:5
**really** [1] - 17:10
**reason** [1] - 3:20
**receipt** [1] - 16:15
**received** [1] - 16:11
**recommend** [2] - 7:18, 19:2
**recommendation** [3] - 10:15, 11:20, 19:6
**recommendations** [1] - 7:22
**recommended** [2] - 8:23, 10:11
**recommending** [2] - 9:19,

9:23
**record** [1] - 14:6
**records** [2] - 8:10, 8:11
**reduced** [1] - 21:13
**references** [1] - 12:19
**relating** [1] - 5:22
**relation** [1] - 21:10
**remember** [8] - 6:16, 12:13, 13:6, 13:7, 15:17, 17:10, 18:15, 19:15
**removed** [2] - 15:14, 15:16
**report** [4] - 5:13, 5:18, 9:17, 13:5
**reported** [1] - 10:17
**Reporter** [1] - 21:5
**REPORTING** [1] - 1:22
**Reporting** [1] - 21:6
**reports** [2] - 5:20, 8:1
**represent** [1] - 3:11
**request** [1] - 18:21
**resign** [2] - 17:15, 19:10
**Resources** [3] - 6:7, 12:9, 14:19
**responding** [2] - 5:7, 5:8
**responsibilities** [1] - 5:1
**responsible** [1] - 5:5
**results** [1] - 10:4
**returned** [1] - 11:12
**review** [2] - 8:1, 8:9
**reviewed** [1] - 8:3
**ROBINSON** [3] - 2:11, 14:11, 20:3, 20:8
**Rogers** [1] - 7:14
**role** [2] - 11:3, 14:20
**roster** [1] - 16:10
**running** [1] - 17:12
**Sandra** [4] - 1:16, 1:20, 21:4, 21:22
**seal** [1] - 21:17
**second** [1] - 6:21
**see** [3] - 11:23, 12:4, 12:20
**service** [7] - 15:16, 16:7, 16:8, 17:15, 18:4, 18:22, 19:10
**Seventh** [1] - 2:4
**several** [2] - 6:19, 10:22
**sheet** [2] - 8:6, 13:9
**Shorthand** [1] - 21:5
**shorthand** [1] - 21:16
**show** [2] - 6:17, 15:22
**showed** [1] - 10:1
**showing** [1] - 16:2
**signature** [2] - 7:1, 20:8
**sit** [1] - 15:9
**sitting** [1] - 15:1
**somewhere** [1] - 15:21
**sort** [1] - 9:19
**South** [1] - 2:4
**specifically** [1] - 15:10
**Springfield** [1] - 2:4
**SS** [1] - 21:1
**standard** [1] - 13:4

**standards** [7] - 12:4, 12:20, 12:22, 13:2, 13:13, 19:13, 19:21
**start** [1] - 4:8
**started** [1] - 13:18
**STATE** [1] - 21:1
**STATES** [1] - 1:3
**stenographically** [1] - 21:13
**Street** [1] - 2:4
**suggested** [1] - 14:22
**summary** [5] - 8:7, 9:2, 9:3, 13:10, 17:17
**supervise** [1] - 5:9
**supervision** [1] - 5:10
**switched** [1] - 19:15
**sworn** [3] - 4:9, 4:11, 5:6
**sworn/affirmed** [2] - 3:4, 21:9
**Taylorville** [1] - 21:18
**term** [1] - 18:1
**terminate** [1] - 17:16
**termination** [1] - 17:21
**test** [1] - 13:1
**testified** [1] - 3:5
**testify** [1] - 21:9
**testing** [1] - 13:16
**THE** [3] - 1:3, 1:3, 1:9
**three** [2] - 17:10, 19:7
**throughout** [2] - 4:9, 4:14
**Tim** [1] - 10:24
**to-wit** [1] - 3:5
**today** [1] - 15:9
**together** [5] - 7:9, 8:24, 9:8, 12:9, 12:10
**transcript** [1] - 21:15
**translation** [1] - 21:16
**transpired** [2] - 15:11, 17:8
**TRUDY** [1] - 1:6
**Trudy** [15] - 2:16, 3:11, 5:23, 10:2, 11:11, 13:4, 13:17, 15:13, 16:6, 16:17, 16:20, 16:24, 17:11, 18:9, 18:16
**true** [1] - 21:15
**truth** [1] - 21:10
**trying** [1] - 6:5
**twenty** [1] - 4:7
**twenty-one** [1] - 4:7
**two** [2] - 4:20, 13:3
**typewritten** [1] - 21:14
**typical** [1] - 15:7
**uncommon** [1] - 15:19
**under** [1] - 21:17
**undergo** [1] - 12:2
**underlying** [1] - 8:10
**UNITED** [1] - 1:3
**up** [1] - 3:20
**utilized** [1] - 12:23
**vs** [1] - 1:8
**waive** [1] - 20:8
**Wilson** [1] - 7:16
**wit** [1] - 3:5
**Witness** [2] - 19:22, 20:9

**witness** [1] - 3:2
**work** [1] - 9:5
**working** [1] - 12:10
**works** [1] - 5:15
**written** [1] - 6:19
**years** [7] - 3:13, 4:1, 4:7, 4:18, 4:20, 10:23
**yourself** [1] - 8:2