E-FILED
Thursday, 17 September, 2020 07:48:17 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | | | |
|---|---|---|---|
| TRUDY KARR, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | Case No. | 19-cv-2134 |
| | ) | | |
| CITY OF DECATUR, ILLINOIS, | ) | | |
| | ) | | |
| Defendant. | ) | | |

**Plaintiff's Response to Defendant's Motion for Summary Judgment**

## I. INTRODUCTION

Trudy Karr was employed as a police officer for the City of Decatur, Illinois (the "City") for nearly a decade. In 2014 and 2015 Karr suffered some type of a medical issue that has never been diagnosed. After a battery of examinations, the City's physician released her to return to work without any restrictions on March 23, 2015 (π Fact 16).[1] She was seen by a neurologist at that time who concluded that no diagnosis could be made and her test results were all normal (π Fact 10).

On November 29, 2016, more than 18 months after she had any of her previous medical issues, the City requested that Karr submit for a fitness for duty evaluation (π Fact 20). Karr complied with the request and met with the City's physician, Dr. Braco. Despite the fact that she had been cleared by Dr. Braco to work more than 18 months earlier, Dr. Braco curiously found

---

[1] All references to "π Fact" are a reference to Karr's additional statement of undisputed facts.

her unfit for duty at that time (π Fact 21-23). Contrary to any previous diagnosis that she had
been given, Dr. Braco found that she suffered from a "seizure disorder" (π Fact 21).

After being placed on a leave of absence, Karr met with another City doctor, Dr.
Petersen.  Dr. Petersen acknowledged that Karr had no "definitive diagnosis" but assumed that
she was suffering from a seizure disorder (π Fact 38). Peterson, like Braco, is not a neurologist.
Nonetheless, he suggested that the City obtain a definitive diagnosis from a neurologist –
something it apparently elected not to do (π Fact 38).  Rather than complying with Dr.
Petersen's suggestion that a neurologist be consulted, the City, through its police chief, told Karr
that she had three options available to her.  On March 3, 2017, Chief Getz told Karr she could
resign her employment, be terminated, or take a "voluntary" leave from the classified service (π
Fact 40, 41). While Karr believed she could work, she recognized that the leave was the least
odious of her options and took the leave of absence as directed by Chief Getz (π Fact 41).

Because the City had determined that she was not physically able to perform her job
duties, Karr filed an application with the Decatur Police Pension Fund seeking a disability
pension (π Fact 30). At the time she submitted the application she believed that she was capable
of performing her job duties, however, she filed it because the City had concluded that she was
not able to perform her job duties (π Fact 29, Disclosures 53).

The Pension Board required that Karr submit to a multitude of medical evaluations and
thoroughly reviewed all of Karr's medical records in order to make a determination as to whether
she was disabled or whether she could perform the job duties of a police officer. On April 25,
2018, the Pension Board issued its determination as to Karr's ability to perform her job duties.  It
determined that she was fully fit for duty (π Fact 52).

Not only did the Pension Board find that Karr was fit for duty, it expressly disavowed the

City's views as to Karr's medical status.  Specifically, the  Pension Board found:

> The Board finds it significant that none of the treating physicians
> affirmatively diagnosed Ms. Karr with a seizure disorder. This fact
> was confirmed by Dr. Orris and Dr. Buchanan in their IME reports.
> Similarly, Dr. Scott also could not identify any physician who
> diagnosed a seizure disorder. Further, Dr. Murphy disregarded or
> avoided the issue of whether Ms. Karr had a seizure disorder. In
> sum, none of the treating physicians and none of the IME
> physicians affirmatively believed that Ms. Karr had a seizure
> disorder.

(π Fact 53).

The Pension Board didn't stop there.  It specifically concluded that the City's physicians had

misinterpreted or ignored the medical records and that the City had been "inconsistent and/or

arbitrary" in making its decisions related to Karr's fitness to perform her job duties (π Fact 54).

