## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| TRUDY KARR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-CV-2134 |
| | ) | |
| CITY OF DECATUR, ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R

Before the court is Defendant's Motion for Summary Judgment (#16), to which Plaintiff filed a Response (#23), to which Defendant filed a Reply (#26). For the reasons discussed below, Defendant's Motion (#16) is DENIED.

Also before the court is Defendant's Second Motion for Summary Judgment (#31), Plaintiff's Motion to Strike Second Motion for Summary Judgment (#32), and Defendant's Motion for Leave to File Second Motion For Summary Judgment (#34), to which Plaintiff filed a Response (#35). For the reasons discussed below, the court will not allow Defendant to file a second summary judgment motion.

## I. BACKGROUND

Plaintiff, Trudy Karr, a former City of Decatur police officer, invokes the court's federal question jurisdiction. Plaintiff alleges in her Complaint (#1) that Defendant, the City of Decatur, Illinois, discriminated against her in violation of her rights under the

1

Americans with Disabilities Act Amendments Act, 42 U.S.C. §§ 12101, *et seq.* ("ADA"), in that Defendant wrongfully regarded her as disabled and took adverse employment actions against her based on that incorrect belief.

The following discussion of the facts is drawn from the parties' summary judgment filings.

<u>Plaintiff's Work for Defendant</u>

Defendant employed Plaintiff as a police officer, beginning September 12, 2007.

The essential job functions of a Decatur police officer include the ability to patrol the city to preserve law and order, the ability to apprehend violators of the traffic laws, emotional stability, and the ability to develop skill in the use and care of firearms.

<u>The May 2014 Incident</u>

On May 14, 2014, while driving to work, Plaintiff experienced symptoms including dizziness, tiredness, and multiple vision. Upon arriving at work, Plaintiff's coworkers called an ambulance, which transported Plaintiff to St. Mary's Hospital in Decatur. Plaintiff was admitted to the hospital.

Plaintiff was assessed in the emergency department and was later assessed by a neurologist. Plaintiff underwent tests including CT Scans, MRIs, EEGs, a chest x-ray, and blood work, none of which were conclusive of any diagnosis. Possible diagnoses included a "confusional migraine" due to lack of sleep and stress, and a mild stroke.

Plaintiff was discharged from St. Mary's Hospital on May 16, 2014.

Plaintiff began treatment with Dr. Shanta Mattai at the Illinois Neurological Institute ("INI") in Peoria, Illinois, on June 16, 2014. When Plaintiff began seeing Dr.

2

Mattai, the doctor remarked that "at the present time, etiology of symptoms is still not clear."

Plaintiff submitted two "SICK AND INJURY REPORT" documents to Defendant's Human Resources Division, related to the 2014 incident. (#18-1) at 44 – 45. The first, dated June 20, 2014, certifies Plaintiff was unable to perform her work for 200 hours, beginning May 14, 2014, and returning to work on June 20, 2014. The stated reason for Plaintiff's inability to perform her work was "minor stroke caused by atypical migraine event." The attending physician is listed as "Dr. Kattah," whose full name and title, the court notes, is Dr. Jorge C. Kattah, MD. The second, dated July 3, 2015, with "Update" handwritten at the top, certified that Plaintiff was unable to perform her work for ten days, beginning May 19, 2014, and returning to work on June 20, 2014. The stated reason on that document is "seizure resulting in hospitalization." The attending physician is still listed as Dr. Kattah.

<u>The January 2015 Incident</u>

On January 11, 2015, Plaintiff arrived at work for Defendant with similar symptoms to what she experienced during the 2014 incident. She was transported by ambulance to St. Mary's Hospital in Decatur, then was transferred to OSF St. Joseph's Hospital in Bloomington, Illinois, where she was evaluated by a neurologist, Dr. Curtis J. Hayden, MD. Dr. Hayden stated that "the etiology of her symptoms are unknown." Discharge notes from St. Joseph show a normal MRI and EEG.

Defendant required Plaintiff to undergo a fitness for duty exam at Decatur Memorial Hospital Corporate Health Services ("DMH") on January 20, 2015. DMH

3

provider Sarah Sheers, PA-C, completed a "Physical Result Form" on January 20, 2015. (#18-3) at 22. That document shows Plaintiff underwent a fit for duty exam and was found "Not suitable for position," with the comments, "NOT CURRENTLY FIT FOR DUTY AT THIS TIME. PLEASE RETURN FOR REEVALUATION AFTER FOLLOWUP WITH NEUROLOGIST. CALL WITH ANY QUESTIONS OR CONCERNS."

On January 27, 2015, Plaintiff again saw Dr. Hayden, a neurologist, who ordered a CT scan and considered a complicated migraine as a potential diagnosis. The results of the CT scan were unremarkable.

On February 12, 2015, Plaintiff returned to INI, whose office notes indicate Plaintiff's symptoms could be the result of a migraine.

On February 19, 2015, Plaintiff again went to INI. Office notes indicate her symptoms were of an "unclear etiology – possible migraine and/or anxiety related seizures less likely." An EEG was ordered to evaluate for any "epileptiform abnormalities" or seizures.

On March 13, 2015, Plaintiff again returned to INI. The etiology of her symptoms was unknown. The results of her EEG were normal. The office notes state:

> Thus far her workup has been negative. Discussion occurred with Dr. [Erhan] Ergene and it was felt that a trial of Topamax could be offered but may not be beneficial as she has not definitively been diagnosed with seizures. She is also being worked up for migraines. [Plaintiff] is extremely anxious that she may lose her job and is willing to give Topamax a try.

The Decatur Police Department uses "Police Bulletins" as a form of official internal communication. Plaintiff wrote in a bulletin to then Decatur Police Chief Brad Sweeney that she was being treated with Topamax. The date of that bulletin is unclear.

On March 23, 2015, after Plaintiff had been prescribed Topamax at INI, Dr. Robert Braco, MD, who practices with DMH, sent a memo to Defendant stating Plaintiff was able to return to work on March 23, 2015, without restrictions. The record is not clear if Dr. Braco knew Plaintiff was taking Topamax.

Plaintiff submitted a "SICK AND INJURY REPORT" to Defendant's Human Resources Division related to the 2015 incident. That document certifies Plaintiff was unable to perform her work for five days. The reason Plaintiff said she was unable to work was "seizure resulting in hospitalization." The attending physician is Dr. Kattah. (#18-1) at 46.

Plaintiff's Medical Treatment After Dr. Braco Cleared Her to Return to Work

On November 13, 2015, Plaintiff returned to INI for a follow up visit. The office notes indicate an unknown etiology, and further state:

> Thus far her workup has been negative. A trial of Topamax was initiated in March 2015, per her request. … A dose reduction was offered, but she completely declines, citing that she is doing well …. Given that she has not had any further episodes, she feels secure in her job, is driving, and is happy. She will be followed annually, sooner if needed.

On July 21, 2016, Plaintiff began treatment with McLean County Orthopedics for neck pain. An MRI showed bulging discs at C4-5 and C5-6. On August 15, 2016, Plaintiff was referred to a pain management physician and was directed to undergo physical therapy. She was treated with epidural injections in August, September, and

October 2016. She was prescribed gabapentin and hydrocodone on August 27, 2016. There is no record of treatment by McLean County Orthopedics after October 17, 2016.

On September 26, 2016, Plaintiff returned to INI for another follow up appointment. The office notes indicate Plaintiff reported her neck injury, and further says, "overall, [Plaintiff] is doing remarkably well. … Given that she has not had any further episodes, she feels secure in her job, is driving, and is happy. She will be followed annually, sooner if needed."

<u>Plaintiff is Reevaluated for Fitness for Duty and Placed on Leave</u>

On November 29, 2016, Defendant sent a letter to DMH requesting a fitness for duty exam of Plaintiff, stating:

> [T]here have been recent reports of [Plaintiff] appearing to be glazed over and in a fog. She has had trouble concentrating on the job. She also has the appearance of sometimes being intoxicated. She is on prescription pain medication, and her superiors are concerned that dosage of the medication might be the reason for the above-mentioned behavior.

DMH's Dr. Braco signed a "Physical Result Form" which identifies the date of service as November 29, 2016. (#18-3) at 23. That document says Plaintiff underwent a fit for duty exam. A box is checked next to, "May work with the following restrictions." The comments section says:

> [M]edical review is complete, using the new LEO standards published by ACOEM [American College of Occupational and Environmental Medicine]; under these standards of medical fitness, the officer would not be fit for unrestricted duty, but should be restricted from carrying a lethal weapon and operating a cruiser at high speed in pursuit for a period of 10

years free of her current condition that has breakthru spells despite daily medication.[1]

The record includes another "Physical Result Form," with a date of service of November 29, 2016, signed by Dr. Braco, marked "May work with the following restrictions." The comments say, "UNTIL FURTHER MEDICAL INFORMATION IS AVAILABLE FOR REVIEW, RECOMMENDED NO LETHAL WEAPON USE, NO HAZMAT OR ERT TEAM DUTY." (#18-3) at 24.