The Board continued:

> After Ms. Karr's first episode of confusion and vision problems on
> May 14, 2014, there is no record of the Police Department
> conducting any inquiry, let alone requesting an exam, about Ms.
> Karr's fitness for duty. Though the Department should have been
> well aware of the May 14, 2014 incident, given an ambulance was
> called to the Department's station, it appears Ms. Karr simply took
> time off from work and returned to full duty without any inquiry
> from the Department.1 After the next episode on January 11,
> 2015, she was seen by DMH Corporate Health on January 20, 2015
> because "her supervisors do not feel comfortable with her restarting
> her job until multiple doctors agree that she can return to work."
> (PFF P. 222) DMH Corporate Health wanted to review the records
> and specialist notes and have Dr. Braco review them before
> determining a next course of action. (PPF P. 223) As a result, on
> January 20, 2015, she was deemed to be unfit for duty until further
> evaluation. (PPF P. 224) On March 23, 2015, Dr. Braco at DMH
> Corporate Health determined Ms. Karr was able to return to work
> without restrictions. (PPF P. 225) However, because there is
> nothing in the records to show that the Department or DMH

Corporate Health ever considered applying any standards or guidelines to determine Ms. Karr's fitness for duty, one can only conclude that no standards or guidelines were ever used or applied in allowing Ms. Karr to return to full duty as of March 23, 2015.

(π Fact 55).

In analyzing the City's fitness for duty evaluations, the Board concluded:

Thus, it is puzzling that, although none of the treating neurologists had diagnosed Ms. Karr with a seizure disorder, Dr. Braco diagnosed Ms. Karr with a "seizure disorder," despite his acknowledgment that Ms. Karr was being prescribed "multiple psychoactive medications that can interact, with results felt on her functioning." (PPF P. 228) Moreover, Dr. Braco, without explanation, concluded that "medical review is complete, using the new LEO standards published by ACOEM; under these standards of medical fitness, the officer would not be fit for unrestricted duty, but should be restricted from carrying a lethal weapon and operating a cruiser at high speed in pursuit for a period of 10 years free of her current condition that has breakthrough (sic) spells despite daily medication."

(π Fact 56).

The Board concluded by explaining that five neurologists had evaluated Karr: Dr. Collins, Dr. Hayden, Dr, Cheetah, Dr. Ergene, and Dr. Mattai.  Not one of the neurologists had found that Karr suffered from any type of a seizure disorder seizure disorder (π Fact 57).  The Board found that there exited no evidence to support the conclusion that Karr suffered from a seizure disorder (π Fact 57).

While most employers would likely take the thorough analysis performed by the Board and move forward, the City chose a different path. The City instead wrote a letter to the Pension Board explaining that it disagreed with the Board's determination (π Fact 61).

On May 18, 2018, after the ruling by the Pension Board, Karr, through her attorney,

submitted a letter to the City notifying them that she had been found fit to perform her job duties and requested that she be reinstated (π Fact 59). The City rejected Karr's perspective and advised that it disagreed with the Board's findings (π Fact 60).

On August 8, 2018, Karr received an email from the City notifying her that she was being offered a position as a patrol officer with the City (π Fact 63). That was followed up by another email stating the same thing on October 16, 2018 (π Fact 64). Finally, on November 2, 2018, the City made a formal job offer to Karr (π Fact 65). That offer, however, came with a catch.  It was contingent upon Karr passing a fitness for duty evaluation (π Fact 65).

As she had been requested, Karr dutifully submitted to the fitness for duty evaluation. On November 16, 2018, the City's hand selected physician (who was not a neurologist) indicated that Karr was fit to perform "sitting work only" (π Fact 66). No additional information was forthcoming.  Later that same day, the same physician followed up by saying, again without any explanation, that Karr was "Not Fit for Duty" (π Fact 67). Finally on January 18, 2019, that same physician wrote a final note that stated Karr was not fit and gave as his explanation that "per the guidance for the Medical Evaluation of Law Enforcement Officers (LEO) standards" (π Fact 67).

On January 31, 2019, Karr was sent a letter from the City notifying her that she had failed her physical and was thus not qualified for the job she had previously been offered (π Fact 70). She was also told that she had been removed from the City's reinstatement register (π Fact 70).

Once her employment was fully severed by the City, Karr filed this lawsuit.  In the lawsuit she alleges that the City erroneously regarded her as suffering from a disability.  As a result, she suffered two adverse job consequences.  First, she was placed on an unpaid leave of absence as of March 3, 2017.  Second, she was rejected for a position with the City on January 31, 2019, and

told that she was no longer considered to be on the City's eligibility roster.

At the close of discovery the City has filed a motion seeking summary judgment.  In that motion they suggest that they did not regard Karr as disabled, that she was not qualified to be a police officer, and she presented a danger to herself and others.  The suggestion that the City did not regard Karr as disabled is laughable.  As to the other two arguments that the City raises, however, there are legitimate disputes of fact.  These disputes are found solidly in the medical records that have been filed with this Court.