The record also includes a two-page document, signed by Dr. Braco, dated November 29, 2016, containing additional notes pertaining to the fit for duty exam he conducted on Plaintiff that day.

The "HISTORY OF PRESENT ILLNESS" section includes various information about and observations of Plaintiff. Of note, it includes, "[Plaintiff] states she was trying to get her 's' together[.] In January 2015, she had her last seizure, had a FFD exam that month, and reports continuous medication since then to avoid seizures." The record is unclear if this is a quotation of Plaintiff, or if this is Dr. Braco's interpretation of what Plaintiff meant, in light of Dr. Braco's seizure disorder assessment.

Dr. Braco also wrote, "Today, [Plaintiff] is agreeable to sign release of information forms for each HCP, but indicates she may think about this some more overnight and rescind the permission, tomorrow, if she decides to bring in the info herself to the next [appointment] in the Clinic[.]"

---

[1] The undisputed material facts put forth by the parties do not include the language of the LEO guidelines, or say what portion of those guidelines Dr. Braco applied.

7

The "ASSESSMENT" section includes the following:

> Seizure disorder, described as an unusual type, with a concurrent need for multiple psychoactive medications that can interact[], with results felt on her functioning. She shows little insight to her impaired memory & judgment, need for advanced cooperation & communication between the many prescribing physicians. She sees little reason to report on any changes in medication. There is some missing information, that can probably best be filled in by talking with her HCP's directly.

(#22-5) at 27-28.

On November 30, 2016, Defendant placed Plaintiff on paid administrative leave pending a fit for duty process.

<u>Plaintiff's Other Healthcare Records</u>

In a letter dated December 1, 2016, Dr. Scott Hamilton, a psychiatrist with OSF Medical Group in Normal, Illinois, stated:

> Ms. Karr has been receiving services at my current practice since 1/28/15; she was additionally a patient under my care at my previous practice … Ms. Karr has a prognosis of stable functioning with her medical conditions being well controlled with her current medication regime, her excellent medication compliance, and her good coping mechanisms (particularly physical activity[)]. I am aware that Ms. Karr has been compliant in working with her other physicians, particularly neurologist …. I assess that Ms. Karr is fit for duty in her current employment.

In a letter dated December 6, 2016, Elizabeth Cleveland, a Certified Nurse Practitioner, wrote to Defendant that Plaintiff's mental health had always been stable.

<u>Plaintiff Applies for a Disability Pension</u>

On January 4, 2017, Defendant placed Plaintiff on unpaid leave and required a physician's release before returning her to full duty status.

8

In her deposition for this lawsuit, Defendant asked Plaintiff if, at the time she applied for the disability pension, she believed she was "not capable of performing the essential job duties of a police officer." Plaintiff answered, "I had been doing my job as a police officer for two years following the initial incident. So, I believed that I was fine. I was told by the City that I was unfit." Defendant followed up by asking if Plaintiff "made a false application for a disability pension." Plaintiff answered, "No. … I was advised by the City that I was unfit for duty. I was told that I was unfit for duty, and was advised to apply for disability because the City had determined that I was unfit for duty." (#16-1) at 37-38.

Plaintiff contends she was told to apply for disability sometime shortly after January 4, 2017. Defendant contends that Plaintiff was presented with the option of applying for a disability pension and denies that it told her to do so.

On January 15, 2017, Plaintiff applied to the Decatur Police Pension Fund and its Board of Trustees for a disability pension. Plaintiff's application indicated she was filing because she had been found unfit for duty by Defendant's physician. Plaintiff's application states, "I certify that my disability renders me incapable of performing the duties required of me as a police officer for the City of Decatur," and further states, "I certify that the nature and extent of my disability is: Medical review by Dr. Braco, finding me not fit for unrestricted duty, with duty restricted from carrying a lethal firearm and operating squad at high speed for 10 years free of current condition. (seizure disorder)." (#22-1) at 53.

During Plaintiff's testimony before the Pension Board, the following exchange took place between Plaintiff and the Pension Board's attorney:

> Q. And you read the IMEs that evaluated you, correct?
>
> A. Yes, sir.
>
> Q. Out of the four, are there any of those that you agree with their conclusions?
>
> A. I agree with the conclusion of Dr. Murphy because he's a neurologist, so I believe that he has a background in neurology, which none of the other doctors do, so I would say that I would probably agree with his most. I agree with – throughout Dr. Orris's review, I read several times that he said that nothing has been definitively diagnosed but nothing has been diagnosed as well, is the way I read it so – and at the end of it, he basically says that he believes that if I'm being told I'm not fit for duty, then he would consider me disabled. … Dr. Murphy says that he finds me to be disabled, and I agree with his as well.
>
> Q. Okay. Do you think you're fit for duty now?
>
> A. No.
>
> Q. And why not?
>
> A. Because I don't meet the standards put forth by the department.
>
> Q. Okay. If you look at the standards from a physical and just an overall health perspective, do you think you would be fit for duty?
>
> A. I'm not a doctor. I don't believe I can really make that determination.

(#18-3) at 42-43.

10

Plaintiff's closing argument to the Pension Board, (#18-3) at 55-62, argues, in summary, "[Defendant] has concluded that [Plaintiff] is not medically able to work and the bulk of medical opinion in this case supports that conclusion." (#18-3) at 61.

Plaintiff testified in her deposition in this lawsuit that she believed she was fit for duty at the time she applied for a disability pension, but she did so because Defendant had found her unfit for duty.

On January 23, 2017, Defendant rescinded the January 4, 2017, order, and placed Plaintiff back on administrative leave with pay retroactive to January 4, 2017.

The Pension Board wrote Plaintiff a letter on January 30, 2017, stating, in part, that the Board was required to "determine if you are disabled to the extent that you are no longer able to perform your police duties."

<u>Plaintiff's Assessment and Statements from INI</u>

On January 30, 2017, Plaintiff returned to INI indicating that she was on administrative leave currently due to her inability to be determined fit for duty by a company physician. Plaintiff reported "struggling with some significant work stress" and recounted having "severe nerve pain down her left arm" due to a chiropractic visit. Plaintiff reported being placed on gabapentin and Vicodin for the pain but that she was no longer using these. Plaintiff indicated that she experienced some focus and concentration difficulties and that co-workers and supervisors noticed and began to question her. Plaintiff showed Erica Spangler, APN, the form Dr. Braco completed, dated November 29, 2016, that determined Plaintiff was not fit for unrestricted duty based on "new LEO standards published by ACOEM." Spangler proposed options to

11

Plaintiff including weaning off Topamax as a trial, changing to another anti-epileptic drug, Lamictal, or continuing as is.  Plaintiff chose not to change her medication. APN Spangler informed Plaintiff that a fit for duty determination using the LEO standards was "outside of my determination" and thus Spangler said she was unable to clear Plaintiff as fit for duty. Spangler said she could "merely state from a seizure/LOC standpoint and with the use of Topamax, there are no work restrictions."

In a letter dated February 1, 2017, Spangler wrote:

[Plaintiff] was seen in the office today. She remains on Topamax (topiramate) for episodes of alteration of consciousness in 2014 & 2015. She has had no further episodes resembling the initial episodes.  From my current perspective, she does not have any work restrictions related to the previous events. Without having information on the current LEO standards published by ACOEM, I am unable to speak to [Plaintiff's] fitness for duty….

In a letter dated February 6, 2017, Spangler wrote:

[Plaintiff] was seen in the office on February 1, 2017. She remains on Topamax (topiramate) for episodes of alteration of consciousness in 2014 & 2015. She has had no further episodes resembling the initial episodes. From my current perspective, she does not have any work restrictions related to the previous events.

Plaintiff Undergoes Another Fit for Duty Exam and is Taken Off Paid Leave

On February 23, 2017, Defendant ordered Plaintiff "to undergo a physical examination, and a psychiatric examination, each conducted pursuant to NFPA standards, for the purpose of confirming your fitness to perform your duties as a Police Officer." NFPA stands for National Fire Protection Association.

That same day, February 23, 2017, Plaintiff underwent a fit for duty exam with HSHS Medical Group Occupational Health & Wellness – Decatur ("HSHS") provider

Dr. Jon F. Petersen, MD. In the written report of that exam, Dr. Petersen includes a block of text under a heading, "HISTORY OF PRESENT ILLNESS."

In that section, Dr. Petersen provides a brief description of the May 2014 and January 2015 incidents, recounting that after the May 2014 incident, Plaintiff was evaluated in the emergency department at St. Mary's Hospital in Decatur and "released with no definitive diagnosis." Dr. Petersen further recounts that later, Plaintiff made an appointment at INI, and that "a definitive diagnosis was not made." Dr. Petersen notes that Plaintiff's symptoms resolved in approximately 5 to 6 weeks. Dr. Petersen recounts that following the January 2015 incident Plaintiff had a "complete workup including lumbar puncture, MRI, CT, EMG and was eventually seen again by Dr[.] Kattah, [s]he was started on Topamax for presumed seizure disorder …."