Ultimately a jury could view the facts the same way that the Decatur Pension Board saw them.  They could conclude that Karr was medically qualified to perform her job duties as a police officer for the City.  Given that such a conclusion would be proper under the facts, the City's motion for summary judgment must be denied.

## II.  RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL

On September 17, 2020, Karr filed a motion seeking leave to file her statement of fact section under seal (Doc. 21).  Karr also filed her statement of fact section pursuant to Local Rule 5.10. That filing is incorporated herein.

## III. ARGUMENT

**A.      Standards Governing a Motion for Summary Judgment**

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250, 106 S.Ct. 2505 (1986).  On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a fact finder. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.*, 158 F.3d 966, 968 (7th Cir. 1998).

**B.      There are disputes of material fact that preclude the Court from granting the City's motion for summary judgment.**

Karr's complaint alleges that she has been discriminated against by the City in violation of the  Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq. (the "ADA"). Specifically she claims that the City regarded her as disabled (Complaint, ¶ 3) and discriminated

against her on account of that reason at two different times:

1.   On March 3, 2017, When she taken off of paid administrative leave and forced to take a leave of absence from the classified service (Complaint ¶ 3, π Fact 39).

2.   On January 31, 2019, when the City had notified her that its previous offer of employment was being revoked because she was purportedly not fit for duty (Complaint ¶ 18, π Fact 70).

In relevant part, the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prove a violation of this provision, a plaintiff must show "(1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by her disability." *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016). The statute defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). Paragraph (3), in turn, explains that someone is "being regarded as having such an impairment" when "he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A).

Karr contends that the City erroneously believed that she was disabled when it took the two actions described above.  The City, on the other hand, argues that it did not believe that

Karr was disabled, she was not qualified to perform the job duties of a police officer, and she presented a "direct threat" to the safety of herself or others.

The problem with the City's argument is that it views the evidence in a light that is completely favorable to it. While the City taking such a view is not surprising, it is not the way the issues should be considered by this Court at summary judgment. Given the number of disputes of fact a finder of fact could conclude that Karr was competent to perform her job duties and that the City violated her rights under the ADA. For that reason summary judgment is inappropriate.

       1.      **The City clearly perceived that Karr was disabled. Even if the evidence didn't make that point clear, a jury could certainly reach that conclusion.**

As its initial argument the City indicates that it did not perceive that Karr was disabled. It offers no real argument or analysis as to this point and largely outlines the protections afforded to employees under the ADA.

Before turning to the facts, an understanding of the analysis of an ADA claim under the "regarded as" prong is helpful. While individuals who bring claims under the actual disability portion of the ADA are required to show that they suffer from a disability that impacts a major life activity, the "regarded as" claims do not have such a requirement. Before the enactment of ADAAA in 2009, "an employee was not 'regarded as' disabled by his employer unless his employer believed he satisfied the definition of 'disabled' under the ADA." *Steffen v. Donahoe*, 680 F.3d 738, 743 (7th Cir. 2012). "Thus, an employee believed to have an impairment was not 'regarded as' disabled unless his employer believed that impairment substantially limited the employee in a major life activity." *Id.* This has changed. The ADAAA provides that a Plaintiff is

regarded as disabled "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity" with the caveat that this provision does "not apply to impairments that are transitory and minor." 42 U.S.C. § 12102; *Steffen*, 680 F.3d at 743. The current regulations implementing the ADA, as amended, provide:

> (1) Except as provided in § 1630.15(f), an individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity. Prohibited actions include but are not limited to refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment. 29 C.F.R. § 1630.2(l)(1).

This requires only that Karr show that the City believed that she suffered from a physical or mental impairment.  It is hard to see how this point could seriously be argued by the City.

The fact that the City believed that Karr suffered from a physical or mental impairment is clear from a number  documents and the decisions that they made.  For example, during Karr's conversation with Chief Getz in March of 2017 he told her that she couldn't physically perform the job (π Fact 40).  Karr was then removed from paid administrative leave (π Fact 39). When the Pension Board concluded that Karr was not disabled the City took the extraordinary step of writing to the Board explaining that it disagreed with the disability determination it had reached (π Fact 61).  Again, in 2019 when the decision was made to revoke the offer of employment to Karr the City explained the decision by stating that she did not pass her physical examination (π

Fact 70).

It is clear that the City regarded Karr as being disabled as that term is defined by the

ADA and its amendments.