Dr. Petersen's report also includes a "DIAGNOSIS" section and an "ASSESSMENT" section. The diagnosis section identifies Dr. Petersen's diagnosis as "[a]ltered mental status, unspecified." The assessment section says, "Fitness for duty evaluation with history of recurrent states of altered consciousness. Definitive diagnosis of seizure or epilepsy is not made."

In the "CONCLUSIONS" section, Dr. Petersen writes, "Candidate does not have a definitive diagnosis, however; the best tentative diagnosis is seizure disorder …."

Dr. Petersen completed a "Fit for Duty – Employer Summary" form. The results were "Employee is considered 'Not Fit for Duty' and cannot perform the requirements of their job." Dr. Petersen's conclusions were:

Independent medical evaluation performed by a neurologist after a functional capacity evaluation is performed[], and She cannot perform the essential functions of the proposed job. [C]andidate does not have definitive diagnosis, however; the best tentative diagnosis is seizure disorder which is addressed in the NFPA 1582 as follows, According to NFPA 1582 chapter 6.15.1.2: to be medically qualified a candidate shall meet all of the following: 1, No seizure (or one year off all antiepileptic medication or five-year seizure free on regimen[)] 2, Neurologic examination normal 3, Imaging studies are normal 4, Awake and asleep EEG studies with photic stimulation hyperventilation normal 5, A definitive statement from a qualified neurological specialist that the candidate is qualified to perform her essential job functions[.] Until definitive diagnosis is made I do not recommend return to duty for this examinee.

(#18-3) at 27.

On March 3, 2017, Defendant took Plaintiff off paid administrative leave effective March 2, 2017. Defendant did not return Plaintiff to paid status at any point thereafter.

<u>Plaintiff Leaves her Employment with Defendant</u>

Plaintiff testified before the Pension Board that after Defendant took her off paid administrative leave, Decatur Police Chief James E. Getz, Jr. (who by that point had succeeded Chief Sweeney) gave Plaintiff three options: resign, be terminated, or take a leave from the classified service. Plaintiff testified that a leave from classified service "would allow me to retire once the disability hearing, if it came out that I was granted a pension, that I would be able to retire on disability … so he told me how to word the document. I sent it in and that's where we are now."

Chief Getz agreed in his deposition that Plaintiff was presented with three options moving forward: resign, be terminated, or take a leave from the classified service.

Plaintiff testified, in her deposition for this lawsuit:

> [Chief Getz] contacted me to let me know that Dr. Petersen had found me to be unfit for duty, and we talked about what to do moving forward. He had asked me what I wanted him to do, and I told him that this was not, you know, what – I needed his guidance. So, he advised me that my options were to resign, to be fired, or to take a leave from the classified service. The way he explained it to me was that if I took the leave from the classified service and applied for disability, his opinion was that there was no reason I shouldn't qualify for disability as the City had found me unfit for duty. And he said that if I took the leave from the classified service, that I would be protected, and that I could just be able to retire instead of being – obviously I did not want a termination on my record because it would be hard to get another job. I wasn't going to resign because I thought it wasn't – it was just the City's opinion that I couldn't do my job. I still wanted to do my job. So, his advice to me was to take this leave from the classified service, and then I would be protected until in his words the Pension Board approved my disability, and then I could retire, and just move forward. He advised me exactly how to word the bulletin, and to submit it to him, and I did as he directed.

On March 24, 2017, Plaintiff wrote a letter to Defendant requesting that she be placed on leave from the classified service.

<u>Plaintiff's Medical Records After She Applied for a Disability Pension</u>

On March 20, 2017, APN Spangler, with INI, wrote:

> [Plaintiff] was seen in the office today for a fit for duty evaluation. Ms. Karr does not have a definitive diagnosis, however based on the clinical description of her past events and her response to antiepileptic medication, her tentative diagnosis included seizure disorder. Ms. Karr has been treated for events suspicious for seizures that occurred in May 2014 and again January 2015. She started antiepileptic medication March 2015 and remains on medication with good adherence.

> This letter is based on the NFPA 1582 standards provided to her by her department and were provided to the office by Ms. Karr today for review. Ms. Karr has a medical condition that does not certify her as meeting the medical requirement of this standard (6.2.2). She has not been free from her events for 5 years while on antiepileptic medication (6.15.1.1) and seizure disorder is listed as a "Category A" medical condition (6.15.1(8)[)].

(#18-2) at 43.

On June 2, 2017, Plaintiff saw Dr. Peter Orris, MD, who practices with the University of Illinois Hospital & Health Services System in Chicago, with a specialty in Occupational and Environmental Medicine. Dr. Orris was one of four independent medical examiners commissioned by the Pension Board to examine Plaintiff.

Dr. Orris believed Plaintiff was fit for duty but that she should be followed by a neurologist, a police department consultant, and possibly a psychologist or psychiatrist. Dr. Orris deferred to the neurologists in making any diagnosis of Plaintiff. He noted that, although the neurologists could not rule out the possibility of seizures, it was more probable that her symptoms were related to migraines, anxiety, or a viral syndrome, and it was unlikely Plaintiff had suffered from seizures. Dr. Orris concluded that Plaintiff "is able to safely return to full duty, being able to drive, run, climb, subdue an active resister, effectuate an arrest, and safely carry, handle, and use her weapon." Dr. Orris based his determination on his 40 years of practice and his knowledge of both the LEO and NFPA standards.

On June 8, 2017, Plaintiff saw Dr. Michael Murphy, MD, who practices with the Central Counties Health Centers in Springfield, Illinois. Dr. Murphy practices internal medicine. In his prior practice, Dr. Murphy practiced as a neurologist in Los Angeles, California. Dr. Murphy was another independent medical examiner commissioned by the Board. Dr. Murphy stated:

> Whether or not the episodes described represent atypical migraine or partial complex seizure activity is not particularly important at this point. Whichever the favored diagnosis the episodes are unpredictable and

associated with prolonged cognitive changes which would make Public Safety job performance questionable. The episodes have not recurred and could be considered under good control with present medications. She has wanted to return to work but has not been allowed to return to work as a police officer in Decatur because she is not off antiepileptic medications. Her neurological exam is now presently normal and her imaging studies are essentially unremarkable under either the American College of Occupational and Environmental Medical/LEO guidelines and the National Fire Protection Guidelines [b]ecause she remains at risk for further episodes and such episodes would certainly affect her performance and safety. She would have to be considered disabled at this time. This disability would apply only to her previous and similar occupations and future employment may or may not be similarly affected.

On June 20, 2017, Plaintiff saw Dr. William S. Scott, MD, another independent medical examiner commissioned by the Board. Dr. Scott was unable to determine a diagnosis or whether Plaintiff was disabled. He wrote, "I believe that her current condition is still unexplained with no specific diagnosis." Dr. Scott believed that, regardless of the diagnosis, "stress, anxiety and fatigue and medications played a significant factor in initiating her symptoms, [whether] they were 51% or greater cause of her problems, I cannot answer with any certainty."

On January 8, 2018, Plaintiff saw Dr. Susan Buchanan, MD, who practices with the University of Illinois Hospital & Health Services System in Chicago, with a specialty in Occupational and Environmental Medicine. Dr. Buchanan was an independent medical examiner commissioned by the Board. Dr. Buchanan determined there was no definitive diagnosis for Plaintiff's two episodes. The weight of the evidence led Dr. Buchanan to conclude that Plaintiff has a migraine variant. Dr. Buchanan noted that none of the treating neurologists thought that the two episodes were seizures, and noted that if the episodes were caused by an acute confusional migraine, it was unlikely

17

to recur given Plaintiff's current medications which are used to treat migraines. Dr. Buchanan determined Plaintiff "should be able to perform all duties" of a Decatur police officer and a migraine variant or probable confusional migraine would not prohibit her from performing those duties.

On January 11, 2018, Dr. Hamilton of OSF Medical Group wrote a letter regarding Plaintiff. Dr. Hamilton wrote that Plaintiff had been under his care for several years. Dr. Hamilton wrote:

> [Plaintiff] had an incident of confusion in May of 2014 and again in January of 2015. It was not completely clear what caused the incidents. She did have some mild abnormalities on the MRI of her brain. It is not clear whether those were relevant to her episodes. I saw her fairly shortly after the 2nd episode and my impression at that time was that these were not psychogenic in nature. Unfortunately, I do not know what caused the episodes but as I said I did not think then and do not believe now that they were psychogenic in nature.

<u>The Pension Board's Decision</u>

On April 25, 2018, the Pension Board issued its determination denying Plaintiff's application for a disability pension.

Illinois law provides that a disability pension shall not be paid unless the applicant and three practicing physicians selected by the board certify that the pension applicant is disabled. The Pension Board raked through Plaintiff's medical records and made several pointed disagreements with Dr. Braco and Dr. Petersen's fit for duty examinations, particularly emphasizing that Plaintiff had not been diagnosed by a treating neurologist with a seizure disorder. The Pension Board ultimately issued a narrow ruling in denying Plaintiff's application: "In this case, the Board did not have three physicians who certified that Ms. Karr was disabled." (#21-1) at 48.