**2.** **There is a dispute of fact amongst the medical professionals as to whether Karr could perform the job duties of a police officer. The Pension Board found that the City had "misinterpreted or ignored the medical records" and that it was "inconsistent and/or arbitrary in rendering their fitness for duty decisions." A jury could reasonably look at the same evidence and reach the same conclusion the Pension Board reached. As such, summary judgment is not proper.**

To establish a claim under the ADA, a plaintiff must show that she is a "qualified

individual." *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013). A qualified

individual is defined as "an individual who, with or without reasonable accommodation, can

perform the essential functions of the employment position." 42 U.S.C. § 12111(8).

Before turning to the critical aspects of this argument it is important to dispense with a

couple of red herrings that the City has thrown out to support its contention that Karr was not

"otherwise qualified." It contends that Karr lacked requisite skill in the usage of firearms and that

she lacked the requisite emotional stability to perform her job duties.

There are multiple problems with these two points. For starters, none of these were ever

relied upon in making the decisions that are in question in this lawsuit. The decision to place

Karr on unpaid leave had nothing to do with her usage of guns or a supposed lack of emotional

stability. Chief Getz made this clear in his comments to Karr when he notified her of the decision

(π Fact 40-41). The determination that she could not work was based upon Dr. Petersen's

flawed conclusion that she had a "seizure disorder" (π Fact 37). Further, there is absolutely no

evidence that any of these factors were relied upon in making the decision to revoke her

reinstatement in early 2019 (π Fact 68, 70). Rather, the City argued that she did not meet the LEO standards because she had supposedly suffered from seizures in the past.

The other problem with these supposed concerns is that they are disputed.  These issues all relate to Karr's supposed mental inability to perform her job duties.  Any of these concerns were rendered moot by the psychiatric evaluation of Dr. Hamilton on December 1, 2016 (π Fact 25). There are absolutely no medical records that have been submitted that in any way suggest that Karr was emotionally unstable and not able to perform her job duties.

The bigger argument raised by the City is that she was simply not capable of performing her job duties.  They contend that they relied upon medical evidence and that evidence established that she was not able to perform her job duties. Given that Dr. Braco allowed her to return to work in March of 2015 and she remained there for more than eighteen months, this argument would seem to be riddled with holes.

The problem with this argument is that it is greatly disputed.  Recently the Seventh Circuit explained that for a plaintiff to prevail on an ADA claim she "must identify a genuine issue of material fact as to whether (1) she is disabled; (2) she is able to perform the essential functions of the job either with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability." *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020).  Here there are disputes as to the material facts as to whether Karr was able to perform her job duties and those disputes preclude summary judgment.

On March 3, 2017, it isn't entirely what standards the City was relying upon to reach the conclusion that Karr could not perform her job duties.  Adding to the confusion is the City's decision to change the standards it utilizes to assess fitness for police officers. On February 23,

2017, Karr was instructed "to undergo a physical examination . . . . . pursuant to the NFPA standards . . "[2] (π Fact 37). Prior to that, in December, Dr. Braco (the City's physician) relied upon the LEO standards (π Fact 23).[3]  On January 18, 2019, Dr. Kahturia apparently found – without an explanation as to why – that Karr was not qualified under the LEO standards.[4]

The problem is that under either set of standards there is no basis to conclude that Karr was unable to perform her job duties. Section 6.15.1 of the NFPA requires that an employee suffer from either epilepsy or a psychomotor seizure disorder (Rogers Affidavit Ex. 57).  Not one of the City's physicians could ever point to a diagnosis of epilepsy or a psychomotor seizure disorder. Like the NFPA, the LEO standards provide that there actually be a diagnosis of seizures.

The Pension Board engaged in a devastating critique of the City's actions in this case. The Boar explained that Karr had been evaluated by five separate neurologists and none of them ever concluded she had suffered from any type of a seizure disorder and there was absolutely no evidence to support the contention that she did suffer from such a disorder (π Fact 57, 58). Indeed, none of Karr's treating physicians ever diagnosed Karr with suffering from a seizure disorder  (π Fact 53) The Board explained that while both Dr. Braco and Dr. Peterson suggested that Karr had a seizure disorder, that was not based upon any medical facts.  The Board

---

[2]  The relevant NFPA standards are found at Disclosures 469-470 (See also Rodgers Affidavit Ex. 57).  As it relates to Karr, the relevant provision of those standards provide that a person is ineligible – unless certain conditions are met – if she suffers from epilepsy or psychomotor seizure disorders. (Disclosures 469).