The Pension Board went on to reiterate that it found Defendant's determination unpersuasive because Defendant and Defendant's retained physicians "ignored important medical records of treating neurologists, and, thereafter used inappropriate standards and guidelines, not applicable to Ms. Karr."

Defendant was not a party to the proceedings before the Pension Board. On May 30, 2018, Defendant wrote a letter to the Board lamenting that the Board had not invited Defendant to participate, disagreeing with the Board's ruling, and pointing out perceived inaccuracies in the Board's ruling.

<u>Defendant Offers to Re-hire Plaintiff then Rescinds Its Offer</u>

On May 18, 2018, after the Board's ruling, Plaintiff, through her attorney, submitted a letter to Defendant notifying it that Plaintiff had been found fit to perform her job duties and requesting that she be reinstated.

On May 25, 2018, Defendant responded to Plaintiff's May 18 letter. In its response, Defendant said that it disagreed with the Pension Board's determination.

On June 5, 2018, Plaintiff personally wrote to a letter to Defendant requesting that she be removed from leave and immediately reinstated to her prior position.

On August 8, 2018, Defendant sent an email to Plaintiff offering her a position as a patrol officer for Defendant. The offer was contingent on Plaintiff passing a physical, a drug screen, and a psychiatric evaluation. Plaintiff rejected the offer, apparently due to a misunderstanding over whether Defendant's offer amounted to hiring Plaintiff at the same salary level, and with the same job description, that she had when she took leave. By the time that misunderstanding was ironed out, the offered position had been filled.

19

On October 16, 2018, Defendant again emailed Plaintiff, offering to reemploy her, contingent on Plaintiff passing a physical, a drug screen, and a psychological evaluation. On November 2, 2018, a formal job offer was made by Defendant to Plaintiff, with the same contingencies.

On November 16, 2018, Dr. Inderjote Kathuria, MD, an occupational health physician practicing with HSHS, completed a "Fit for Duty – Employer Summary." That document has the box checked for "Employee is considered 'Fit for Duty with Restrictions.'" In the "Notes of Restrictions" section is typed, "sitting work only." (#18-2) at 62. Dr. Kathuria completed a second "Fit for Duty – Employer Summary" document the same day. That document has the box checked for "Employee is considered 'Not Fit for Duty' and cannot perform the requirements of their job." The "Notes or Restrictions" section is blank. (#18-2) at 63.

On January 18, 2019, Dr. Kathuria completed yet another summary based on the November 16, 2018, exam. On that document the box is checked for "Employee is considered 'Not Fit for Duty' and cannot perform the requirements of their job." In the "Notes or Restrictions" section is typed only, "per the 'Guidance for the Medical Evaluation of Law Enforcement Officers' (LEO) standards." (#18-2) at 64.

On January 25, 2019, Defendant sent Plaintiff an email notifying her that because she "had not passed the physical," – i.e., Dr. Kathuria's exam – she was disqualified from the employment process and her name was removed from Defendant's reinstatement register. The email indicated an official notification on Defendant's letterhead would be forthcoming the following week.

On January 31, 2019, Defendant sent Plaintiff a formal letter that stated:

On October 16, 2018, you were extended an offer for the position of Patrol
Officer in the Investigations Bureau for the City of Decatur. This offer was
contingent upon you passing the physical examination. Unfortunately, the
results of the physical examination determined that you are not fit for
duty and cannot perform the requirements of this job, per the "Guidance
for the Medical Evaluation of Law Enforcement Officers (LEO)
standards.["] You are, therefore, disqualified from the employment
process, and you name has been removed from the reinstatement register.

<u>Plaintiff's Emotional Stability, Firearm Safety, and Direct Threat</u>

Defendant proposes, as undisputed material facts, the conclusory statements that

Plaintiff "lacked the requisite emotional stability," "lacked the ability to develop skill in

the use and care of firearms,"  and "posed a direct threat to her safety, and the safety of

others."

Defendant cites the same nineteen exhibits in support of its statements as to

Plaintiff's emotional stability and direct threat. Defendant cites one of those nineteen

exhibits in support of its statement about Plaintiff's firearm safety.

Plaintiff challenges Defendant's statements as immaterial and factually disputed.

The court will summarize the general content of these nineteen exhibits.

However, the court cannot sift through all these exhibits and conclusively identify the

specific facts Defendant had in mind to support its assertions. The court declines to take

on the role of a hopeful miner in the California Gold Rush, desperately searching for a

flash in the pan, as it rules in this matter. "We will not root through the hundreds of

documents and thousands of pages that make up the record here to make a party's

case[.] Judges are not like pigs, hunting for truffles buried in the record." *Williams v. Bd.*

*of Educ. of City of Chi.*, 982 F.3d 495, 510–11 (7th Cir. 2020), reh'g denied (Jan. 7, 2021) (cleaned up).

Five of the exhibits Defendant cites discuss an incident in early July 2016. See (#18-1) at 49, 51-55, 57, and 58. These exhibits are all bulletins completed by several of Defendant's police officers.

In early July 2016 a clerk at a Casey's General Store believed Plaintiff was intoxicated while on duty. The Casey's clerk reported her suspicions to Defendant. Defendant obtained and reviewed security footage, interviewed the clerk, got a statement from Plaintiff, and got statements from other officers who interacted with Plaintiff on the evening in question, both before and after the reported incident. The investigation was terminated as "unfounded," because there was "not … any evidence of a balance problem with [Plaintiff]," or evidence Plaintiff had otherwise done anything wrong when she stopped at Casey's soon after she got off duty that night.

The other fourteen exhibits are bulletins, and one email, prepared and signed by Defendant's police officers, at the direction or request of their chain of command or Defendant's HR department, discussing Plaintiff. See (#18-1) at 60-77; (#18-2) at 1-10, 16-19. The topics discussed include Plaintiff swearing at an intern, swearing at other officers, alternating from happy and carefree to being in a "fog like/intoxicated state," making statements about being "drunk" or on "dope," consuming pills from prescription pill bottles, having trouble keeping facts straight, being dishonest or conniving, "blowing up" about getting a traffic ticket, and exhibiting unsafe behavior

one day at the gun range. There may be other "truffles" Defendant believes important, but these were the topics that caught the court's eye.

Many of these documents say that the person who made the statement would not feel safe with Plaintiff in a dangerous situation. Some simply say that the person who completed it had no personal knowledge of Plaintiff's behavior. Some statements undermine the potential impact of others: for example, some discuss an occasion where Plaintiff said she was "drunk," at work. However, another statement says that three of Plaintiff's colleagues discussed that comment and agreed that Plaintiff was "screwing around" and trying to fit in with her new assignment. None of these documents were prepared or signed under oath, to the best of the court's assessment. Many discuss "rumors" about Plaintiff and contain layers of hearsay.

Defendant cites one document for its conclusion that Plaintiff "lacked the ability to develop skill in the use and care of firearms." The relevant part of that document, signed by Detective Ronald A. Borowczyk, appears to be the following:

> On my range training day while readying weapons for inspection, Officer Allison, Sgt. Carrol, Detective Karr and I were in the armory when she attempted to remove her weapon from the holster she was wearing on her hip. I observed Detective Karr having a problem getting her service weapon out of the holster. When she finally was able to remove the weapon from the holster she ended up pointing her loaded weapon at Officer Allison while his back was turned.

> I then observed Sgt. Carrol place his hand on the barrel moving from where the weapon was pointed. Sgt. Carrol then advised Detective Karr to unload her weapon, which she responded that she didn't know how to unload it. While this was occurring Detective Karr put her hand over the barrel of the loaded weapon. Again Sgt. Carrol moved the weapon instructed her on how to unload the weapon and deal with it from there. I would not feel safe standing in front of Detective Karr while she would

have a weapon withdrawn from the holster in either … offensive or defensive actions.

See (#18-1) at 64-65.

## II. ANALYSIS

A. <u>Defendant's Second Summary Judgment Motion</u>

The court will first address Defendant's desire to present a second summary judgment motion.

Magistrate Judge Eric I. Long held a hearing on September 4, 2019, where he established certain deadlines for this case. One of those deadlines was that case dispositive motions were due by August 14, 2020. Defendant filed its Motion for Summary Judgment (#16) on August 13, 2020. Neither party filed a motion for an extension of the August 14, 2020, deadline before it passed. Defendant's summary judgment motion (#16) was fully briefed on October 14, 2020.

On November 9, 2020, without seeking leave of court, Defendant filed its Second Motion for Summary Judgment (#31). Plaintiff filed a Motion to Strike (#32).

On November 24, 2020, over two months after the dispositive motion deadline had elapsed, Defendant filed its Motion for Leave to File Second Motion for Summary Judgment (#34), which Plaintiff opposed (#35).

The court will first address Plaintiff's Motion to Strike (#32).