[3]  The LEO standards are found at Rogers Affidavit Ex. 56.

[4] The City has refused to explain why the change was made and its thinking about that. They claim that while Karr was discussed as part of the change, the decision as to what standard to be used involved legal counsel and was privileged (Rogers dep., p. 21-26).

concluded that the "City's physicians misinterpreted or ignored medical reports available to them in determining Ms. Karr's fitness for duty."  (π Fact 54).

The experts in this case – the neurologists – all conclude that Karr did not suffer from any sort of a seizure disorder.  With no seizure disorder neither the NFPA or LEO standards render her unable to physically perform her job duties. It is clear that there is a dispute of fact as to the issue of Karr's ability to perform her job duties that makes summary judgment inappropriate.

While no two cases are identical, there are very clear similarities between the facts in this case and *E.E.O.C. v. Rexnord Indus., LLC*, 966 F. Supp. 2d 829 (E.D. Wis. 2013).  In *Rexnord* the employer perceived that the employee suffered from a seizure disorder. *Id.* at 834. There was a dispute amongst the medical professionals as to whether the plaintiff had actually suffered from any type of a seizure disorder. *Id.* at 837-838. The Court found that this created a dispute of fact that rendered summary judgment inappropriate.  The same, of course, is true here.  There are disputes of fact from the medical professionals as to whether Karr suffered from a medical condition that precluded her from working.  While a jury could conclude she couldn't work, a jury could certainly reach the very same conclusion that the Pension Board reached.

**3.    There is a dispute of fact as to whether Karr was a "direct threat" and summary judgment is not appropriate for that reason.**

The final argument advanced by the City is that Karr constituted a "direct threat" to herself and the safety of others. The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 670 (7th Cir. 2000).

The question of whether Karr poses a direct threat must be premised upon "a reasonable

medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (citing 29 C.F.R. § 1630.2(r). The determination that a significant risk exists must also be objectively reasonable. *Bragdon v. Abbott*, 524 U.S. 624, 649–50 (1998). To determine whether a risk is significant, the employer must consider: (1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm. 29 C.F.R. § 1630.2(r); *see also Chevron*, 536 U.S. at 86, 122 S.Ct. 2045; *Emerson v. N. States Power Co.*, 256 F.3d 506, 514 (7th Cir. 2001). *Branham v. Snow*, 392 F.3d 896, 906–07 (7th Cir. 2004) established that the burden to establish that an employee constitutes a "direct threat" rests with the employer.

The "direct threat" analysis was thoroughly detailed in *Rexnord*. There the Court concluded that there was conflicting evidence that made it impossible for a decision to be made at summary judgment. The dispute of fact warranted a trial. As noted above, there are disputes of fact here. Indeed, the weight of the medical evidence – including all of the neurologists – suggests that there was no threat involved.

Finally, given that the burden rests with the City on this issue, they have completely failed to present evidence that is sufficient to establish that Karr posed a "direct threat." There is no evidence offered other than a limited statement from Dr. Peterson in 2017 and Dr. Kahturia in 2019 suggesting that Karr couldn't perform her job duties. Neither physician made any sort of a diagnosis and neither physician ever explained how they reached the conclusion they reached. Given the conflicting evidence, the City simply can not prevail on this point at summary

judgment.

## IV. CONCLUSION

When there are disputes of material facts a motion for summary judgment must be denied.  Here the critical question is whether Karr was medically fit to perform her job duties as a police officer.  Given the breadth of medical evidence that has been submitted, Karr can certainly establish that there are disputes of fact that must be resolved at a trial.  Based upon the record that has been established, a jury could properly make the same conclusion that the Decatur Pension Board made, i.e., that Karr is fit for duty.  For that reason summary judgment is an inappropriate means of resolving this case and the City's motion must be denied.

Trudy Karr

By: /s/ *John A. Baker*
                 Her Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:        (217) 522-3445
Facsimile:        (217) 522-8234
Email:           jab@bbklegal.com

## CERTIFICATE OF SERVICE

This document is filed utilizing this Court's ECF system this 17th day of September, 2020. A copy will automatically be sent to all counsel of record.  No copies have been served via any alternative method of service.

Trudy Karr

By: /s/ *John A. Baker*

Her Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:             (217) 522-3445
Facsimile:             (217) 522-8234
Email:                 jab@bbklegal.com