Plaintiff argues that Defendant's Second Motion for Summary Judgment (#31) should be stricken because its filing does not comply with the court's scheduling order, the Federal Rules of Civil Procedure, or the Local Rules.

Defendant did not file a response to Plaintiff's Motion to Strike (#32).

Plaintiff's arguments are well taken.

Defendant did not comply with the court's scheduling order, which required dispositive motions to be filed by August 14, 2020, in filing its second summary judgment motion on November 9, 2020.

Defendant also did not comply with Federal Rule of Civil Procedure 56(b), which provides that "Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Discovery closed on July 17, 2020.

Defendant also did not comply with the Local Rules. Local Rule 6.1 provides: "Any party seeking an extension of time for any reason must file a motion for such extension before the original deadline. Motions filed out of time will be denied, unless the presiding judge determines that such denial would create a substantial injustice." And, Local Rule 7.1(D) notes that extensions of time for the filing of motions related to summary judgment are disfavored, and "such motions may be summarily denied unless they are filed within the original time as allowed by this rule or by the scheduling order."

Plaintiff's Motion to Strike (#32) is GRANTED. Defendant's Second Motion for Summary Judgment (#31) is STRICKEN.

The court next turns to Plaintiff's Motion for Leave to File Second Motion for Summary Judgment (#34).

Defendant moves for leave to file a second summary judgment motion, in addition to its original summary judgment motion, to raise the issue of judicial estoppel based on Plaintiff's pursuit of a disability pension. Defendant acknowledges the matter is within the court's discretion and argues that the court should exercise its discretion and grant Defendant's motion for reasons of judicial economy and fairness, and because Plaintiff would suffer no prejudice.

Plaintiff argues in response that Defendant's motion is untimely, the parties have already fully briefed the issues laid out in Defendant's original summary judgment motion, and argues Defendant has failed to state a reason why it is just now attempting to raise this issue.

Federal Rule of Civil Procedure 56(b) provides that "[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Discovery in this case closed about 120 days before Defendant's motion. So, the Rules of Civil Procedure would tend to support denial of Defendant's motion.

Local Rule 6.1 provides: "Any party seeking an extension of time for any reason must file a motion for such extension before the original deadline. Motions filed out of time will be denied, unless the presiding judge determines that such denial would create a substantial injustice." Further, Local Rule 7.1(D) particularly notes that extensions of time for the filing of motions related to summary judgment are disfavored, and "such motions may be summarily denied unless they are filed within the original time as allowed by this rule or by the scheduling order." Those rules also

both tend to support denial of Defendant's motion, unless Defendant shows denial of its motion would create a substantial injustice.

The court finds Defendant has not shown that denial of its Motion (#34) would create a substantial injustice. Parties must comply with the court's Orders and the Federal and Local Rules, and the court may strictly enforce those Rules regarding summary judgment motions. See *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 536-39 (7th Cir. 2011). Defendant has provided no persuasive reason for the court to grant an extension. Defendant's Motion for Leave to File (#34) is DENIED.

The court now turns to Defendant's original summary judgment motion (#16).

B. <u>Summary Judgment Legal Standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).

The court "need not accept as true a [party's] *characterization* of the facts or … legal conclusion." *Wozniak v. Adesida*, 368 F. Supp. 3d 1217, 1232 (C.D. Ill. 2018)

(emphasis in original), quoting *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. Ill. 2010).

    C. <u>ADA Legal Standard</u>

    Plaintiff alleges Defendant violated the ADA (1) on March 3, 2017, when Defendant took her off of paid administrative leave and "forced [her] to take a leave of absence from the classified service," and (2) on January 31, 2019, when Defendant revoked its offer of reemployment because "she was purportedly not fit for duty."

    The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prove a violation of this provision, a plaintiff must show "(1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by her disability." *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016); *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020) (for a plaintiff to survive summary judgment on an ADA claim she "must identify a genuine issue of material fact as to whether (1) she is disabled; (2) she is able to perform the essential functions of the job either with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability.") (citation omitted).

    The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of

28

such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). Paragraph (3), in turn, explains that someone is "being regarded as having such an impairment" when "he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." § 12102(3)(A).

D. Defendant's Motion for Summary Judgment

Defendant argues it is entitled to summary judgment because there is no genuine issue of material fact that (1) it did not consider Plaintiff to be disabled, and (2) Plaintiff was not otherwise qualified or able to perform the essential job functions of a police officer.

Plaintiff responds that Defendant considered her to be disabled as defined by the ADA, and there is a disputed issue of material fact as to whether she was qualified or able to perform the essential functions of her job.

1. *Whether Plaintiff Was Disabled for ADA Purposes*

Plaintiff premises her entitlement to ADA protections on the "being regarded as having a physical or mental impairment" category of disability.

Defendant argues it did not regard Plaintiff as being disabled.

Plaintiff responds that Defendant plainly regarded her as being disabled.

The court finds there is at least an issue of fact as to whether Defendant regarded Plaintiff as having an actual or perceived physical or mental impairment. Defendant required Plaintiff to undergo several fit for duty examinations. Based on the results of

29

the first round of those examinations, and particularly Dr. Petersen's examination which found Plaintiff unfit due to a tentative diagnosis of a seizure disorder, Plaintiff was removed from paid administrative leave, and Chief Getz told Plaintiff that she could resign, take a leave from the classified service, or be fired.

Later, when the Pension Board issued its ruling that Plaintiff was not disabled, Defendant wrote a letter to the Board to tell the Board that Defendant disagreed with the Board's determination. Finally, after offering to reemploy Plaintiff contingent on certain examinations, Defendant withdrew its offer of reemployment expressly citing Dr. Kathuria's November 29, 2018, fit for duty exam of Plaintiff, ostensibly, although not expressly, due to Plaintiff's medical history.

The court finds that there is at least an issue of material fact as to whether Defendant regarded Plaintiff as being disabled as that phrase is defined by the ADA.

2. *Whether Plaintiff was A Qualified Individual as Defined by the ADA*

To establish an ADA claim, a plaintiff must show that they are a "qualified individual." *Brumfield v. City of Chi.*, 735 F.3d 619, 631 (7th Cir. 2013). A qualified individual is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8).

The court of appeals for the Seventh Circuit has said:

In determining whether a person is a qualified individual, we apply a two-step process. First, we determine whether the person satisfies the prerequisites for the position, such as possessing the proper educational background, employment experience, skills, or licenses. We then consider

30

"whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation."

*Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 417 (7th Cir. 2016), quoting *Stern v. St. Anthony's Health Center*, 788 F.3d 276, 285 (7th Cir. 2015) (additional citation omitted).

The parties agree that the prerequisites for, and the essential job functions of, a Decatur police officer include the same capabilities: the ability to patrol the city to preserve law and order, the ability to apprehend violators of the traffic laws, emotional stability, and the ability to develop skill in the use and care of firearms.

a. Whether Plaintiff Admitted She Could Not Do Her Job

The court will resolve the parties' dispute on this point here, at the beginning of the section on whether Plaintiff was a qualified individual. If indeed Plaintiff has admitted that she was not a qualified individual, that determination would resolve the entire case. But it does not.

Defendant provides the following conclusion as an undisputed material fact: "Plaintiff admitted she was not qualified or able to perform the essential job functions of a police officer." (#16) at 3. Defendant cites portions of the record related to Plaintiff's unsuccessful application for a disability pension.

Plaintiff responds that she applied for a disability pension because Defendant told her she was not fit for duty, and Chief Getz told her to take a leave and pursue the disability pension. So, she contends, a fact issue exists whether she admitted she was either unqualified for or unable to perform the essential functions of a Decatur police officer.

31

The United States Supreme Court has issued an opinion that the court finds helpful. In *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S 795, 797 (1999), the Court considered whether an employee's successful pursuit of Social Security Disability Insurance ("SSDI") benefits either estops her from pursuing an ADA claim or triggers a presumption that she is unable to perform the essential functions of her job. The Court held, "these two seemingly divergent statutory contentions are often consistent, each with the other. Thus pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim." *Cleveland*, 526 U.S. at 797. The court went on to hold that when a plaintiff submits a sworn statement that she is disabled, the court should require an explanation if there is an apparent inconsistency with the necessary elements of an ADA claim. *Cleveland*, 526 U.S. at 797. "To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job ...." *Cleveland*, 526 U.S. at 807.

The Court provided an example of what such an explanation may look like:

> [I]f an individual has merely applied for, but has not been awarded, SSDI benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system. Our ordinary Rules recognize that a person may not be sure in advance upon which legal theory she will succeed, and so permit parties to "set forth two or more statements of a claim or defense alternately or hypothetically," and to "state as many separate claims or defenses as the party has regardless of consistency." Fed. Rule Civ. Proc. 8(e)(2). We do not see why the law in respect to the assertion of SSDI and ADA claims should differ.

*Cleveland*, 526 U.S. at 805.

A district court in this circuit applied *Cleveland* in a case analogous to the case at bar, and the court finds that case persuasive. See *E.E.O.C. v. Rexnord Indus., LLC*, 966 F. Supp. 2d 829, 841 (E.D. Wis. 2013). There, the plaintiff applied for disability insurance, asserting under oath that she was disabled, after her employer's physician found her unfit for duty due to a seizure disorder. The plaintiff's disability insurance application was unsuccessful. The defendant argued that the plaintiff's sworn disability insurance claim nonetheless entitled the defendant to a finding as a matter of law that the plaintiff could not perform the essential functions of her job. The *Rexnord* court found that because the plaintiff's disability application was denied, her ADA claim fell "under the 'pleading in the alternative' explanation posited by the *Cleveland* Court" which required the plaintiff to explain how her statement of disability in support of her disability application was consistent with the plaintiff's position in her ADA case. *Rexnord*, 966 F. Supp. 2d at 841. The court went on to find that the plaintiff's explanations, including that the defendant's fitness for duty physician had told her she should pursue SSDI, precluded summary judgment for the defendant. *Rexnord*, 966 F. Supp. 2d at 841.

Here, Plaintiff's disability pension application states, "I certify that my disability renders me incapable of performing the duties required of me as a police officer for the City of Decatur." Plaintiff testified before the Pension Board that she agreed with the Board's independent medical examiners who opined that she was disabled. Further, Plaintiff testified before the Board that she did not think she was fit for duty, because Defendant had told her so based on its standards. When asked, "If you look at the standards from a physical and just an overall health perspective, do you think you

33

would be fit for duty?" Plaintiff responded, "I'm not a doctor. I don't believe I can really make that determination." In her written closing argument to the Board, Plaintiff argued, "[Defendant] has concluded that [Plaintiff] is not medically able to work and the bulk of medical opinion in this case supports that conclusion." In her deposition for this lawsuit, Defendant asked Plaintiff if she believed she was "not capable of performing the essential job duties of a police officer." Plaintiff answered, "I had been doing my job as a police officer for two years following the initial incident. So, I believed that I was fine. I was told by the City that I was unfit." Defendant followed up to ask Plaintiff if she was saying she "made a false application for a disability pension." Plaintiff answered, "No. … I was advised by the City that I was unfit for duty. I was told that I was unfit for duty, and was advised to apply for disability because the City had determined that I was unfit for duty."

The court finds Plaintiff has provided the sort of explanation required by *Cleveland*. Viewing the evidence most favorably to Plaintiff, a jury could find that Plaintiff unsuccessfully pursued a disability pension as an alternative claim to her attempt to get her job back through an ADA claim. See *Rexnord*, 966 F. Supp. 2d at 841.

Having found a jury question as to whether Plaintiff admitted she was not a qualified individual the court turns to Defendant's more substantive arguments.

34

b. Plaintiff's Health

i. *To What Information Did Defendant Have Access?*

The court must decide to what information Defendant had access when it decided to take Plaintiff off paid leave, give her an employment status ultimatum, and later rescind its offer of reemployment.

Defendant contends it learned the details of much of Plaintiff's medical history only upon receiving a copy of the Pension Board's decision, in some cases, or upon disclosure by Plaintiff in this lawsuit, in others. Thus, Defendant contends, it should not be held responsible for knowing various details about Plaintiff's medical status and diagnoses when it took certain adverse actions against her.

However, Defendant does not present the dates it learned various pieces of information as undisputed material facts, with citations to the record. Instead, it merely argues that it did not know the information until later. Without proper presentation as undisputed material facts subject to challenge by Plaintiff and scrutiny by the court, the court cannot rely on Defendant's assertions about when it learned certain information.

Regarding Plaintiff's own provider's records, the court notes that Dr. Braco's report from November 29, 2016, says that Plaintiff completed medical releases for all her providers that day. Dr. Braco says Plaintiff did so with hesitation and said that she said she might revoke those releases. The record does not show that she ever revoked the releases. Construing the record most favorably to Plaintiff, the court must assume Defendant had access to and was aware of Plaintiff's medical history within a few weeks after November 29, 2016, allowing time for Defendant to submit records requests

35

and receive the requested records, which would be well before Defendant's March 2017 actions.

Regarding the independent medical examiners' reports commissioned by the Pension Board, the court sees no inference that Defendant had access to that information before the Board issued its ruling on April 25, 2018. The Pension Board sent Defendant a copy of its decision, though, which in turn speaks in detail about its independent medical examiners' findings. Thus, Defendant would have had access to the information discussed by the Pension Board well before Defendant decided to rescind its offer of reemployment in January 2019. Indeed, it appears that the Pension Board's ruling caused, or was at least a factor in, Defendant's decision to offer to reemploy Plaintiff. So, while irrelevant to Defendant's March 2017 actions, the Board's ruling and its independent medical examinations of Plaintiff are relevant to understanding what Defendant knew leading up to its January 2019 decision to rescind its offer of reemployment.

Having discussed this preliminary matter, the court turns to the substance of Defendant's argument related to whether Plaintiff's diagnoses or medications rendered her not a qualified individual.

ii. _Whether Plaintiff's Health Rendered Her Unqualified_

Defendant argues that its physicians' fit for duty exams conclusively show Plaintiff was unable to meet the prerequisites for being a Decatur police officer. And, Defendant argues, its determination that Plaintiff could not safely perform her essential job functions was objectively reasonable because (1) it relied on its physicians'

36

examinations, which were themselves objectively reasonable, (2) it relied on Plaintiff's own admissions about her condition, and (3) it relied on the observations of Plaintiff's coworkers.

Plaintiff argues that Defendant's adverse actions were based solely on its physicians' flawed conclusions. Plaintiff points to the Board's disagreement with Defendant's doctors' conclusions and argues that a reasonable jury could rule the same way – that is, it could find that Defendant's fit for duty exams were so flawed in light of all the information Defendant had that those exams did not allow Defendant to take adverse actions against Plaintiff.

Employers may require their employees to meet minimum standards, both as prerequisites to employment and as duties essential to continued employment. See, e.g., *Wheatley*, 826 F.3d at 417.

The court finds that whether Plaintiff was a qualified individual is a contested issue of material fact, on the unique summary judgment record before the court.

The court will first address Defendant's given reasons – that is, those supported by the summary judgment record – for the adverse actions of which Plaintiff complains. Then the court will point out the disputed issues of fact that preclude summary judgment for Defendant based on those given reasons.

Defendant argues that, in addition to its physicians, it also relied on Plaintiff's admissions about her health, and the observations of her coworkers. However, the summary judgment record as presented by Defendant does not support these arguments. Defendant does not cite, for example, testimony by its Human Resources

staff, Chief Getz, or anyone else, to support its contention that it took consideration of anything beyond its physicians' determinations. Defense counsel's unsupported assertions about why Defendant took the adverse actions it took are better suited to trial.

The court will assess Defendant's adverse actions one at a time.

On March 3, 2017, Defendant rescinded Plaintiff's paid leave status. In viewing the facts most favorably to Plaintiff, this decision was a direct result of Dr. Petersen's February 23, 2017, determination that Plaintiff was not fit for duty. The summary judgment record does not show Plaintiff was taken off paid leave for any other reason related to Plaintiff's ability to meet the prerequisites for, or ability to perform the essential functions of, the job of Decatur police officer.

Later, again viewing the facts most favorably to Plaintiff, when Chief Getz spoke with Plaintiff he cited Dr. Petersen's examination and gave Plaintiff an ultimatum to resign, be fired, or take a leave from the classified service to continue pursuing a disability pension. The summary judgment record does not show that Chief Getz premised the ultimatum on any other reason related to Plaintiff's ability to meet the prerequisites for, or ability to perform the essential functions of, the job of Decatur police officer.

Finally, after Defendant elected to make a contingent offer of reemployment to Plaintiff, Defendant's retained physician Dr. Kathuria found Plaintiff unfit for duty. In both its informal email and its formal letter rescinding its reemployment offer

38

Defendant expressly and solely relies on Dr. Kathuria's examination as the reason it rescinded its reemployment offer.

These physicians' examinations could allow a reasonable jury to find for Defendant. However, the question before the court is whether Plaintiff has put forth sufficient evidence for a reasonable jury to determine that Plaintiff nonetheless met the prerequisites for, and was able to perform the essential functions of, a Decatur police officer.

There is also significant factual turbulence as to Plaintiff's health.

The sick and injury reports Plaintiff submitted to Defendant in 2014 and 2015 said she was off work for "seizures." Defendant did not consider those statements to render her unfit for duty at that time, and indeed Dr. Braco cleared Plaintiff for duty following the 2015 episode. It is unclear what standards he applied in 2015, if any.

Plaintiff underwent a lot of tests beginning in 2014 and continuing through the time of Defendant's adverse actions. That testing included work by neurologists at several hospitals and at INI. None of the tests resulted in a definitive diagnosis of a seizure disorder. Plaintiff was prescribed Topamax, which can be prescribed as an antiepileptic drug, by her providers at INI.

On November 29, 2016, on Defendant's request, Dr. Braco examined Plaintiff again. Defendant's request did not mention seizures. It related to Plaintiff having appeared to be in a fog or intoxicated. Dr. Braco – not one of Plaintiff's treating doctors – found Plaintiff had a "seizure disorder, described as an unusual type," and ostensibly applying the ACOEM LEO guidelines for seizures, found Plaintiff unfit. Dr. Braco's

assessment also discussed other concerns regarding Plaintiff. It is unclear what weight Dr. Braco placed on those other factors, as his primary determination related to seizures.

On December 1, 2016, Dr. Hamilton, Plaintiff's treating psychiatrist, wrote a letter detailing the length of time he had been treating Plaintiff, describing Plaintiff's prognosis as "stable functioning with her medical conditions being well controlled with her current medication regime, her excellent medication compliance, and her good coping mechanisms (particularly physical activity)," and assessing that Plaintiff was "fit for duty in her current employment."

On December 6, 2016, Elizabeth Cleveland, CNP, wrote to Defendant that Plaintiff's mental health had always been stable.

Between January 30, 2017, and February 6, 2017, Erica Spangler, APN, of INI, made several statements related to Plaintiff's fitness for duty. On January 30, APN Spangler reviewed Dr. Braco's November 29, 2016, examination of Plaintiff. APN Spangler told Plaintiff that Spangler was unable to provide a fit for duty determination using the LEO standards and she was unable to clear Plaintiff as fit for duty, but that she could "merely state from a seizure/[level of consciousness] standpoint and with the use of Topamax, there are no work restrictions." On February 1, APN Spangler wrote that Plaintiff was prescribed Topamax based on the 2014 and 2015 incidents, Plaintiff had no further episodes like those two, and "she does not have any work restrictions related to the previous events," but without information on the ACOEM LEO guidelines she could not speak to Plaintiff's fitness for duty. On February 6, APN

Spangler wrote an identical letter, but left off the qualifying language related to the ACOEM LEO guidelines.

On February 23, 2017, Dr. Petersen purported to apply National Fire Protection Association standards to Plaintiff, as applicable to a person with a seizure disorder. The record is unclear why NFPA standards were used for this exam. Unlike Dr. Braco, Dr. Petersen repeatedly acknowledged that Plaintiff *had not been diagnosed with a seizure disorder*, yet he employed a "tentative diagnosis" of a seizure disorder and found Plaintiff unfit.

On March 20, 2017, after Defendant took Plaintiff off paid leave and gave her the employment status ultimatum, APN Spangler wrote that Plaintiff did not meet the medical requirements of NFPA 1582, provided to Spangler by Defendant.

Finally, Dr. Kathuria, apparently returning to the ACOEM LEO guidelines Dr. Braco purported to apply, found Plaintiff unfit for duty. There is no explanation for why Dr. Kathuria went back to assessing Plaintiff under the LEO standards, or what portion of those standards he applied. In the record before the court, Dr. Kathuria provided no depth of analysis, simply checking a box that indicated Plaintiff was not fit for duty and writing, "per the 'Guidance for the Medical Evaluation of Law Enforcement Officers' (LEO) standards.'"

By the time of Dr. Kathuria's January 2019 update to his November 2018 fitness examination, Defendant was aware of the Pension Board's independent medical examiners' reports as discussed in the Board's April 2018 ruling. Those examinations provided a depth of information as to Plaintiff's condition, diagnoses, and abilities.

41

Defendant cites *Bay v. Cassens Transp. Co.*, 212 F.3d 969 (7th Cir. 2000) in support of its argument that Plaintiff was unable to meet the prerequisite of being able to operate a police squad car to patrol the city and enforce the traffic laws.

In *Bay*, the plaintiff was a commercial motor vehicle operator subject to Federal Department of Transportation ("DOT") certification requirements, including an examination by a physician applying DOT standards. The plaintiff's employer was required by federal law to obtain a physician's certification of fitness before it allowed its drivers on the road. After the plaintiff suffered a cardiac episode and doctors implanted a pacemaker, the defendant's physician determined the plaintiff did not meet the mandatory DOT standards. The plaintiff contended the defendant's doctor had applied the standards incorrectly. The plaintiff obtained an equivocal physician's opinion which still declined to certify the plaintiff pursuant to DOT standards. The parties went to mediation through the plaintiff's union's grievance process, and a physician ultimately applied the DOT standards and found the plaintiff fit for duty, whereupon the defendant restored the plaintiff to his job. The plaintiff then sued under the ADA, arguing the defendant should not have relied on the DOT exams that initially found him unfit. *Bay*, 212 F.3d at 971-72.

The Seventh Circuit held that the defendant was entitled to rely on the opinion of its physician, where the defendant's own physician was equivocal as to the defendant's ability to meet DOT standards, and where the defendant was prevented by federal law from allowing its employees to drive commercial motor vehicles unless a physician applying the DOT standards had found them fit for duty. *Bay*, 212 F.3d at 974-76.

42

*Bay* is clearly distinguishable. Here, the summary judgment record does not establish any mandatory requirements, federal or otherwise, like there were in *Bay*. Indeed, it appears Defendant has fluctuated between standards when it has applied any standard at all. Defendant includes a copy of the 2015 ACOEM LEO guidelines in its filings, (#18-3) at 2-14, and Plaintiff includes a copy of the 2007 NFPA 1582 standards in her filings, (#22-10) at 67 – (#22-12) at 8, but language from neither are presented as undisputed material facts. The parties' undisputed material facts do not establish what medical standard should apply, if Defendant had a policy as to which standard to apply, why Defendant's physicians went back and forth between standards, if there is even a functional difference between the two standards, and, crucially, if the standards Defendant employs were applied uniformly as to all its police officers.

The court finds that the remainder of the cases Defendant cites, related to Plaintiff's ability to meet the prerequisites for, or perform the essential functions of, a Decatur police officer, are also distinguishable from the instant case. See *Leverett v. City of Indianapolis*, 51 F. Supp. 2d 949, 952 (S.D. Ind. 1999) (ability to hear in both ears was reasonable per se requirement of employment as a firefighter); *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 577 (1999) (employer entitled to rely on DOT vision standards for commercial motor vehicle operator); *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 995–96 (10th Cir. 2001) (commercial motor vehicle operator subject to mandatory DOT physical evaluation entitled to apply DOT guidelines to find employee unfit due to seizures and antiepileptic drug prescription); *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 103 (2d Cir. 2003) (failed mandatory red/green differentiation vision test

supported summary judgment against city bus driver). None of these cases had the sort of intractable factual disputes present on the summary judgment record here.

Defendant cites *Michael v. City of Troy Police Dep't*, 808 F.3d 304, 309 (6th Cir. 2015), for the proposition that the court should not second guess the medical opinion of healthcare professionals, but should "assess whether the defendant's determination that plaintiff cannot safely perform her job functions is objectively reasonable, in that defendant relied on medical opinions that are objectively reasonable."

First, *Michael* purports to apply the "direct threat" standard, discussed later in this order, so it is not a perfect fit as Defendant employs it here. Although *Michael* is nonbinding out of circuit precedent, the court finds *Michael* persuasive as to this court's decision that Defendant is *not* entitled to summary judgment.

*Michael* is like this case in many ways. The plaintiff, a police officer, was deemed unfit for duty by the defendant's physicians due to neurological concerns and removed from the defendant's police force. The officer applied for disability benefits. The disability benefit examiners disagreed strongly with the defendant's doctors and found the plaintiff was fit for duty and was not entitled to disability. Further, the court discussed a body of nonmedical evidence of the plaintiff's "aberrant behavior," including threats of legal action, possible illegal steroid use, and recording of conversations, among others. *Michael*, 808 F.3d at 305-307. In that case, the defendants successfully argued that notwithstanding the contradictory medical records it was entitled to summary judgment based on its doctors' findings. *Michael*, 808 F.3d at 309.

The Sixth Circuit held that the employer rightfully relied on the nonmedical evidence in finding the plaintiff was unfit for duty. *Michael*, 808 F.3d at 309.

This court finds the dissent in *Michael* particularly persuasive. See *Michael*, 808 F.3d at 309-18 (Gilman, J., dissenting). The dissent points out that while a reasonable jury could credit the employer's medical examiners and find for the defendant, that result was by no means certain. The disability examiners had carefully assessed the plaintiff and made thorough and sometimes pointed disagreements with the employer's examiners' conclusions. Because the facts should have been viewed in the light most favorable to the plaintiff, the dissent would have submitted the evidence to a jury to determine if the plaintiff was a qualified individual. Further, the dissent contends, the nonmedical evidence was subject to interpretation and was not enough to warrant summary judgment for the employer. *Michael*, 808 F.3d at 317-18.

Here, the court finds the logic of the dissent in *Michael* to be persuasive. All the material factual disputes discussed above require a jury trial in this case.

The court takes note of Plaintiff's heavy reliance on the Pension Board and its medical examiners' critiques of Defendant's doctors' determinations regarding Plaintiff's fitness for duty. Perhaps that is natural, as the Pension Board's ruling fits well with Plaintiff's ADA claim. However, the court has not relied on the Pension Board's ruling in assessing the issues here, except as specifically identified in the analysis section of this order. The Pension Board's ruling and all the examinations of Plaintiff that the Board commissioned had not yet been completed at the time of Defendant's March 2017 actions, so the court is hesitant to give them any weight in this ruling.

45

Further, the Pension Board had before it the somewhat different task of applying Illinois police pension law, although the question was still, broadly, whether Plaintiff could do the job of a Decatur police officer. The Board's ruling is more useful in understanding the information that Defendant had when it withdrew its offer to reemploy Plaintiff, but that decision is not pivotal to this ruling even in such context.[2]

A factfinder could determine that Defendant considered its physician's findings, weighed them against all the records it had access to, and correctly decided to act against Plaintiff. A jury could also conclude the contrary and find for Plaintiff. Defendant's summary judgment motion must therefore be denied as to Defendant's argument that Plaintiff's health rendered her unable to meet the prerequisites for her job, prevented her from performing the essential functions of her job, or both.

c. Plaintiff's Emotional Stability and Firearm Safety

Defendant argues that Plaintiff was not a qualified individual because she lacked the required emotional stability and firearm safety skills to meet the prerequisites of her job, to perform the essential functions of her job, or both.

---

[2] The court would like to flag the Kafkaesque situation that Plaintiff (and, for that matter, the plaintiff in *Michael*) faced: Her employer found her medically unfit to do her job and sent her to the Pension Board. The Pension Board was adamant that Plaintiff *was* fit to do her job and sent her away. So, Plaintiff went back to her former employer, who offered to reemploy her. But then her employer continued to find that Plaintiff was medically unfit to do her job and rescinded the offer, *and now*, in this suit, wants to hold Plaintiff's disability pension application against her.

46

Plaintiff contends that these issues are immaterial, since Defendant's adverse actions were actually because of the fit for duty examinations, and that there is also at least a disputed issue of fact on this question.

The court finds a contested issue of fact precludes summary judgment.

First, many of the exhibits Defendant cites in support of its conclusory statements on these points themselves create an issue of fact. For example, many exhibits Defendant cites discuss an incident where a clerk at a Casey's General Store believed Plaintiff was intoxicated while on duty. The Casey's clerk called Defendant and spoke to several of Defendant's officers. Defendant carefully investigated the report, which was "unfounded," as there was no proof Plaintiff had done anything wrong. Inferences from this arc of facts could be drawn in favor of either party.

The incident regarding Plaintiff's firearm safety skills is likewise inconclusive. The court characterizes Defendant's evidence on this point as shaky: while at least one report of the incident appears to be firsthand, it is not a sworn declaration, and was prepared by an officer because the officer's chain of command required it. Further, even viewed without favor to either party, the report simply shows that on one single day Plaintiff behaved contrary to gun safety protocols. There is no evidence that Plaintiff was disciplined for, or could have been disciplined for, what happened at the gun range that one day. Defendant's inference that Plaintiff therefore "lacked the ability to develop skill in the use and care of firearms" runs counter to the requirement that the court construe the evidence in the light most favorable to Plaintiff. A jury could find

that while Plaintiff may have committed an error, it did not render her unable to meet the prerequisites of her job, perform the essential functions of her job, or both.

Did Plaintiff admit she was "drunk," or was she just "screwing around"?

Does Plaintiff swearing at an intern and her coworkers, and "blowing up" over getting a traffic ticket, render her so emotionally unstable she was unfit to serve as a police officer?

The court could continue to sift through the pile of exhibits Defendant cites for its conclusions on these points, and discuss additional reasons as to why there are factual disputes. The above discussion is enough. Defendant's support for these two conclusions is open to interpretation, and a jury is in the best position to perform that job.

The court finds that Plaintiff's purported emotional instability and lack of ability to develop and maintain firearm safety skills do not entitle Defendant to summary judgment. The undisputed material facts do not show Plaintiff was unable to meet the prerequisites of her job, or perform the essential functions of her job, for either reason.

3. *Whether Plaintiff Posed a Direct Threat to Her Own or Others' Safety*

Defendant argues that Plaintiff was a direct threat to herself, her colleagues, and the public, and was therefore not qualified to perform the essential functions of a Decatur police officer. Defendant's argument on this point is as follows:

> In this case, plaintiff's documented difficulties at the firing range, which occurred after years of training, demonstrate that she was not qualified to safely perform the essential job function of developing skill in the use and care of firearms.

Additionally, because of her history of seizure disorder and/or treatment
for seizure disorder, plaintiff was per se disqualified from operating
commercial vehicles, calling into question whether she was qualified to
safely perform the essential job function of patrolling the city to preserve
law and order, and apprehending violators of the traffic laws.

Plaintiff argues that the disputed issues of fact related to whether she could meet

the prerequisites of her job and whether she could perform the essential functions of her

job, i.e., whether she was a qualified individual, also preclude a finding in Defendant's

favor on the issue of whether she posed a direct threat.

An individual is not qualified to perform their job if they present a "direct

threat" to their own health and safety or that of others. *Darnell v. Thermafiber, Inc.*, 417

F.3d 657, 660 (7th Cir. 2005).

The determination of whether an employee poses a direct threat must be

premised upon "a reasonable medical judgment that relies on the most current medical

knowledge[,] the best available objective evidence, [or both,] and upon an expressly

individualized assessment of the individual's present ability to safely perform the

essential functions of the job." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002),

citing 29 C.F.R. § 1630.2(r). The determination that a significant risk exists must also be

objectively reasonable. *Bragdon v. Abbott*, 524 U.S. 624, 649–50 (1998).

To determine whether a risk is significant, the employer must consider: (1) the

duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood

that the potential harm will occur, and (4) the imminence of the potential harm. 29

C.F.R. § 1630.2(r); see also *Chevron*, 536 U.S. at 86; *Emerson v. N. States Power Co.*, 256

F.3d 506, 514 (7th Cir. 2001).

In this circuit, the burden of proving that an employee constitutes a "direct threat" rests with the employer. *Branham v. Snow*, 392 F.3d 896, 906–07 (7th Cir. 2004).

The court finds that the disputed issues of fact which the court discussed above regarding whether Plaintiff is a qualified individual also preclude summary judgment in Defendant's favor on the question of whether Plaintiff is not a qualified individual because she posed a direct threat.

The record does not provide any explanation of how or even whether Defendant assessed Dr. Braco, Dr. Petersen, and Dr. Kathuria's recommendations for objective reasonableness. The record does not show that Defendant took account of or considered the records from Plaintiff's treating providers. Of note is the letter by Dr. Hamilton, who on December 1, 2016, wrote of his treating relationship with Plaintiff, noted her excellent medication compliance, and stated that she was not restricted from duty. Also of note is APN Spangler's multiple statements that Plaintiff was not restricted from duty due to her treatment. Relevant to Defendant's January 2019 decision to rescind its offer to reemploy Plaintiff as a police officer are APN Spangler's statement that the NFPA 1582 standards *would* impact Plaintiff's ability to do her job, and the Board's medical examinations, which support inferences favorable to both parties.

The court would further note that Defendant has not shown, through undisputed material facts, that it considered *any* of the § 1630.2(r) factors independently from its retained physician's comments.

In its Reply (#26) Defendant argues this case is like *Reinacher v. Alton & S. Ry. Co.*, 203 F. Supp. 3d 958 (S.D. Ill. 2016). There, the plaintiff, a railroad carman, undisputedly

had two seizures.  A third episode was disputed.  After the third episode, the defendant placed the plaintiff on medical leave and did not permit him to work. The plaintiff pursued an ADA claim against the defendant. The case proceeded to a bench trial, the district court took evidence, made credibility determinations, made findings of fact, and ultimately ruled in favor of the defendant, finding the plaintiff posed a serious safety risk and was thus not a qualified individual. *Reinacher*, 203 F. Supp. 3d at 962. While *Reinacher* may bear some resemblance to this case, it is so distinguishable factually and in procedural posture that the court finds it wholly unpersuasive.

Defendant has not carried its burden to show that Plaintiff posed a direct threat, such that she was not a qualified individual as a matter of law.

IT IS THEREFORE ORDERED THAT:

1.  Defendant's Motion for Summary Judgment (#16) is DENIED.

2.  Plaintiff's Motion to Strike (#32) is GRANTED. The court directs the Clerk to STRIKE Defendant's Second Motion for Summary Judgment (#31).

3.  Defendant's Motion for Leave to File Second Motion for Summary Judgment (#34) is DENIED.

4.  This case remains set for a Final Pretrial Conference on April 12, 2021, at 1:00 p.m., and a Jury Trial on May 11, 2021, at 9:00 a.m.

ENTERED this 22nd day of March, 2021.

s/ Colin Stirling Bruce
COLIN S. BRUCE
U.S. DISTRICT JUDGE